# Exhibit 4

## In The Matter Of:
*DIRECTV, LLC v.*
*Spina, et al.*

*Craig Spencer*
*September 25, 2015*
*DIRECTV, LLC v. Spina, et al.*

**Smith Reporting**
400 North High Street - Suite 200
Muncie, Indiana 47305
1-800-700-3566 / 765.284.7836
www.smithreporting.net



Min-U-Script® with Word Index

Case 1:15-cv-00104-JMS-TAB   Document 65-4   Filed 11/16/15   Page 2 of 19 PageID #: 599
DIRECTV, LLC v. Spina, et al.
Craig Spencer
September 25, 2015

Page 1

```
  1         UNITED STATES DISTRICT COURT FOR THE
              SOUTHERN DISTRICT OF INDIANA
  2                 INDIANAPOLIS DIVISION

  3          CAUSE NO. 1:15-cv-00104-JMS-TAB

  4
     DIRECTV, LLC, a California     )
  5  limited liability company,     )
                                    )
  6       Plaintiff,                )
                                    )
  7       -vs-                      )
                                    )
  8  VICTOR A. SPINA, JR.,          )
     WILLIAM A. SPINA, and          )
  9  MARTINSVILLE CORRAL, INC.,     )
                                    )
 10       Defendants.               )

 11

 12      THE DEPOSITION UPON ORAL EXAMINATION OF:

 13

 14                  CRAIG SPENCER

 15  the deponent produced and sworn before me,
     Joyce E. Shinault, a Notary Public at large
 16  in and for the State of Indiana, taken on
     behalf of the Defendants, at the offices of
 17  Overhauser Law Offices, 740 West Green
     Meadows Drive, Suite 300, Greenfield,
 18  Indiana, on September 25, 2015, commencing at
     2:00 p.m., pursuant to the applicable rules
 19  of procedure.
```

Page 2

```
  1              A P P E A R A N C E S

  2
     ON BEHALF OF THE PLAINTIFF:
  3
         Christopher Hufnagel, Esq. (Via phone)
  4       LONSTEIN LAW OFFICE, P.C.
          P.O. Box 351
  5       80 North Main Street
          Ellenville, NY 12428
  6       chufnagel@signallaw.com

  7

  8  ON BEHALF OF THE DEFENDANTS:
  9
         Paul Overhauser, Esq.
 10       OVERHAUSER LAW OFFICES, LLC
          740 West Green Meadows Drive, Suite 300
 11       Greenfield, IN 46140
          poverhauser@overhauser.com
```

Page 3

```
  1               INDEX OF EXAMINATION
                                              PAGE
  3  DIRECT EXAMINATION........................4
         QUESTIONS BY MR. OVERHAUSER

  5  CROSS-EXAMINATION........................65
         QUESTIONS BY MR. HUFNAGEL



  9               INDEX OF EXHIBITS
                                              PAGE
 11  DEPOSITION EXHIBIT NO.

 12  1 -   Indiana Secretary of State
              Business name search.............5

 14  2 -   SAS Invoice.......................14

     3 -   SAS Invoice.......................19

 16  4 -   Martinsville Corral, Inc.
              Check #4819......................20

 17  5 -   E-mail 4-29-15....................29

 18  6 -   Affidavit.........................32

 19  7 -   Text messages.....................50
```

Page 4

 1    (The witness is sworn by the court
 2  reporter at 2:10 p.m., at which time the
 3  following proceedings are had:)
 4        CRAIG SPENCER,
 5  having been first duly sworn to tell the
 6  truth, the whole truth, and nothing but the
 7  truth relating to said matter, is examined
 8  and testifies as follows:
 9  DIRECT EXAMINATION,
10     QUESTIONS BY MR. OVERHAUSER:
11  Q. Mr. Spencer, my name is Paul Overhauser. Can
12     you please state your name and address for
13     the record, please?
14  A. It's Craig Spencer, 833 Old Greenville
15     Highway, Apartment 112, Clemson, South
16     Carolina 29631.
17  Q. And we're here at this date and time because
18     it was the date that you suggested because I
19     understand your son is getting married in
20     Ft. Wayne?
21  A. That is correct.
22  Q. Okay. So you happened to be in town for
23     that?
24  A. Yeah.
25  Q. But you're here voluntarily, right?

Page 5

1  A. Yes, sir.
2  Q. Mr. Spencer, do you own a business?
3  A. Yes, I do.
4  Q. What is that?
5  A. It's Superior Antenna Systems, also known as
6     SAS Digital.
7  Q. And what business is SAS Digital in?
8  A. We do a lot of different things. DIRECTV
9     happens to be one of them. We also install
10    video surveillance cameras, TVs, all types of
11    home entertainment stuff.
12 Q. Are you the sole owner?
13 A. I am.
14 Q. When did this business begin?
15 A. 1994.
16 Q. Have you been a DIRECTV reseller continuously
17    since then?
18 A. Yes, I have.
19 Q. Has anyone else ever been involved with you
20    with this business?
21 A. I did have a partner at one time, but that
22    was dissolved in 2005.
23 Q. Who was that partner?
24 A. His name was Randy Maxwell.
25          (Whereupon, Exhibit No. 1 was

Page 6

1     marked for identification.)
2     BY MR. OVERHAUSER:
3  Q. Okay. Let me show you what's been marked as
4     Exhibit 1. This is a printout from the
5     Indiana Secretary of State. It seems to say
6     that the company -- was this Maxwell
7     Enterprises, Inc.? Was that the company?
8  A. Yes.
9  Q. It says it was dissolved and became inactive
10    on July 15th of 2010. Is that correct?
11 A. Yes.
12 Q. Okay. Did the business continue following
13    the dissolution of the corporation?
14 A. Yes.
15 Q. So you continued running SAS Digital in your
16    own name as a proprietorship?
17 A. That is correct.
18 Q. After the dissolution, was there any change
19    in the day-to-day operation of the business?
20 A. No.
21 Q. Well, after the dissolution, was there any
22    change in how you interacted with DIRECTV or
23    SAS's customers on a day-to-day basis?
24 A. No, there was not.
25 Q. Okay. What are residuals?

Page 7

1  A. That is a -- that is money that's paid
2     monthly on certain accounts. It's changed a
3     lot over the last 10, 15 years. But
4     basically it's accumulated customers, and
5     you're paid a fee of -- just depending on how
6     many installs you do or how far back they go
7     as far as like back when PrimeStar was part
8     of -- or PrimeStar got bought by DIRECTV,
9     there was some residuals that I get paid a
10    certain amount for. And then there's
11    customers that I installed, that type of
12    thing. But it's just like a monthly bonus, I
13    guess I would say.
14 Q. Okay. Do you presently receive residuals
15    from DIRECTV for subscriptions that you or
16    the corporation installed?
17 A. I do.
18 Q. Okay. I'll tell you what, this afternoon
19    I'll use the term SAS to refer to your
20    business whenever it was done by the
21    corporation or by you individually.
22 A. That's fine, yes.
23 Q. So is SAS an authorized retailer for DIRECTV
24    today?
25 A. Yes.

Page 8

1  Q. And it's been authorized since what, 1994,
2     1995?
3  A. Somewhere in that area, yeah.
4  Q. Okay. And has SAS continuously been
5     authorized since then to install DIRECTV
6     equipment and sign up DIRECTV residential and
7     commercial subscribers?
8  A. Yes.
9  Q. And does DIRECTV itself activate DIRECTV
10    receivers?
11 A. They're the ones that we contact to call to
12    activate equipment. That is correct, yes.
13 Q. Okay. And has DIRECTV told you that persons
14    that watch DIRECTV using an activated DIRECTV
15    receiver are authorized to view the DIRECTV
16    programming?
17 A. Yeah. Yes.
18 Q. Does SAS have a DIRECTV dealer number?
19 A. Yes, it does.
20 Q. And what is that?
21 A. 1311782.
22 Q. Is that the same dealer number you've had
23    since --
24 A. Since day one, yep.
25 Q. And do you personally perform some of the

**Page 9**

1  installations?
2  A. I have, yes.
3  Q. Okay. And do you also use independent
4     subcontractors to install some systems?
5  A. For the majority of them, yes. They were
6     conducted by -- the installations are done by
7     contractors, that is correct.
8  Q. What happens when one of SAS's independent
9     contractors installs a system for SAS?
10 A. Basically, they're given my dealer number so
11    they can complete the activation of the
12    system.
13 Q. So they contact DIRECTV to --
14 A. At the end of the installation they would
15    call them and activate the receivers, that is
16    correct.
17 Q. Okay. And by activating a receiver, does
18    DIRECTV authorize the -- its programming to
19    be displayed on that receiver?
20         MR. HUFNAGEL: I'm going to object
21    to that question. You're calling for a legal
22    conclusion with authorization.
23         BY MR. OVERHAUSER:
24 Q. You can go ahead and answer.
25 A. Well, I'm sorry --

**Page 10**

1  Q. I'll restate the question. So when DIRECTV
2     activates a receiver, does that mean that
3     people can watch the DIRECTV programming
4     using that receiver?
5  A. Yes.
6  Q. Okay. Now, do you know Bill and Victor
7     Spina?
8  A. Yep. Known them for 30 years.
9  Q. Really?
10 A. Yeah.
11 Q. Are you familiar with their business
12    operations?
13 A. Somewhat, yeah.
14 Q. And how long -- so you've known them for how
15    long?
16         MR. HUFNAGEL: Objection --
17 A. I'd say it's over 30 years. I'm sorry.
18         MR. HUFNAGEL: I want to state an
19    objection on the record. That was asked and
20    answered already.
21         MR. OVERHAUSER: Okay.
22         BY MR. OVERHAUSER:
23 Q. So they knew you ran SAS and that it was a
24    DIRECTV retailer?
25 A. Yeah, sure.

**Page 11**

1  Q. Now, did the Spinas run a Damon's restaurant
2     in Martinsville in the 2000s?
3  A. Yes, they did.
4  Q. And what happened to it?
5  A. I believe it went out of business.
6  Q. Okay. Are you aware of any requests by the
7     Spinas to have a DIRECTV system installed?
8  A. At the business?
9  Q. Yes.
10 A. No.
11 Q. Are you aware that the Spinas wanted to get
12    DIRECTV in their business?
13 A. That had been discussed, right.
14         MR. HUFNAGEL: Paul, can you
15    clarify what you're talking about when you
16    say "business"?
17         MR. OVERHAUSER: Oh, I'm sorry.
18    That's a good point.
19         BY MR. OVERHAUSER:
20 Q. Did the Spinas -- are you aware that the
21    Spinas wanted to get DIRECTV in their
22    restaurant in Martinsville?
23 A. Like I said, I was -- yes.
24 Q. Okay.
25 A. I would say that we had talked about it. But

**Page 12**

1     as far as I knew, it had never been pursued,
2     so...
3  Q. Okay. And was the address of that the 610
4     Birk Road in Martinsville?
5  A. I believe that's the address, yes.
6  Q. Okay. Are you familiar with that location?
7     Have you seen what -- I guess, what is there
8     now? Is that a Texas Corral?
9  A. Texas Corral, I believe it is, yes.
10 Q. Okay. And so the Spinas asked about getting
11    an installation of DIRECTV with multiple
12    televisions for the Martinsville restaurant?
13 A. We had talked about it at one time, yes.
14 Q. And when you talked about it, was that
15    restaurant still called Damon's?
16 A. I don't believe so. I think they were in the
17    process -- I think they still had the
18    building and they were in the process of
19    changing it over to a different restaurant,
20    which I guess is now called the Texas Corral.
21 Q. Well, did any of SAS's contractors go out to
22    install DIRECTV there?
23 A. Apparently so.
24 Q. Okay. Now, did SAS supply the equipment, the
25    DIRECTV equipment, for that installation?

Case 1:15-cv-00104-JMS-TAB   Document 65-4   Filed 11/16/15   Page 5 of 19 PageID #: 602
DIRECTV, LLC v. Spina, et al.
Craig Spencer
September 25, 2015

Page 13

1  A. I would say so, since we're having this
2     conversation.
3  Q. Okay. So did SAS supply the antenna and all
4     of the receivers?
5  A. I would say that we did, yeah.
6  Q. Okay. And did SAS deliver all of that
7     equipment to the restaurant?
8  A. Well, SAS didn't, but my contractor
9     apparently did.
10 Q. Okay. So after the installation was
11    completed, what did the contractor do?
12 A. Basically he brought me back a work order
13    stating that he installed DIRECTV at the
14    Spinas' residence.
15 Q. Okay.
16 A. So at that point I found no problem with it.
17 Q. Okay. So did the subcontractor do anything
18    to activate the system?
19 A. Did he do anything? He had to make a phone
20    call to DIRECTV to activate it.
21 Q. So DIRECTV did the activation after a -- upon
22    a phone call from the contractor?
23 A. Right.
24 Q. Okay. So after DIRECTV activates a receiver,
25    does that make it ready to receive --

Page 14

1  A. Yes.
2  Q. -- DIRECTV programming?
3  A. Yes, it does.
4  Q. Okay. Now, do the receivers -- do the
5     DIRECTV receivers, do they like receive and
6     decrypt the DIRECTV programming?
7  A. Right. There's a RID number and an access
8     card number that have to be matched up and
9     married up within the DIRECTV's computer
10    system from my knowledge, you know, for it to
11    receive the programming. So yeah, I guess...
12 Q. Okay.
13 A. Yes.
14 Q. Okay. Well, you mentioned that SAS delivered
15    all the equipment out to the restaurant for
16    this.
17 A. Uh-huh.
18 Q. But at the time it was, you know, delivered
19    out there for the installation, was it
20    actually open for restaurant business?
21 A. Not to my knowledge it wasn't, no.
22 Q. Okay. But it later opened as a restaurant?
23 A. I believe so, yeah. And I think it's still
24    there.
25    (Whereupon, Exhibit No. 2 was

Page 15

1     marked for identification.)
2     BY MR. OVERHAUSER:
3  Q. Let me show you what's been marked as Exhibit
4     Number 2. Is this an invoice from SAS to
5     Texas Corral for work relating to this
6     installation?
7  A. Well, as you see on this, it shows LCD TVs
8     and mounts.
9  Q. Okay. So those would be the TVs on which
10    the --
11 A. Which I do do that kind of stuff, and I
12    actually did that installation of that stuff
13    right there, the TVs and stuff.
14 Q. Okay. And this is dated what, June 7, 2009,
15    is that correct?
16 A. That is correct.
17 Q. And it says on here, "sales rep, Craig." Is
18    that you?
19 A. That'd be me.
20 Q. Okay. So maybe I already asked you this. If
21    I did, I'm sorry. But once the installation
22    is complete, when DIRECTV activates the
23    account, that's what authorizes the TV
24    programming on it?
25 A. Yes.

Page 16

1  Q. Okay. Now, did you ever give Bill Spina or
2     Victor Spina or anyone else any reason to
3     believe that the receipt or display of
4     DIRECTV programming on the receivers at the
5     Martinsville Texas Corral was not authorized?
6  A. No, because basically I wasn't aware that
7     they had DIRECTV programming at the
8     restaurant. So I believe what happened was
9     that the contractor told them that there was
10    no problem with it. My guy, the Mark Lavance
11    guy that did the installation and the sale
12    part of it on his own, is the one that
13    basically told them to --
14 Q. To get it going?
15 A. Yeah.
16 Q. Have you ever been in the Texas Corral
17    Restaurant in Martinsville?
18 A. Yeah, I have. Uh-huh.
19 Q. So you've been there since it's opened. Have
20    you observed -- have you noticed there's
21    DIRECTV --
22 A. Actually, I haven't been there since it's
23    opened.
24 Q. Oh, you haven't?
25 A. No. I mean, the work that I did here, like

Page 17

1  installing TVs and stuff, that was all done
2  before that place ever opened. So as far as
3  have I been in there since it opened, no, I
4  have not.
5 Q. Okay. Now, did the Spinas ever ask about
6  installing any other DIRECTV equipment beyond
7  Martinsville?
8 A. I believe they had asked me about Shelbyville
9  at one point, and they've kind of went away
10  from that. And I think that's where Mark got
11  ahold of them again and told them he would
12  just add those receivers to their residential
13  account, which apparently they didn't have.
14 Q. Okay. And when you say Mark, you're talking
15  about --
16 A. The subcontractor that did the job.
17 Q. Okay.
18 A. Right.
19 Q. And his name is Mark Lavance?
20 A. Yes.
21 Q. And was the Shelbyville address for the other
22  location, was that the 2103 Intelliplex
23  Drive?
24 A. Yeah, if you say it is. I really don't know
25  exactly what the address is on that.

Page 18

1 Q. Okay. So when the Spinas had a discussion
2  about the Shelbyville restaurant, was it
3  before or after it had opened?
4 A. Before.
5 Q. Okay.
6 A. Because actually, I did, me personally, did
7  some video surveillance work out there on
8  that restaurant as well. I installed a video
9  surveillance system for them at that
10  restaurant.
11 Q. Okay. And did SAS provide DIRECTV equipment
12  for the Shelbyville installation?
13 A. Again, I'm going to have to say yes, because
14  that's why we're here, again, because
15  apparently equipment that I purchased through
16  my dealer number was activated at that
17  restaurant.
18 Q. Okay. And so the contractor completed that
19  installation, and did they also provide the
20  subscription information to DIRECTV for the
21  DIRECTV receivers that had been installed in
22  Shelbyville?
23 A. I mean, I'm going to have to say yes, on
24  that. I mean, I personally can't say what
25  was said by the installer. But I'm going to

Page 19

1  assume that it was since it was activated.
2 Q. Okay. And again, you've been out at that
3  building before to do some work?
4 A. Yes, I have been to the one in Shelbyville.
5  I just didn't remember the address of it. I
6  couldn't tell you what it was.
7 Q. Okay. Well, when you were out there doing
8  the work, was the restaurant opened or was
9  it --
10 A. No.
11 Q. -- before it opened?
12 A. It was before it opened.
13 Q. Okay.
14         MR. HUFNAGEL: I'm going object to
15  that, Paul. You've already asked that and
16  it's already been answered.
17         MR. OVERHAUSER: Okay.
18         (Whereupon, Exhibit No. 3 was
19  marked for identification.)
20  BY MR. OVERHAUSER:
21 Q. All right. Let me show you Exhibit 3.
22 A. Uh-huh.
23 Q. Is this an invoice for work done at the
24  Shelbyville location?
25 A. It is.

Page 20

1 Q. Okay. And is this your handwriting on
2  Exhibit 3?
3 A. Yep, I believe it is.
4 Q. And how much did SAS charge for this work?
5 A. Looks like it's $598.13.
6         (Whereupon, Exhibit No. 4 was
7  marked for identification.)
8  BY MR. OVERHAUSER:
9 Q. And let me show you Exhibit 4. This appears
10  to be a canceled check payable to Craig
11  Spencer for $598.13, dated November of 2011.
12  Would you agree with that?
13 A. Yep, I sure would.
14 Q. And is that your signature on the endorsement
15  area on the back of the check?
16 A. It is, and my driver's license number as
17  well.
18 Q. Okay. And is this the payment for the
19  invoice shown in Exhibit 3?
20 A. Yep, sure looks like it.
21 Q. Okay. So following the installation at the
22  Shelbyville restaurant, was the receipt of TV
23  programming through the receivers there
24  authorized by DIRECTV?
25         MR. HUFNAGEL: I'm going to object

Case 1:15-cv-00104-JMS-TAB   Document 65-4   Filed 11/16/15   Page 7 of 19 PageID #: 604

DIRECTV, LLC v. Spina, et al.
Craig Spencer
September 25, 2015

**Page 21**

1  to that, Paul. You're calling again for a
2  legal conclusion.
3  BY MR. OVERHAUSER:
4  Q. Did you ever give Bill or Victor Spina any
5     reason to believe that they were not
6     authorized to receive or display DIRECTV
7     programming?
8  A. No. Me personally, I did not, no.
9  Q. So just so I'm clear, all of the DIRECTV
10    receivers in Martinsville and Shelbyville
11    were supplied by SAS?
12 A. Uh-huh. They were bought -- purchased by me
13    through DSI and activated under my dealer
14    number. So there's no denying that, no.
15 Q. So who is DSI?
16 A. DSI is one of DIRECTV's equipment
17    distributors.
18 Q. Okay.
19 A. They have different distributors throughout
20    the country that provide the equipment to,
21    say, people like myself that have businesses.
22    And then that's who -- it all goes through
23    the distributor and then it goes to me and
24    then it gets activated by, you know, myself
25    or a contractor or whatever.

**Page 22**

1  Q. Okay. Now, in this lawsuit, DIRECTV's
2     complaints say that Victor Spina had DIRECTV
3     receivers in his residence and that he moved
4     them over to the restaurants. Do you have
5     any knowledge of that happening?
6  A. No. I have no way of knowing that, no.
7  Q. Okay. Have you ever been contacted by
8     DIRECTV about this lawsuit?
9  A. Yes, I have.
10 Q. How were you first contacted?
11 A. By a gentleman by the name of Jose Cruz in, I
12    believe, California.
13 Q. And do you remember when that was?
14 A. Oh, gosh. I think it was back in April.
15 Q. April of 2015?
16 A. Yes.
17 Q. Okay. Did you talk to him on the phone?
18 A. Yes, I did.
19 Q. And what did he say?
20 A. He had called to ask me about the Spinas, and
21    knowledge of them, and that they were in the
22    process of filing a lawsuit against me, my
23    company personally.
24 Q. So, I'm sorry, who was filing a lawsuit
25    against you?

**Page 23**

1  A. They told me the Spinas were filing a lawsuit
2     against Superior Antenna Systems or SAS
3     Digital or Craig Spencer or whoever you want
4     to say, and, you know, against me and
5     DIRECTV.
6  Q. So DIRECTV told you that the Spinas were
7     suing you?
8  A. Yes, they did.
9  Q. What did he want?
10 A. He wanted to -- basically, about the same
11    questions that you're asking me right now.
12    And if I had any knowledge of them installing
13    those receivers in that restaurant. And I
14    told him no, I did not know that, that
15    they -- at that time, you know, the whole
16    family, uncles, aunts, relatives, everybody
17    had had DIRECTV through my company. And I
18    just assumed that they were talking about,
19    you know, residential stuff.
20    And then they told me that they had
21    installed them in these restaurants and did I
22    have any knowledge about it. And I said, no,
23    I don't.
24 Q. Okay. Well, did Mr. Cruz ask you to talk to
25    any attorneys for DIRECTV?

**Page 24**

1  A. I believe I talked to Chris and Julie
2     Lonstein.
3  Q. Okay. Was that in a conference call or
4     something?
5  A. Yes, it was. Between them and DIRECTV and
6     myself.
7  Q. And was the DIRECTV person, Mr. Cruz?
8  A. As well as I think there was one or two other
9     people from DIRECTV. I'm not sure. But,
10    yes.
11 Q. You don't remember their names?
12 A. No, I do not.
13 Q. Well, you said that -- who was it that had
14    told you that you had been sued by Bill or
15    Victor Spina?
16    MR. HUFNAGEL: Asked and answered.
17    Let's move on, Paul.
18    BY MR. OVERHAUSER:
19 Q. Was it anyone besides Mr. Cruz?
20 A. I believe it was the gentleman that we're
21    talking to on the phone and Julie Lonstein
22    and the people at DIRECTV.
23 Q. And the person we're talking to on the phone
24    is -- you mean, Chris Hufnagel?
25 A. Yes.

Page 25

1  Q. So DIRECTV, Julie Lonstein, and Chris
2     Hufnagel all told you that you had been sued
3     by Bill and Victor Spina?
4  A. Yes.
5  Q. Were you surprised to hear that?
6  A. Yes, I was.
7  Q. Did you later find out -- I mean, have you
8     found --
9  A. Yes, I'd actually called Bill and asked him
10    what's going on. He's like well, DIRECTV
11    shut all our stuff off and they're filing a
12    lawsuit against me. And I was like, well,
13    they're telling me that you're suing me too.
14    And he goes no, we're not suing you for
15    anything.
16 Q. Okay. So did you explain to them how the
17    installations occurred in the two restaurants
18    the same way you have told me?
19 A. To the best of my knowledge. You know, it's
20    all speculation, but yeah, I did explain to
21    them what I thought had happened.
22 Q. And what was DIRECTV's response during that
23    phone call?
24 A. Well, they -- they kind of just asked me the
25    questions. And then once we were all done,

Page 26

1     they asked each other via the phone if
2     anybody else had any more questions for me.
3     And they said no, and that's basically where
4     it went. We hung up and I thought it was
5     over.
6  Q. Okay. Did they ask you whether any receivers
7     had been moved from a residence to the
8     restaurant?
9  A. Yeah, but I would have no knowledge of that
10    if that were the case. So I was -- you know,
11    no.
12 Q. So you didn't tell them that the Spinas had
13    taken receivers from their houses to the
14    restaurant?
15 A. No, I did not tell them that.
16 Q. Okay.
17 A. No.
18 Q. Did you tell DIRECTV that the Spinas had no
19    reason to believe that they were not
20    authorized to use DIRECTV programming at the
21    restaurants?
22 A. Well, I assumed, or they wouldn't have done
23    it. Because like I said, I've known Bill
24    since high school, and I've always known him
25    to be a straight-up honest man. So I told

Page 27

1     them I thought if he thought he was doing
2     something wrong, he wouldn't have done it.
3  Q. What happened after you told the people on
4     the call this?
5  A. Basically, it got kind of quiet, and Julie
6     Lonstein asked if anybody else had any more
7     questions they wanted to ask me, and nobody
8     did. And I kind of sat there for a minute,
9     and they said okay, thank you.
10 Q. Did they --
11 A. And later on I was contacted by, I believe,
12    Chris to sign an affidavit.
13 Q. Well, during that initial call did they ask
14    you any information about the people or
15    contractors that actually did the
16    installations?
17 A. Let me think. I don't remember. I want to
18    say they may have. But when I told them
19    about using the subcontractors, that's when
20    it all kind of got quiet, you know, when I
21    said I have subcontractors that did most of
22    work for me.
23 Q. So during this call you told them about the
24    use of contractors --
25 A. Uh-huh.

Page 28

1  Q. -- or subcontractors?
2  A. I did.
3  Q. And what was the reaction of the people on
4     the phone to that?
5  A. I think that's when Julie kind of -- I can't
6     remember. Gosh, you're asking me something
7     that happened six months ago almost. I think
8     Julie kind of was happy about it, but I'm not
9     really sure. You know, it's hard to read
10    people over the phone, so...
11 Q. But she sounded more enthusiastic or
12    something like that?
13 A. Yeah, yeah.
14 Q. So was there anything else that was said
15    during the phone call?
16 A. No. I think that was pretty much it. I
17    thought -- like I said, I thought that it was
18    done and everybody was happy with the
19    resolution that we had. But I guess they
20    continued to pursue the Spinas for illegally
21    hooking stuff up, supposedly. So I don't
22    know. I'm not really sure. But I did get a
23    call --
24    MR. HUFNAGEL: Object --
25    THE WITNESS: I'm sorry.

Case 1:15-cv-00104-JMS-TAB   Document 65-4   Filed 11/16/15   Page 9 of 19 PageID #: 606

DIRECTV, LLC v. Spina, et al.
Craig Spencer
September 25, 2015

Page 29

1   MR. HUFNAGEL: No, you can finish.
2   I'm going to put an objection on the record.
3   Sorry.
4   BY MR. OVERHAUSER:
5 Q. Well, did you get anything from DIRECTV after
6   that phone call?
7 A. I did get an affidavit from Chris, asking me
8   to sign it, which I did, and returned it to
9   him.
10 Q. Let me show you --
11   MR. HUFNAGEL: Paul, before you
12   move on, I want to object to that whole line
13   of questioning as calling for hearsay. You
14   can continue.
15   (Whereupon, Exhibit No. 5 was
16   marked for identification.)
17   BY MR. OVERHAUSER:
18 Q. Okay. Let me show you what's been marked as
19   Exhibit 5. Is this the -- this appears to be
20   an e-mail dated April 29, 2015, from Chris
21   Hufnagel to you. Is that right?
22 A. Yep.
23 Q. And it says that attached is an affidavit.
24   Is that correct?
25 A. Yes.

Page 30

1 Q. Okay. And did you sign that affidavit right
2   away after you got the e-mail?
3 A. No, I waited quite a while before I returned
4   it.
5 Q. Now, why was that?
6 A. It seemed to have some inaccuracies to it
7   from what I originally stated to them. I
8   decided to go ahead -- I received a phone
9   call from somebody at DIRECTV -- which
10   actually made me turn it in to them rather
11   quickly -- again, stating the fact that the
12   Spinas were suing me and it would be in my
13   best interest to sign the affidavit and get
14   it back to Chris.
15 Q. Okay. So you got a phone call -- was that
16   the Jose Cruz person again that called you or
17   do you remember?
18 A. Actually, it was somebody different. It was
19   somebody that -- somebody that had to do with
20   vice president of operations or something.
21   I'm not really sure who it was. But he
22   sounded important enough that I called Jose
23   and said, hey, can you tell the guy that just
24   called me that I'll be signing that affidavit
25   and getting it back to Chris tomorrow, which

Page 31

1   I did the next day.
2 Q. Okay. So you said something about best
3   interest or something? What was that?
4 A. I'm not really sure. Basically the fact that
5   they were stating that, you know, that --
6   basically, again, the thing about the Spinas
7   pursuing a lawsuit against me personally, or
8   my company, and that it was best for me to,
9   you know, get that signed and get it back to
10   DIRECTV.
11 Q. Because they said if you signed it, then the
12   lawsuit against you would go away or
13   something?
14   MR. HUFNAGEL: I'm going to
15   object. That's calling for a hypothetical.
16   That's not what he stated.
17 A. It's kind of what I felt like, yeah, but
18   anyway...
19 Q. Well, have you since learned that, in fact,
20   the Spinas have not sued you?
21 A. Yes, I have.
22 Q. Okay. Now, did you ever have a -- did you
23   ever talk to Chris Hufnagel about this
24   affidavit?
25 A. I believe I did one time, maybe. Maybe twice

Page 32

1   at the most.
2 Q. Once or twice?
3 A. Yeah.
4   (Whereupon, Exhibit No. 6 was
5   marked for identification.)
6   BY MR. OVERHAUSER:
7 Q. Let me show you Exhibit 6, which is -- I
8   think this is the affidavit.
9 A. Is that the one from DIRECTV?
10 Q. Can you take a look at that and tell me is
11   that the affidavit that you -- that DIRECTV
12   sent to you?
13 A. Yes, it is.
14 Q. Okay. You mentioned before that there were
15   some things about this that may have been
16   misleading. I'd like to just go through that
17   and ask you about some of them. Let me start
18   with Paragraph 3. So Paragraph 3 -- I'll
19   just read it out loud. It says: "In 2009,
20   neither I nor SAS Digital, nor any SAS
21   Digital employee was authorized by DIRECTV,
22   LLC to solicit commercial subscriptions and
23   install satellite equipment for commercial
24   programming services."
25 A. That is correct. I believe we lost our

Case 1:15-cv-00104-JMS-TAB   Document 65-4   Filed 11/16/15   Page 10 of 19 PageID #: 607

DIRECTV, LLC v. Spina, et al.
Craig Spencer
September 25, 2015

Page 33

1  commercial dealer number sometime back in
2  mid-2000s. So no, we were strictly
3  residential.
4  Q. Well, at the time, in 2009, the corporation
5     was still around, right?
6  A. Yes.
7  Q. So you were doing the business through
8     Maxwell Spencer Enterprises, Inc., correct?
9  A. That is correct.
10 Q. Okay. So it was Maxwell Spencer Enterprises,
11    Inc. that had the dealership with DIRECTV,
12    correct?
13 A. Yes.
14 Q. So it was that corporation that was
15    authorized by DIRECTV to solicit commercial
16    and residential subscriptions, but not you
17    personally?
18 A. Well, I would say so, yeah. I mean...
19 Q. Okay. Let me ask you about Paragraph 5. Let
20    me just read that out loud to you. This one
21    says: "At no time in 2009, nor before or
22    thereafter, did I meet with either Victor or
23    William Spina regarding establishing an
24    account with DIRECTV to display or exhibit
25    DIRECTV satellite programming in the

Page 34

1  commercial establishment known as
2  Martinsville Texas Corral, located at 610
3  Birk Road, Martinsville, Indiana 46151."
4  A. Okay.
5  Q. Now, do you think there's any part of this
6     that might be a little misleading?
7  A. Yeah.
8  Q. How so?
9  A. Well, it says that I did not meet. And I
10    actually was doing business with them at that
11    time. And we did talk about it, but I didn't
12    initially install them. That was where my
13    contractor, the Mark Lavance guy, jumped in
14    there and basically took it upon himself to
15    do that stuff without my knowledge. And I
16    thought that they were just adding receivers
17    to the home account. But, you know,
18    apparently they weren't. So...
19 Q. But when you did business with the Spinas,
20    would you go out and meet with them usually,
21    or would you do it on the phone, or --
22 A. Sometimes it was on the phone. Did meet with
23    Bill at his office there in Martinsville a
24    couple times, which is a separate little
25    building that's attached to the 610 Birk

Page 35

1  address that we're talking about at times
2  here.
3  Q. Okay.
4  A. He has a separate office on the backside of
5     that building.
6  Q. Okay. But do you remember if you met with
7     them about DIRECTV at that time? Or was --
8     did you do the DIRECTV discussion on the
9     phone, or what?
10        MR. HUFNAGEL: Paul, one question
11    at a time, please. I'm going to object.
12    It's compound.
13    BY MR. OVERHAUSER:
14 Q. Okay. Let me just -- did you ever talk
15    about -- you mentioned before that you knew
16    that they were looking to get DIRECTV for the
17    Martinsville restaurant, right?
18 A. Right.
19 Q. So did you find that out through --
20 A. Or some sort of programming. I mean, yeah.
21    They were looking to get something. So at
22    that time, yes, I guess we did probably have
23    that conversation.
24 Q. But it might have been on the phone?
25 A. It could have been. You know, you're asking

Page 36

1  me something that happened six years ago
2  almost now.
3  Q. Okay. Well, I see that Paragraph 5 also
4     talks about a commercial establishment. Now,
5     when you had some kind of conversation with
6     the Spinas, had the restaurant opened yet?
7  A. There was no business there at that time,
8     that is correct.
9  Q. Okay. So the restaurant was not --
10 A. No.
11 Q. -- at that time a commercial establishment?
12 A. No, it was not.
13 Q. But when you had the conversation, it was
14    your understanding that in the future it
15    would become a commercial establishment,
16    right?
17 A. (No response.)
18 Q. Let me just rephrase the question.
19 A. Yeah.
20 Q. There had been some discussions about them
21    getting --
22 A. Yeah, yeah.
23 Q. -- DIRECTV or something?
24 A. They were looking at it, yeah. And basically
25    I think at that time I told them that

Page 37

1    commercial and residential were different at
2    that time.
3  Q. Okay. Let me read Paragraph 6 out loud.
4    Well, let me just go back to the -- you said
5    you were familiar with the building at 610
6    Birk Road in Martinsville?
7  A. Uh-huh.
8  Q. Is it pretty obvious from that building that
9    it's a restaurant building and not --
10 A. Well, it is right now, yes, sir.
11 Q. But is it obvious that it's not a residence?
12 A. Oh, yeah. Without a doubt.
13 Q. Okay.
14 A. Yes.
15 Q. All right. Let me go back to -- let me read
16   Paragraph 6 out loud. It says: "At no time
17   in 2009, nor before or thereafter, did I
18   visit or inspect the commercial location of
19   610 Birk Road, Martinsville, to establish a
20   quote for DIRECTV satellite services to be
21   used at said location."
22 A. Right.
23 Q. Okay. And, you know, as I read that, it
24   makes it sound like you didn't have anything
25   to do with getting DIRECTV installed there.

Page 38

1    But in 2009, it was your corporation that was
2    doing the business, not you personally,
3    right?
4  A. That is right, yeah.
5  Q. And again this Paragraph 6 talks about there
6    being a commercial location at that address,
7    correct?
8  A. Uh-huh.
9  Q. But at the time it was not yet a commercial
10   location because the restaurant hadn't
11   opened?
12 A. That's right.
13 Q. And this also talked about establishing a
14   quote. Do you always provide quotes before
15   you do any work?
16 A. Usually, yes.
17 Q. Okay.
18 A. People like to know what they're going to be
19   paying for something before they get it.
20 Q. But do you know if you provided a written
21   quote for the Spinas?
22 A. Um...
23 Q. Or did you just trust each other because --
24 A. Yeah, I mean, that's pretty much just the
25   friendship thing, what you say is what goes,

Page 39

1    usually. I mean, between friends, yeah.
2  Q. Okay. Let me read Paragraph 7 out loud. It
3    says: "At no time, in 2009 or ever, did I
4    personally install, nor did I authorize any
5    employee of SAS Digital to install DIRECTV
6    receivers or satellite dishes at the
7    commercial establishment known as
8    Martinsville Texas Corral located at 610 Birk
9    Road, Martinsville, Indiana 46151."
10       Now, this says that you did not
11   personally install --
12 A. Right.
13 Q. -- anything there, right?
14 A. Right. That is correct.
15 Q. And you didn't have an employee install it --
16 A. No, it would have been a subcontractor. I
17   had no employees.
18 Q. Okay. So a subcontractor did the
19   installation, right?
20 A. Yes.
21 Q. Okay. And just again, this Paragraph 7 also
22   uses the term commercial establishment, but
23   at the time it had not yet opened for
24   business, right?
25 A. No.

Page 40

1  Q. Okay. Let me read Paragraph 8 to you. It
2    says: "At no time in 2009, and at no time
3    prior or thereafter, did I represent to
4    Victor or William Spina that a residential
5    account was appropriate and suitable for use
6    inside a restaurant/commercial establishment.
7    The Spinas were never authorized by myself
8    nor SAS Digital to use residential services
9    and accounts for the public display of
10   DIRECTV satellite programming in commercial
11   locations."
12 A. Right.
13 Q. This kind of sounds to me as though you told
14   Victor or Bill that they were getting a
15   residential account in the first place. Is
16   that what you told them?
17       MR. HUFNAGEL: I'm going object to
18   that question. You're leading here, Paul.
19 A. Well, basically, as far as I knew that's what
20   they were getting, was residential accounts.
21   I was not aware that they were being
22   installed by my contractor in their location
23   at 610 Birk Drive.
24 Q. Okay. But just to be clear, SAS did provide
25   the DIRECTV equipment to the commercial

Page 41

1 location?
2 A. Yeah, we did. We sure did.
3 Q. Okay.
4 A. Yep. No denying that.
5 Q. And this also says the Spinas were never
6    authorized by myself or SAS Digital. That
7    kind of implies that, you know, to get the
8    programming, that you authorize them. But
9    who does the real authorization? Is it
10   you --
11 A. DIRECTV does the real authorization.
12 Q. Okay. So if this paragraph implied that you
13   were able to authorize it --
14 A. No.
15 Q. -- it's a little bit misleading?
16 A. Right.
17 Q. Okay. Tell me, how does the authorization
18   work?
19 A. Well, it can work several different ways.
20   You can build an account on a computer and
21   you can go through an automated system at the
22   end of installation where you don't even talk
23   to a representative at the time of
24   activation.
25      Or sometimes you actually do talk to

Page 42

1    a person that asks you questions about where
2    it's installed and how it was installed and
3    is everything working. And they send out an
4    authorization hit to the receivers and it's
5    activated.
6 Q. Okay. But does DIRECTV have to do something
7    to cause the receivers to be activated?
8 A. They have to marry the RID number and the
9    access card number to the receiver in order
10   for it to be activated.
11 Q. Okay. Just for the benefit of our court
12   reporter, you said a RID number?
13 A. Yeah, it's a Receiver Identification Number.
14 Q. Like R-I-D?
15 A. R-I-D.
16 Q. Okay. All right. Let me read Paragraph 9 of
17   that affidavit. It says: "At no time in
18   2011, neither before nor thereafter, did I
19   meet with either Victor or William Spina
20   regarding establishing an account with
21   DIRECTV to display DIRECTV satellite
22   programming in the commercial establishment
23   known as Shelbyville Texas Corral, located at
24   2103 Intelliplex Drive, Shelbyville, Indiana
25   46176."

Page 43

1    And again, this paragraph talks about
2    a meeting with the Spinas?
3 A. No.
4 Q. Okay. But did you do business with the
5    Spinas on the phone?
6 A. Yeah. I mean, normally when Bill wanted
7    something, he would call me up and say I need
8    a video surveillance system, hey, I want --
9    you know, I think possibly at that point
10   there, he may have asked me to install a
11   satellite dish at the -- up on top of his
12   dish -- or up on top of his roof because they
13   were looking to get DIRECTV service. So I
14   didn't realize that my contractor was the one
15   that was going out and installing this --
16   these receivers under my dealer number for
17   them.
18 Q. Uh-huh.
19 A. Yeah.
20 Q. And is this stuff you explained to --
21 A. I tried to explain to the best of my ability.
22   Yeah, I mean, again, you're asking me a lot
23   of stuff about things that happened a long
24   time ago. But I explained to Chris and Julie
25   and the people at DIRECTV, yeah.

Page 44

1 Q. Okay. And at the time you did the
2    installation at Shelbyville, was it at that
3    point a commercial establishment, or did --
4 A. No. There was -- I had never been in that
5    restaurant when it was up and running. Any
6    work I did there was before it ever opened.
7       MR. HUFNAGEL: Paul, I was going
8    to ask you to clarify. When you say
9    installation, what are you referring to and
10   when in time period?
11      MR. OVERHAUSER: I'm sorry. I was
12   talking about the installation at the
13   Shelbyville restaurant in 2011.
14      MR. HUFNAGEL: The installation of
15   what?
16      MR. OVERHAUSER: The DIRECTV
17   system.
18      MR. HUFNAGEL: Okay.
19 BY MR. OVERHAUSER:
20 Q. So just to confirm, Mr. Spencer, you
21   installed some DIRECTV equipment at the
22   Shelbyville --
23 A. I believe, if I remember right, when I went
24   and put up their video surveillance system, I
25   did put a dish on the top of their building

Page 45

1     for them. But as far as activating their
2     receivers, I told them that, you know, they
3     were going to have to find somebody else to
4     do that. And little did I know that it was
5     this guy that was working for me that was
6     going to go in there and hook up receivers
7     that were listed as a residential account,
8     you know.
9         I didn't know that until after the
10    fact, until Bill Spina actually called me --
11    or I called him after DIRECTV called me, and
12    said what happened, what's going on? And he
13    goes, well, your guy, when he hooked up my
14    receivers at Shelbyville and Martinsville,
15    told me that we could add these to my home
16    account, and, you know, didn't realize that
17    he was doing something wrong in activating
18    that equipment for him.
19        You know, he activated those
20    receivers under my dealer number and my
21    equipment that I had got from DSI. You know,
22    he's a subcontractor. He gets paid on
23    commission. And, you know, for him to go out
24    and add a receiver here or there, you know,
25    he got paid money to do that, by me. But I

Page 46

1     didn't realize that they were going in --
2 Q. Well, do you know whether the accounts at the
3     restaurant were set up under -- was the
4     account originally created, you know, at
5     about the time of the installation --
6 A. I would say so. Somewhere -- you know,
7     somewhere in that same time frame.
8 Q. Okay.
9 A. That's possible, yeah.
10 Q. Okay. So in Paragraph 10, it says you didn't
11    inspect the location to provide a quote for
12    DIRECTV satellite services, but you did go
13    out there and put in a DIRECTV --
14 A. Right, I did --
15 Q. -- antenna.
16 A. That is correct.
17 Q. Okay. And you got it wired -- as a part of
18    the --
19 A. I wired it all up, yeah, along with the video
20    surveillance system. Right.
21 Q. Okay.
22 A. Yep. I did.
23 Q. Okay. Paragraph 11, I'll read that. "At no
24    time, in 2011 or ever, did I personally
25    install, nor did I authorize any employee of

Page 47

1     SAS Digital to install DIRECTV receivers or
2     satellite dish at the commercial location
3     known as Shelbyville Texas Corral, located at
4     2103 Intelliplex Drive, Shelbyville, Indiana
5     46176."
6 A. Well, the receiver is part of it, yeah. But
7     the dish, you know, I just said I did do a
8     dish for them. But that was just for the
9     simple fact that I thought they were going to
10    pursue the commercial side of it and that way
11    they were ready to go. But as far as me
12    having an employee or myself, no, did not.
13 Q. But you now know that it was your contractor
14    that installed the DIRECTV receivers?
15 A. Yes.
16 Q. And caused DIRECTV to activate those
17    receivers?
18 A. Yeah. After I talked to Bill, we put it all
19    together what was going down. So...
20 Q. And again, when that happened, the restaurant
21    had not yet opened, correct?
22 A. No, it had not. No.
23 Q. Okay. Let me read Paragraph 13 out loud. It
24    says: "The first time I heard about the
25    claims of DIRECTV, LLC against the commercial

Page 48

1     establishments known as Martinsville Texas
2     Corral and Shelbyville Texas Corral was in
3     September 2014 when I was contacted by
4     William Spina via phone."
5         "I have known the Spina family since
6     high school and therefore was not surprised
7     to receive a call from William until I heard
8     what William was alleging. During that phone
9     call, William Spina stated to me that he was
10    aware that a technician had installed
11    satellite dishes and receivers at the two
12    business locations, and that he had paid the
13    installer to do that work. The phone call
14    was the first time I had any knowledge of any
15    receivers being installed" --
16 A. There you go.
17 Q. -- "in either business locations, or being
18    utilized by either business locations owned
19    by the Spinas."
20 A. That is correct.
21 Q. Okay. Now, let me just clarify one thing
22    here. This mentions that the call occurred
23    in -- I think it says September 2014. Do you
24    believe that's accurate, 2014?
25 A. Again, it could be. It could have been a

Page 49

1  month or two or three off, I reckon.
2  Q. Well, when you had the conversation with
3     William Spina, was it after you had had
4     the -- after you had been contacted by
5     DIRECTV?
6  A. Actually, yeah, it was. Because I didn't
7     have any knowledge about it until -- wait a
8     minute. Let me think about this. Actually,
9     I didn't have any knowledge about it -- all
10    this going down until after DIRECTV called me
11    and told me that they were naming -- you
12    know, that the Spinas were naming me in a
13    lawsuit.
14 Q. So that was in April of 2015?
15 A. I believe so, yeah.
16 Q. So it was just a mistake that -- the
17    affidavit that Chris Hufnagel put together
18    has September 2014, that was just a mistake?
19 A. Yeah, that, or I -- maybe just everything
20    going on, I possibly stated the dates wrong
21    or something. But yeah, I don't think I
22    originally knew about it until I was
23    contacted by Jose, to get ahold of them, that
24    they had questions about the Spinas' account.
25 Q. And that was in April?

Page 50

1  A. I believe that was in April. End of March,
2     first of April sometime.
3  Q. Of 2015?
4  A. Yes. Just six months ago or whatever.
5         (Whereupon, Exhibit No. 7 was
6     marked for identification.)
7     BY MR. OVERHAUSER:
8  Q. And let me ask you to take a look at
9     Exhibit 7. These appear to be text messages
10    between Bill and Spencer. Do you see that?
11 A. Yep.
12 Q. And it says -- they have a date on them of
13    April 7th, 6:04 p.m.?
14 A. Uh-huh.
15 Q. So are these the text messages that you sent
16    to Bill Spina?
17 A. After DIRECTV contacted me, that's right.
18    Looks like it was the first of April.
19    April 7th. Yeah.
20 Q. And you sent that right after you had been
21    contacted by DIRECTV about this lawsuit?
22 A. Yes, sir, I sure did. I wanted to know what
23    was going down.
24 Q. Okay. So you're pretty sure that the
25    September 2014 was just a mistake?

Page 51

1  A. I'm going to have to say, yeah, I believe it
2     was.
3  Q. Okay. And the reason you texted Bill, it
4     says -- well, the text message says:
5     "DIRECTV tells me you're naming me in a
6     lawsuit. What's up? Can you fill me in?"
7  A. Yes.
8  Q. And you thought that because DIRECTV had told
9     you --
10 A. That is correct.
11 Q. -- that Bill --
12 A. Sure did.
13 Q. Let me finish my question.
14 A. Oh, I'm sorry. I apologize. I'm just
15    reading you.
16 Q. But you sent that because DIRECTV had told
17    you that you had been sued by Bill and Victor
18    Spina?
19 A. Yes.
20 Q. And now you know neither of them have sued
21    you, correct?
22 A. That is correct.
23 Q. And you've later learned that it was DIRECTV
24    that's filed a lawsuit, not Bill Spina,
25    right?

Page 52

1  A. Against the Spinas, yes.
2  Q. Okay. Let's go back to this Paragraph 13
3     real quick. Let me see where it is. It has
4     a sentence that says: "This phone call was
5     the first time I had any knowledge of any
6     receivers being installed at either of the
7     business locations or being utilized at
8     either of the business locations owned by the
9     Spinas." Do you see that?
10 A. Uh-huh.
11 Q. Now, at the time you installed the DIRECTV
12    satellite in Shelbyville, it wasn't a
13    business location yet, correct, because it
14    hadn't opened?
15 A. No. There was no business there, operating
16    business, at the time of any of the work that
17    I did there.
18 Q. So technically, this sentence was accurate,
19    because it wasn't a business location?
20 A. No, it was not.
21 Q. Okay. And who actually drafted this
22    sentence? Who actually drafted section 13?
23    Is that something you wrote or did DIRECTV's
24    attorney do it?
25 A. I believe that DIRECTV took some information

Page 53

1  that I gave them. And I'm trying to figure
2  out the September 14th part -- or the
3  September 2014. Because actually the first
4  time I had talked to Bill about any of this
5  was back in April.
6  Q. Okay. You mentioned earlier that when you
7     first got the declaration shown in Exhibit 6,
8     that you didn't sign it because you thought
9     it was misleading?
10 A. Right.
11 Q. Why did you go ahead and sign it?
12 A. Because of the phone call that I received
13    from somebody at DIRECTV stating that they
14    were vice president of operations or
15    whatever. And that's where I called Jose and
16    told him to tell that man that I would get
17    that stuff sent to Chris right away.
18 Q. Well, was he making some kind of implied
19    threat?
20 A. Just the fact that the Spinas were filing --
21    that they were filing a lawsuit against me,
22    and it was probably in my best interest to
23    get that affidavit signed and back to Chris.
24 Q. So they made you think that if you signed the
25    declaration, that the lawsuit the Spinas had

Page 54

1     filed against you would go away?
2  A. They didn't really say that, but it was kind
3     of -- I felt like it was implied that way by
4     the gentleman that left the message, yes.
5  Q. And that would have been the vice president
6     of operations for DIRECTV?
7  A. And again, I'm not sure that that was the
8     vice president of operations. But they made
9     it sound like that was somebody really
10    important at DIRECTV.
11        MR. HUFNAGEL: Paul, I'm going to
12    object again to this line of questioning.
13    You're -- this is not reasonably calculated
14    to lead to the discovery of admissible
15    evidence, and it's calling for hearsay. I
16    want to state that on the record.
17        MR. OVERHAUSER: Okay.
18    BY MR. OVERHAUSER:
19 Q. Was there any suggestion that if you didn't
20    sign it, DIRECTV may take away your
21    residuals? Or were you concerned about that?
22 A. Yeah, I was concerned about it, sure.
23 Q. And you didn't want them -- you didn't want
24    to lose --
25 A. No, I still want to maintain an active

Page 55

1     relationship with DIRECTV.
2  Q. Okay. Let me read Paragraph 14. This one
3     says: "I did not perform any installations
4     at 610 Birk Road, Martinsville, Indiana
5     46151, or at 2103 Intelliplex Drive,
6     Shelbyville, Indiana 46176, nor did I
7     authorize or direct my employees to install
8     receivers for DIRECTV satellite programming
9     at the commercial locations known as
10    Martinsville Texas Corral and/or Shelbyville
11    Texas Corral."
12        Now, it says that, and again, it uses
13    this term, commercial establishments. But at
14    the time all this was going down for each
15    location --
16 A. Neither one of them had opened for business
17    at that point, no. That's right.
18 Q. Okay. And the person that installed and
19    activated the receivers -- well, I guess
20    DIRECTV activated them -- but the person that
21    installed the receivers was your contractor
22    and not you personally?
23 A. That is correct.
24 Q. And did you ever discuss your concerns with
25    Chris Hufnagel about, you know, the

Page 56

1     potentially misleading parts of this
2     declaration?
3  A. I think I did talk to Chris about it, and he
4     told me that it just wasn't really anything
5     to worry about and that it was truthful and
6     not misleading and go ahead and sign it.
7  Q. He told you it was truthful?
8  A. Man. I can't say what his exact words were,
9     but, I mean, I felt like, you know, I needed
10    to sign it and get it back to them.
11 Q. Okay. And you wanted to make sure you didn't
12    lose your residuals?
13 A. Yeah.
14 Q. Now, you've since learned that DIRECTV
15    disconnected its service to the Texas Corral
16    restaurants and sued the Spinas for over
17    $100,000, right?
18 A. Yeah. That's a lot of money.
19 Q. Do you think that DIRECTV had the right to
20    disconnect the service?
21 A. Oh, I suppose they had the right --
22        MR. HUFNAGEL: I'm going to object
23    to that question. Paul, you're calling for
24    speculation here. If you're going to
25    continue with this line of questioning, I

**Page 57**

1  think we need to get the judge on the phone.
2       MR. OVERHAUSER: Okay.
3  BY MR. OVERHAUSER:
4  Q. I mean, does it appear to you that DIRECTV
5     made a mistake when it initially opened the
6     accounts?
7       MR. HUFNAGEL: Objection. You're
8     calling for speculation.
9  A. I'd say somebody made a mistake.
10 Q. And do you know who made the mistake?
11 A. I would say that my contractor made a mistake
12    explaining to the Spinas that it was not a
13    big deal to do that.
14 Q. Okay. But it's DIRECTV's systems that record
15    whether an account is residential or
16    commercial, right? DIRECTV keeps track of
17    it, right?
18 A. Yeah, yeah. Sure.
19 Q. Well, given your 20 years of experience as a
20    DIRECTV representative, would there have been
21    any way for the Spinas to know that DIRECTV
22    had made a mistake?
23 A. No, not unless somebody brought it to their
24    attention.
25 Q. Do DIRECTV customers have access to DIRECTV's

**Page 58**

1     internal database?
2  A. No.
3  Q. Let me read you a paragraph from the
4     complaint that DIRECTV filed in this case.
5     It says: "Because equipment used with
6     DIRECTV services can be moved from
7     residential locations to commercial
8     establishments without DIRECTV's knowledge,
9     owners of commercial establishments wishing
10    to use DIRECTV's programming for their own
11    commercial gain at the lower residential
12    rates can surreptitiously gain access to
13    DIRECTV's programming without proper
14    authorization by subscribing to DIRECTV's
15    services under a residential account and then
16    installing/moving the equipment to their
17    businesses and utilizing those services in a
18    commercial environment."
19        Now, when you spoke to DIRECTV and
20    its attorneys in April of 2015, did you tell
21    them that the Spinas had never signed up for
22    a residential account?
23 A. No.
24 Q. Did you tell them that if their records had a
25    residential account that their records were

**Page 59**

1     wrong?
2  A. Did I tell DIRECTV that if they had a
3     residential account their records were wrong?
4     No, I don't believe so.
5  Q. Okay. Did you ever tell DIRECTV that you
6     witnessed the Spinas moving DIRECTV equipment
7     from a residence to a business?
8  A. No. I would have never -- like I said, I've
9     known Bill and Vic, and they wouldn't do
10    anything to do that. No. I don't believe
11    that. I don't believe that they did --
12    intentionally thought that they were going to
13    gain anything by doing anything wrong against
14    DIRECTV.
15 Q. When you spoke to DIRECTV and Chris Hufnagel
16    and Julie Lonstein during this call in April
17    of 2015, did you tell them during that call
18    that you had supplied the DIRECTV equipment
19    at the Texas Corral Restaurants?
20 A. Well, yeah, I mean, apparently I did, because
21    that's how they got ahold of me is my dealer
22    number is attached to those receivers. So,
23    yes, the answer would be yes.
24 Q. And you discussed that with them in April of
25    2015?

**Page 60**

1  A. I believe so.
2  Q. Okay. Just to be clear, when the contractor
3     installed the systems at the two Texas Corral
4     restaurants in 2009 and 2011, you were an
5     authorized DIRECTV retailer at the time,
6     weren't you?
7  A. Yes, I was, and I still am.
8  Q. And when DIRECTV activated and authorized
9     those DIRECTV receivers at the two Texas
10    Corral restaurants, you were still an
11    authorized DIRECTV retailer at the time?
12 A. Yes.
13 Q. And you're still an authorized DIRECTV
14    retailer today?
15 A. Yes, I am.
16 Q. Okay. Let me ask you a couple questions just
17    about how the DIRECTV system works.
18 A. Uh-huh.
19 Q. You need a DIRECTV antenna to receive DIRECTV
20    programming, right?
21 A. That is correct.
22 Q. And when a DIRECTV subscriber signs up for
23    service, they get a DIRECTV receiver,
24    correct?
25 A. That is correct.

Page 61

1 Q. Okay. Now, who actually owns the receiver
2    after it is delivered, DIRECTV or the
3    subscriber?
4 A. DIRECTV keeps ownership of all of their
5    equipment.
6 Q. It doesn't get sold to the customer?
7 A. No.
8 Q. Okay. When a DIRECTV subscription ends, what
9    happens to the DIRECTV receiver?
10 A. Sometimes they have the customer send the
11    equipment back, and sometimes they tell the
12    customer they can do with it what they want.
13    It just depends on the -- if that receiver is
14    compatible with their format they're using
15    today versus five years ago.
16 Q. Okay. Are DIRECTV signals encrypted before
17    they are transmitted from a ground-based
18    satellite?
19 A. Yes.
20 Q. And do those signals stay encrypted until
21    they are decrypted by a DIRECTV-owned
22    receiver that DIRECTV has activated?
23 A. Yes.
24 Q. Are persons that view decrypted DIRECTV
25    programming from a receiver that has been

Page 62

1    activated by DIRECTV authorized by DIRECTV to
2    view the programming --
3         MR. HUFNAGEL: I'm going to object
4    to that question, Paul. You're calling for
5    legal conclusions here.
6         MR. OVERHAUSER: Let me repeat it
7    again, just because there was some overtalk
8    due to the phone system here. And I
9    understand. We'll -- you can maintain your
10    objection.
11    BY MR. OVERHAUSER:
12 Q. Are persons that view decrypted DIRECTV
13    programming from a receiver that has been
14    activated by DIRECTV, authorized by DIRECTV
15    to view the programming?
16 A. Yeah, sure.
17         MR. HUFNAGEL: I'm going to object
18    again, you know, as to form.
19    BY MR. OVERHAUSER:
20 Q. Does DIRECTV continuously maintain control
21    over DIRECTV receivers?
22 A. Yes.
23 Q. How do they do that?
24 A. Through the RID number, the Receiver
25    Identification Number, and the access card.

Page 63

1 Q. And what can they do with that?
2 A. They can deactivate it whenever they feel the
3    need to deactivate it. If the customer
4    doesn't pay their bill, or if they find out
5    they're doing something wrong, I suppose they
6    can deactivate it at any time they want.
7 Q. Okay. Now, let's talk more about the TV
8    signals that come out of these systems.
9 A. Uh-huh.
10 Q. Is the TV signal that is output from an
11    activated DIRECTV receiver encrypted or
12    decrypted?
13 A. Oh, it's decrypted when it comes out of the
14    receiver.
15 Q. Okay. And can the TV signal that is output
16    from an activated DIRECTV receiver be input
17    into any conventional television for display?
18 A. Yes.
19 Q. So let me just make sure I got this right.
20    The DIRECTV signal is encrypted from the time
21    it is beamed up to the satellite and sent
22    down to the subscriber's antenna and then
23    into the DIRECTV receiver?
24 A. Yes.
25 Q. And DIRECTV owns all of that equipment?

Page 64

1 A. Yes.
2 Q. And the DIRECTV signal is not decrypted until
3    it comes out of the DIRECTV receiver, which
4    DIRECTV itself owns and activates?
5 A. Yeah. Yes.
6 Q. Okay. And the decrypted signal comes out of
7    a cable that's plugged into the back of the
8    DIRECTV receiver?
9 A. Right.
10 Q. And persons that watch DIRECTV programming
11    through a DIRECTV receiver that has been
12    activated by DIRECTV are authorized by
13    DIRECTV to watch?
14         MR. HUFNAGEL: Objection. Form.
15 A. Yeah.
16         MR. OVERHAUSER: No further
17    questions.
18         MR. HUFNAGEL: Mr. Spencer, I just
19    have a few questions for you today.
20         THE WITNESS: Yeah, go ahead.
21         MR. OVERHAUSER: Hang on just one
22    second. I need to make an objection to any
23    interrogation by Mr. Hufnagel. I mean, if
24    Julie is there, I have no problem with her
25    asking questions because she has appeared in

Page 65

1  this case.
2      Mr. Hufnagel, as I understand it, you
3  have not appeared. Is that correct?
4      MR. HUFNAGEL: That's correct.
5      MR. OVERHAUSER: Okay. So in this
6  case you do not represent DIRECTV before the
7  court, and consequently you are not
8  authorized to interrogate this witness. So I
9  object to any questions that you may ask.
10     MR. HUFNAGEL: Objection noted.
11     CROSS-EXAMINATION,
12     QUESTIONS BY MR. HUFNAGEL:
13 Q. Mr. Spencer, as you sit here today, are you
14    represented by an attorney?
15 A. No, I'm not.
16 Q. Did you meet with an attorney prior to today
17    to prepare for today's deposition?
18 A. No, I have not.
19 Q. Are you represented by Paul Overhauser?
20 A. No, I'm not.
21 Q. Did you meet with Paul Overhauser prior to
22    today's deposition?
23 A. No, I did not.
24 Q. Did you exchange any e-mails with Paul
25    Overhauser prior to today?

Page 66

1 A. The only thing I got from Paul was this --
2    this is what you sent about what...
3      MR. OVERHAUSER: Yeah, about
4  scheduling.
5      THE WITNESS: Just something from
6  the United States court thing here. That's
7  all I've got from him.
8      BY MR. HUFNAGEL:
9 Q. And what did it state, that document? Was it
10   a subpoena or what did it state on it?
11 A. It's United States District Court for the
12   Southern District of Indiana. DIRECTV
13   plaintiff versus Victor Spina. And it's just
14   got a thing with my address on it. And he
15   sent it to me airbill asking me to come here
16   at 10:00 this morning, which I could not do.
17     We scheduled it for 2:00 on the phone
18   yesterday when I called him at the last
19   minute and told him I couldn't be here at
20   10:00. And it says, enclosed is your
21   subpoena to testify. You are -- if you have
22   any e-mails or correspondence with DIRECTV or
23   Lonstein please bring them, which I didn't
24   have anything. So, no.
25 Q. So it was a subpoena you were served with

Page 67

1  when you said airbill, correct?
2 A. I guess so.
3 Q. Well, the document is entitled subpoena?
4 A. Yeah, it says subpoena to testify for
5  deposition in a civil action. And it's got
6  my name underneath it, right.
7 Q. Okay. That's what I wanted to establish.
8  Did you have any phone calls with Paul
9  Overhauser prior to today?
10 A. Just about he needed to do this thing that
11    we're doing now, and he was -- you know,
12    wanting to get with me or wanted to know if I
13    was going to be in Indiana anytime soon. And
14    this was about a month or so ago. And I said
15    I'll be up in Indiana, and we went ahead and
16    scheduled it for Friday at 10:00 and we had
17    to change it to 2:00. So other than that,
18    no. I've had no conversations with him or
19    the Spinas.
20 Q. So in that conversation, you just mentioned
21    that Paul Overhauser said you needed to do
22    this, is that correct?
23 A. Well...
24 Q. Isn't that what you just stated?
25 A. Yeah, I did state that.

Page 68

1 Q. Did he say why you needed to do it?
2 A. No, not necessarily. Just said that he
3  needed my attention on this matter.
4 Q. So he didn't -- did he threaten you in any
5  way?
6 A. No, no, not at all.
7 Q. Did he promise you anything?
8 A. No. Nothing. Why, can I get something? I'm
9  just -- I'm sorry. I'm just being funny.
10 Q. Did he compensate you in any way for your
11    attendance here today?
12 A. No, no. Actually, I left Martinsville this
13    morning, and I'm on my way to Ft. Wayne, and
14    Greenfield was on the way. So here I am.
15 Q. Okay. And have you reviewed any documents
16    prior to today's deposition to prepare?
17 A. No. No, huh-uh.
18 Q. And would you like to have a chance to review
19    the transcript that the court reporter is
20    taking today to possibly change any of your
21    answers prior to you signing that transcript?
22 A. No, I don't think so.
23     MR. HUFNAGEL: Thank you very
24  much. That's all the questions I have.
25     MR. OVERHAUSER: Thank you.

Page 69

1  (Deposition proceedings conclude
2  at 3:30 p.m.)
3
4  AND FURTHER THE DEPONENT SAITH NOT.
5
6  (Signature waived.)
7  _____
       CRAIG SPENCER

Page 70

1  STATE OF INDIANA   )
                      ) SS:
2  COUNTY OF SHELBY   )

3         CERTIFICATE OF COURT REPORTER

4      I, Joyce E. Shinault, the undersigned
   Court Reporter and Notary Public, residing in the
5  County of Shelby, State of Indiana, do hereby
   certify:
6
       That at the time and place described in
7  this transcript, the deponent, CRAIG SPENCER,
   presented himself before me for administration of
8  an oath of truthfulness, which oath I then
   administered;
9
       That I then reported to the best of my
10 ability in machine shorthand all of the words
   spoken by all parties in attendance during the
11 course of the ensuing proceedings, including
   objections, if any, made by all counsel present;
12
       That I later reduced my stenographic notes
13 into the foregoing typewritten transcript form,
   which typewritten transcript is a true record of
14 the testimony given by this witness as stated
   above;
15
       I do further certify that I am a
16 disinterested person in this cause of action;
   that I am not a relative or attorney or employee
17 of any of the parties; that I am not a relative
   of an employee of such attorney or counsel; and
18 that I am not financially interested in this
   action.
19
       IN WITNESS HERETO, I have affixed my
20 Notarial Seal and subscribed my signature below
   this _____ day of September, 2015.
21
                     _____
22                   Joyce E. Shinault, RPR, Notary Public

23 My Commission Expires:
   September 8, 2023
24 County of Residence:
   Shelby
25