Exhibit 6

# In The Matter Of:
*DIRECTV, LLC v.*
*Spina, et al.*

*Craig A. Spencer*
*June 20, 2016*
*DIRECTV, LLC v. Spina, et al.*

*Smith Reporting*
*400 North High Street - Suite 200*
*Muncie, Indiana 47305*
*1-800-700-3566 / 765.284.7836*
*www.smithreporting.net*



**Min-U-Script® with Word Index**

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 2 of 20 PageID #: 1258

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

**Page 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIRECTV, LLC, a California   )
Limited Liability Company,   )
                             )
            Plaintiff,       )
                             ) CIVIL ACTION NO.:
vs.                          ) 1:15-cv-00104-JMS-TAB
                             )
VICTOR A. SPINA, JR., WILLIAM)
A. SPINA, and MARTINSVILLE   )
CORRAL, INC.,                )
                             )
            Defendants.      )

THE DEPOSITION UPON ORAL EXAMINATION OF

CRAIG A. SPENCER,

a witness produced and sworn before me, Mary Beth Schafer, RPR, a Notary Public at large, in and for the State of Indiana, taken on behalf of the Defendants, at the offices of Overhauser Law Offices, LLC, 740 West Green Meadows Drive, Suite 300, Greenfield, Hancock County, Indiana, on June 20, 2016, commencing at approximately 11:45 a.m., pursuant to the Indiana Rules of Trial Procedure.

**Page 2**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
(Appearing Telephonically)

Wayne D. Lonstein, Esq.
Lonstein Law Office, P.C.
80 North Main Street
P.O. Box 351
Ellenville, New York  12428
wayne@signallaw.com

ON BEHALF OF THE DEFENDANTS:

Paul B. Overhauser, Esq.
Overhauser Law Offices, LLC
740 West Green Meadows Drive
Suite 300
Greenfield, Indiana  46140
poverhauser@overhauser.com

**Page 3**

I N D E X   O F   E X A M I N A T I O N

                                                        PAGE
DIRECT EXAMINATION ............................... 7
    Questions By:  Mr. Overhauser
CROSS-EXAMINATION ................................ 72
    Questions By:  Mr. Lonstein
REDIRECT EXAMINATION ............................. 138
    Questions By:  Mr. Overhauser
RECROSS-EXAMINATION .............................. 143
    Questions By:  Mr. Lonstein


I N D E X   O F   E X H I B I T S

                                                        PAGE
EXHIBITS
    1    Indiana Secretary of State Business       19
         Name Search

    2    Superior Antenna Systems Invoice          30

    3    Superior Antenna Systems Receipt          33
         Invoice

    4    Copy of Martinsville Corral, Inc.         34
         Check #4819 in the amount of $598.13

    5    April 29, 2015 E-mail to Craig            41
         Spencer from Christopher Hufnagel

    6    Affidavit of Craig Spencer                44

    7    Copy of Text Message                      57

**Page 4**

 1   June 20, 2016
 2   11:45 a.m.
 3        **MR. OVERHAUSER:** My name is Paul
 4   Overhauser.  We are here for the deposition of
 5   Craig Spencer.  I represent the defendants,
 6   Martinsville Corral, Inc., Victor Spina and
 7   William Spina in this case.  Wayne Lonstein is on
 8   the telephone; he's appearing telephonically.
 9   And, Wayne, you can confirm that you're there.
10        **MR. LONSTEIN:** Yes.  I am here, along
11   with my IT manager, Jason Forgey (phonetic), and
12   Jason has just indicated that the link we sent
13   over to you is live and active, so you should
14   retry and access that link, Paul.
15        **MR. OVERHAUSER:** Yes, I -- just as you
16   said that, I retried and I'm getting a message
17   saying the page cannot be displayed.  The page
18   you are looking for is currently unavailable.
19   Notwithstanding that, I'm able to browse other
20   things on the Internet, so I don't think it's a
21   technical problem at my end.
22        So I guess we're going to have to proceed
23   with this deposition without the benefit of Go To
24   Meeting.
25        But, Wayne, if you have any exhibits that

Page 5

1  you want to use, please e-mail them and copy my
2  secretary Alexis Hutchison at
3  ahutchison@overhauser.com, and she can print
4  those out and we'll use them. So we'll go ahead
5  and get started with the deposition.
6      MR. LONSTEIN: I'm going to be dialing
7  in on a Polycom line then. So I will recall.
8  What number would you --
9      MR. OVERHAUSER: Would you like me to
10 call you?
11     MR. LONSTEIN: No. Is it the 1-500
12 number?
13     MR. OVERHAUSER: Yeah, that will work.
14     MR. LONSTEIN: All right. And what
15 type of computer are you using there, Paul, just
16 so I know?
17     MR. OVERHAUSER: I have a Hewlett-
18 Packard NC440 with a Canon camera.
19     MR. LONSTEIN: Because that link is
20 live and functioning, so, obviously -- you don't
21 have access to any IT personnel on your site?
22     MR. OVERHAUSER: Not right now.
23     MR. LONSTEIN: All right. I will dial
24 right back in.
25     MR. OVERHAUSER: Thank you.

Page 6

1      (Phone ringing.)
2      MR. OVERHAUSER: This is Paul
3  Overhauser.
4      MR. LONSTEIN: Hi. It's Wayne Lonstein
5  again.
6      MR. OVERHAUSER: Hi, Wayne. We're
7  going to go ahead and get started with this
8  deposition.
9      MR. LONSTEIN: Okay. Who else is in
10 the room there, including the reporter's name so
11 I have it here.
12     THE COURT REPORTER: I'm the court
13 reporter today, Mr. Lonstein. My name is Mary
14 Beth Schafer.
15     MR. OVERHAUSER: And Craig Spencer is
16 in here, and I'm Paul Overhauser, so there's
17 three of us.
18     MR. LONSTEIN: Okay. Thank you.
19     THE COURT REPORTER: And I'll go ahead
20 and swear Mr. Spencer in.
21     MR. LONSTEIN: That's fine.
22     (The witness is sworn by the court
23 reporter at 11:53 a.m., at which time the
24 following proceedings are had:)
25

Page 7

1      CRAIG A. SPENCER,
2      having been duly sworn to tell the
3      truth, the whole truth, and nothing but
4      the truth, relating to said matter, is
5      examined and testifies as follows:
6  DIRECT EXAMINATION
7      QUESTIONS BY MR. OVERHAUSER:
8  Q. Can you state your name for the record, please.
9  A. Craig Spencer.
10     MR. LONSTEIN: Mr. Overhauser, just
11 before you start conducting your deposition, I'd
12 like to put something on the record, please.
13     MR. OVERHAUSER: Okay.
14     MR. LONSTEIN: This is Wayne Lonstein
15 on behalf of DIRECTV representing the plaintiff.
16 I just want to inquire of Mr. Overhauser at this
17 point, are you representing merely the Spinas or
18 are you representing the interests of
19 Mr. Allen -- Craig Allen Spencer?
20     MR. OVERHAUSER: I'm not representing
21 Craig Spencer.
22     MR. LONSTEIN: Okay. So for the
23 purposes of admonition, as I always like to do,
24 I'd like to advise the witness that in any
25 deposition any witness is always entitled to be

Page 8

1  represented by independent counsel, and that
2  especially in a case like this since there's been
3  multiple sworn declarations, there may be
4  interests that the witness may have that are
5  contrary to either of the parties and rights and
6  privileges to not testify, and specifically 5th
7  Amendment privileges regarding either testimony
8  that's given incorrectly or other items that may
9  be produced by documents today that could have
10 other ramifications. So with that being said,
11 I'm ready to go.
12     MR. OVERHAUSER: Thank you.
13     QUESTIONS BY MR. OVERHAUSER:
14 Q. Mr. Spencer, can you state your name for the
15   record, please.
16 A. Craig A. Spencer.
17 Q. Now was a subpoena served on you to appear for
18   this deposition here today?
19 A. No. There was not a subpoena for this deposition
20   today.
21 Q. So you are here completely voluntarily?
22 A. Yes, I am.
23 Q. Can you explain why you agreed to appear
24   voluntarily today without a subpoena?
25 A. Basically there are some inaccuracies on the

Page 9

1  installation and the use of DIRECTV programming
2  with some friends of mine that DIRECTV is suing,
3  and I feel it's in my best interest to take care
4  of that for them and myself --
5      **MR. LONSTEIN:** So my objection to the
6  term "inaccuracies."
7      **THE WITNESS:** Excuse me?
8      **MR. LONSTEIN:** Just for the court
9  reporter.
10     **THE COURT REPORTER:** I'm sorry.  You
11 spoke over his answer.  If you could please
12 repeat that.
13     **MR. LONSTEIN:** Sure.  I was noting an
14 objection to the answer.
15     **MR. OVERHAUSER:** Okay.  If I could ask
16 you, Wayne, I don't want to prevent you from
17 making any objections, but I would appreciate if
18 you object to an answer, to please wait until he
19 completes his answer, and then make your
20 objection for the record.
21     **MR. LONSTEIN:** I believe he was, so --
22 because I don't have the video, I can't see that.
23 **QUESTIONS BY MR. OVERHAUSER:**
24 Q. Okay.  Is there any further explanation you want
25    to say as to why you're here voluntarily today?

Page 10

1      **MR. LONSTEIN:** Objection to form.
2  A. Basically I'm trying to help my friends who are
3     being sued by DIRECTV on a situation that
4     occurred through my company due to a mistake, and
5     I'm trying to rectify that for everybody.
6  Q. Okay.  Now did DIRECTV know that you were the one
7     that opened the account for the two Texas Corral
8     restaurants?
9      **MR. OVERHAUSER:** Objection to form.
10 A. I believe they did know that.
11 Q. And why do you think they knew that?
12     **MR. LONSTEIN:** Objection to form.
13     Mr. Spencer, can you just wait until I
14 finish objecting.  Then go right ahead and
15 answer.
16     **THE WITNESS:** Sure.
17     **MR. LONSTEIN:** Thank you.
18     **THE WITNESS:** No problem.
19     **MR. LONSTEIN:** Thank you.
20 **QUESTIONS BY MR. OVERHAUSER:**
21 Q. So why do you believe that DIRECTV knew that you
22    were the one that opened the account for the
23    Texas Corral restaurants?
24 A. Because --
25     **MR. LONSTEIN:** Objection to form.

Page 11

1  A. Because any equipment that is activated through
2     my company is -- DIRECTV knows about it, I
3     mean --
4  Q. Okay.
5      **MR. LONSTEIN:** Objection;
6  nonresponsive.
7  **QUESTIONS BY MR. OVERHAUSER:**
8  Q. Were you paid a commission for setting up the
9     account -- strike that.
10    Were you paid a commission by DIRECTV for
11 setting up the DIRECTV account for the Texas
12 Corral restaurants?
13 A. Yes, we were.
14     **MR. LONSTEIN:** Objection to form.
15 **QUESTIONS BY MR. OVERHAUSER:**
16 Q. And is DIRECTV still paying you residuals for
17    other DIRECTV customers that you recruited?
18 A. Yes, they are, but I have not received them since
19    the last deposition that I did back in September.
20    They've put a hold on my DIRECTV money, but I'm
21    still an active dealer.  I can still go on the
22    website.  I can still build a new customer, but
23    talked to Mr. Green's office at DIRECTV after I
24    talked to DSI, and they told me that there was a
25    hold put on my money.

Page 12

1      **MR. LONSTEIN:** Objection to the answer
2  being nonresponsive.
3  **QUESTIONS BY MR. OVERHAUSER:**
4  Q. So DIRECTV was paying you your residuals on a
5     monthly basis; is that correct?
6  A. That is correct.
7  Q. And then they stopped paying you your residuals?
8  A. Yes, they did.
9  Q. When did they stop paying you your residuals?
10 A. I did not receive my September residuals in
11    October after my deposition that I did.
12     **MR. LONSTEIN:** Objection to form and
13 objection, answered.
14 **QUESTIONS BY MR. OVERHAUSER:**
15 Q. So after you gave a deposition for this case in
16    September of 2015, DIRECTV stopped paying you
17    your residuals?
18 A. That is correct.
19     **MR. LONSTEIN:** Objection.
20 **QUESTIONS BY MR. OVERHAUSER:**
21 Q. Now did you have a phone call in April or May of
22    2015 with DIRECTV?
23 A. Yeah.  A gentleman by the name of Jose Cruz
24    called my phone and asked me to get --
25     **MR. LONSTEIN:** Objection to the

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 5 of 20 PageID #: 1261

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 13

1 question.
2 A. -- and asked me to get in touch with them, and I
3 did.
4 Q. Now did they imply back then that if you didn't
5 cooperate, they might stop paying you your
6 residuals?
7 A. No, they did not.
8   MR. LONSTEIN: Objection to the
9 question. Objection to the term "imply."
10 QUESTIONS BY MR. OVERHAUSER:
11 Q. But as of to date, you are still a DIRECTV
12 representative; correct?
13 A. Yeah.
14 Q. And you're still able to sign up new DIRECTV
15 subscribers; correct?
16 A. Yes.
17   MR. LONSTEIN: Objection to form.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. And has DIRECTV provided you with access to a
20 website you can use to sign up new customers and
21 authorize them to receive DIRECTV programming?
22 A. Yes.
23 Q. Is the website the normal way to sign up new
24 customers?
25 A. Yes.

Page 14

1   MR. LONSTEIN: Objection to form.
2 QUESTIONS BY MR. OVERHAUSER:
3 Q. Do you have access to that website?
4 A. Yes.
5 Q. And if you wanted to sign up a new DIRECTV
6 subscriber today, could you?
7 A. Yes.
8   MR. LONSTEIN: Objection to form.
9 QUESTIONS BY MR. OVERHAUSER:
10 Q. Now you mentioned the deposition from September
11 of 2015. Did you receive a subpoena for that
12 deposition?
13 A. I did.
14 Q. Did that subpoena impact your decision to attend
15 the deposition?
16 A. No, it did not.
17   MR. LONSTEIN: Objection to form.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. Why didn't the subpoena affect your decision to
20 attend the deposition?
21   MR. LONSTEIN: Objection to form.
22 A. Because basically I just want to make everything
23 right as far as what went down, how it went down,
24 and what I can do to help resolve the situation.
25 Q. Okay. Had DIRECTV ever told you that you have

Page 15

1 been sued by William and Victor Spina?
2 A. They did.
3   MR. LONSTEIN: Objection to form.
4 QUESTIONS BY MR. OVERHAUSER:
5 Q. What did they tell you about you being sued by
6 Bill and Victor Spina?
7   MR. LONSTEIN: Objection to form;
8 hearsay.
9 A. Basically that I was listed in a lawsuit, along
10 with DIRECTV, that the Spinas were suing me and
11 them for improperly installing the wrong kind of
12 system at their -- at their restaurants.
13 Q. Who was it that told you that you had been sued
14 by Bill and Victor Spina?
15 A. I believe it was Julie Lonstein and a couple
16 other people from DIRECTV. I can't remember the
17 girl's name. I believe she works for Mr. Green.
18 Q. Anyone else?
19 A. I think there was Chris -- a Chris Hufnagel or
20 possibly -- and Jose Cruz.
21 Q. And when did they tell you that you had been sued
22 by Bill and Victor Spina?
23   MR. LONSTEIN: Objection to form.
24 A. Oh, it was sometime in April of 2015.
25 Q. When they told you that, did you believe it?

Page 16

1 A. Well, I didn't know better. I mean, yeah. I was
2 going by what I was told.
3 Q. Did you later come to learn that, in fact, you
4 had not been sued by Bill or Victor Spina?
5 A. Yes, because I called them and asked them.
6 Q. Now over the last year, have you worked both in
7 South Carolina and in Indiana?
8 A. Yes.
9 Q. And have you traveled back and forth a lot
10 between South Carolina and Indiana?
11 A. Yes, my family is from Indiana, so I do come here
12 quite frequently.
13 Q. And have you done business in Indiana?
14 A. For DIRECTV?
15 Q. Yes.
16 A. Not within the last year, no.
17 Q. Do you own a business?
18 A. Yes.
19 Q. What is it?
20 A. Superior Antenna Systems, also known as SAS
21 Digital.
22 Q. What business is SAS Digital in?
23 A. Well, we're an authorized agent for DIRECTV, as
24 well as other things that we do, like video
25 cameras, TVs, home audio/video products.

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 6 of 20 PageID #: 1262

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 17

1  Q.  So is SAS Digital a reseller for DIRECTV?
2          MR. LONSTEIN: Objection; form.
3  A.  Yes, we're an agent for DIRECTV where we can sign
4      up new customers and authorize them, yes.
5          MR. LONSTEIN: Objection -- objection
6      to form and nonresponsive.
7  QUESTIONS BY MR. OVERHAUSER:
8  Q.  Does SAS Digital also install DIRECTV equipment?
9  A.  Yes.
10 Q.  Are you the sole owner of SAS Digital?
11 A.  Yes.
12 Q.  When did this business begin?
13 A.  1994.
14 Q.  And have you been a DIRECTV reseller continuously
15     since then?
16 A.  Yes.
17         MR. LONSTEIN: Objection to form.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q.  Has anyone else ever been involved in the
20     business?
21 A.  Yes, I actually had a business partner that was
22     dissolved in like 2005, I believe.
23 Q.  Who was the business partner?
24 A.  His name was Randy Maxwell.
25 Q.  Okay. And so he assisted until 2005, you say?

Page 18

1  A.  Yes, sir.
2          MR. LONSTEIN: Objection to form.
3  QUESTIONS BY MR. OVERHAUSER:
4  Q.  Does -- and what was the formal name of the
5      corporation that you had?
6  A.  Maxwell Spencer Enterprises, Incorporated.
7  Q.  Does it still exist?
8  A.  Not at this time.
9  Q.  Was it --
10 A.  Basically anything I do now is under SAS Digital.
11 Q.  Let me just show you seven exhibits real quick.
12     These are the exact same seven exhibits that were
13     used at your last deposition in September. Do
14     you recognize them?
15 A.  Yeah, sure do.
16 Q.  Now you mentioned that at your last deposition
17     you received a subpoena. Were any of these
18     exhibits, 1 through 7, documents that you brought
19     with you to the deposition in September of 2015?
20 A.  Yes. I believe this one right here with the
21     letter that I -- and --
22 Q.  You brought it with you to the deposition?
23 A.  I think I did.
24         MR. LONSTEIN: Objection. I can't see
25     what physically the witness is referring to. Can

Page 19

1      we please use the exhibit number?
2          MR. OVERHAUSER: The witness is
3      pointing to Exhibit 5.
4          MR. LONSTEIN: That would be a Gmail?
5          MR. OVERHAUSER: Correct.
6  QUESTIONS BY MR. OVERHAUSER:
7  Q.  Okay. Let me hand you what's been marked as
8      Exhibit 1, and this is the same exhibit that was
9      used in the prior deposition. Exhibit 1 says the
10     company Maxwell Spencer Enterprises, Inc., was
11     dissolved and became inactive on July 15, 2010.
12     Is that accurate?
13 A.  Yeah, that sounds right.
14         MR. LONSTEIN: Objection to form.
15 QUESTIONS BY MR. OVERHAUSER:
16 Q.  Did the business continue following the
17     dissolution of the corporation?
18 A.  Yes.
19 Q.  Did you continue running it under the same SAS
20     Digital?
21 A.  Yes.
22 Q.  But it was, what, a sole proprietorship?
23 A.  Yeah.
24 Q.  Okay. After the dissolution, was there any
25     change in the day-to-day operation of the

Page 20

1      business?
2  A.  No.
3  Q.  After the dissolution, was there any change to
4      how you interacted with DIRECTV or SAS's
5      customers on a day-to-day basis?
6  A.  Well, basically after the deposition and I didn't
7      receive any money, why -- you know, I've not
8      pursued DIRECTV.
9  Q.  No, I'm sorry. I used the word dissolution. I
10     was referring to the dissolution of the
11     corporation.
12 A.  Oh.
13 Q.  After the dissolution of the corporation, was
14     there any change to how you interacted with
15     DIRECTV or SAS customers?
16 A.  Oh, no, no.
17 Q.  Okay. So does DIRECTV have a marketing system
18     for designating agents to authorize private
19     viewing of DIRECTV programming?
20 A.  Yes.
21         MR. LONSTEIN: Objection.
22 QUESTIONS BY MR. OVERHAUSER:
23 Q.  And are you one of those agents?
24 A.  Yes.
25         MR. LONSTEIN: Objection.

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 7 of 20 PageID #: 1263

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 21

QUESTIONS BY MR. OVERHAUSER:
Q. Can members of the public get authorization through you to watch DIRECTV programming?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. After the dissolution of the corporation -- well, let's move on to that. Okay.
   We talked about residuals already, but --
A. Yeah.
Q. -- I'll use the term SAS to refer to your business, whether it was done by the corporation or by you individually. Is that okay?
A. Sure. Yes.
Q. So just to confirm, is SAS an authorized retailer for DIRECTV today?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. Does DIRECTV authorize DIRECTV receivers to receive DIRECTV programming?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. Is authorizing a DIRECTV receiver the same thing

Page 22

as activating the receiver to receive DIRECTV programming?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. When you talk with DIRECTV, do both of you use the term activate and authorize interchangeably?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. Are DIRECTV signals received by a satellite antenna?
A. Yes.
    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. And then does the signal go through a cable to a DIRECTV receiver?
A. Yes.
Q. And is DIRECTV able to authorize or de-authorize each DIRECTV receiver?
    MR. LONSTEIN: Objection.
A. Yes.
Q. Is a DIRECTV receiver the channel used to receive DIRECTV signals?
A. Yes.

Page 23

    MR. LONSTEIN: Objection.
QUESTIONS BY MR. OVERHAUSER:
Q. If a DIRECTV receiver is authorized, does the DIRECTV programming signal come out of the receiver and go into a television?
A. Yes.
    MR. LONSTEIN: Objection; hypothetical.
QUESTIONS BY MR. OVERHAUSER:
Q. If the receiver has been authorized by DIRECTV, is the DIRECTV signal that comes out of the receiver encrypted?
A. No.
    MR. LONSTEIN: Objection.
A. What comes out of the --
    MR. LONSTEIN: Calls for speculation.
A. What comes out of the receiver is not encrypted. It's unencrypted.
Q. So how does DIRECTV authorize a DIRECTV receiver to receive its signals?
    MR. LONSTEIN: Objection. And do we have a time frame on this question, Mr. Overhauser?
    MR. OVERHAUSER: No.
    MR. LONSTEIN: Objection to time; vague.

Page 24

A. Basically you call in or you go through an automated system. Put in the receiver's serial number and access card, and it's uplinked to the satellite to the receiver and it's activated.
Q. When you say it's activated, does DIRECTV send out a signal that the receiver gets --
A. Yeah.
Q. -- that turns on the receiver?
A. That is correct.
    MR. LONSTEIN: Objection; form.
QUESTIONS BY MR. OVERHAUSER:
Q. And how does DIRECTV de-authorize a receiver?
A. The same way they authorize it.
Q. Which you -- you mean they send out a satellite signal that is received by the receiver, and it turns the receiver off?
A. That is correct.
    MR. LONSTEIN: Objection to form.
QUESTIONS BY MR. OVERHAUSER:
Q. Has DIRECTV ever told you what reasons it may have for de-authorizing a receiver?
    MR. LONSTEIN: Objection to form.
A. Probably their main reason would be that the customer doesn't pay their bill or they want to disconnect.

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 8 of 20 PageID #: 1264

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 25

1  MR. LONSTEIN: The answer is not
2  responsive to the question.
3  QUESTIONS BY MR. OVERHAUSER:
4  Q. Has DIRECTV told you that persons that watch
5     DIRECTV using an authorized DIRECTV receiver are
6     authorized to view the DIRECTV programming?
7     MR. LONSTEIN: Objection.
8     THE WITNESS: Can you repeat the
9     question?
10    MR. OVERHAUSER: Yeah.
11 Q. Has DIRECTV told you that persons that watch
12    DIRECTV using an authorized DIRECTV receiver are
13    authorized to view --
14 A. Sure.
15 Q. -- the DIRECTV programming?
16 A. Yes.
17    MR. LONSTEIN: Objection to form.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. Now does SAS have a DIRECTV dealer number?
20 A. Yes, I do.
21 Q. What?
22 A. 1311782. I know it like my Social Security
23    number.
24 Q. Is that the same dealer number you've had since
25    2005?

Page 26

1  A. Yes, and then before.
2  Q. Do you personally perform DIRECTV installations?
3  A. I have.
4  Q. And do you also use subcontractors?
5  A. On most of the installations we did, yes.
6  Q. Now what happens when one of SAS's subcontractors
7     installs a system for SAS?
8  A. They're handed --
9     MR. LONSTEIN: Objection.
10 A. They are handed a work order and the equipment
11    and asked to go install it.
12 Q. And how, if they complete the installation, does
13    the installed DIRECTV receiver get authorized?
14 A. Oh, yes.
15 Q. And how does that happen?
16 A. Through an automated system.
17 Q. The one you described just a few minutes ago?
18 A. Yes.
19    MR. LONSTEIN: Objection.
20 QUESTIONS BY MR. OVERHAUSER:
21 Q. So by authorizing a receiver, does DIRECTV
22    authorize the receipt and display of DIRECTV
23    programming using the receiver?
24 A. Yes.
25    MR. LONSTEIN: Objection.

Page 27

1  QUESTIONS BY MR. OVERHAUSER:
2  Q. How do you know Bill and Victor Spina?
3  A. Went to school with them.
4  Q. Are you familiar with their business operations?
5  A. Yes.
6  Q. Have you been to their -- have you been to the
7     Martinsville Texas Corral restaurants?
8  A. I have. I've been to both of them.
9  Q. You've been to the one in Shelbyville also?
10 A. Yes, sir.
11 Q. And so you've known them for 30 years?
12 A. Probably more than that now, yeah.
13 Q. And did they know you to be an authorized DIRECTV
14    retailer?
15 A. Mm-hmm. Yes.
16    MR. LONSTEIN: Objection to what their
17    knowledge is.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. Did the Spinas run a Damon's restaurant in
20    Martinsville in the 2000s?
21 A. They did.
22 Q. And did that restaurant go out of business?
23 A. Yes, it did.
24 Q. Did the Spinas ever request that a DIRECTV system
25    be installed in a restaurant in Martinsville?

Page 28

1  A. Basically he requested that we install some --
2     some dishes and wiring, so if he decided he
3     wanted to get DIRECTV, that's the only discussion
4     I had with him about it.
5     MR. LONSTEIN: Objection.
6  QUESTIONS BY MR. OVERHAUSER:
7  Q. And was that address 610 Birk Road, Martinsville?
8  A. Yes, it was.
9  Q. And when was that request made?
10 A. Somewhere like, what, seven years ago. Would
11    have been, what, 2009.
12 Q. So did the Spinas request installation of a
13    DIRECTV system with multiple televisions?
14 A. I believe we had talked about it.
15 Q. Okay.
16    MR. LONSTEIN: Objection;
17    nonresponsive.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. At the time were the Spinas remodeling the
20    restaurant to open it as a Texas Corral
21    restaurant?
22    MR. LONSTEIN: Objection.
23 A. Yes.
24 Q. And did SAS install the system at that location?
25 A. Apparently we did.

Page 29

1  Q. Did SAS supply the equipment?
2  A. **Apparently we did or we wouldn't be sitting here.**
3  Q. Did it supply the antenna?
4  A. **Uh-huh. Yes.**
5  Q. Did SAS also supply the DIRECTV receivers?
6  A. **Yes, we did.**
7  Q. And did SAS deliver the receivers and antenna to
8     the 610 Birk Road, Martinsville location?
9  A. **Well, yeah. Through -- my subcontractor did it**
10    **without my knowledge, yes.**
11        MR. LONSTEIN: Objection;
12    nonresponsive.
13   **QUESTIONS BY MR. OVERHAUSER:**
14 Q. After the installation was completed, what did
15    the subcontractor do?
16 A. **He went on the automated system and activated --**
17        MR. LONSTEIN: Objection.
18 A. **-- an account for the Spinas.**
19 Q. For the restaurant location?
20 A. **Yeah, I believe so.**
21        MR. LONSTEIN: Objection;
22    nonresponsive.
23   **QUESTIONS BY MR. OVERHAUSER:**
24 Q. And as a result of him doing that, did DIRECTV
25    authorize the receivers that were at the Texas

Page 30

1     Corral restaurant?
2  A. **Yes, they did.**
3        MR. LONSTEIN: Objection.
4    **QUESTIONS BY MR. OVERHAUSER:**
5  Q. Now at the time those receivers were authorized
6     by DIRECTV, had the restaurant opened for
7     business yet?
8        MR. LONSTEIN: Objection.
9  A. **No, it had not.**
10 Q. Okay. Let me hand you what's been marked as
11    Exhibit 2. Do you see that?
12 A. **Yes.**
13 Q. Is this an invoice from SAS to Texas Corral for
14    the installation you just described?
15 A. **Well, this one here is for the installation of**
16    **LCD TVs and mounts.**
17 Q. And the date says June 7, 2009; is that correct?
18 A. **Yes, it is.**
19 Q. And it says sales rep, Craig. Is that you?
20 A. **Yeah, that would be me.**
21       MR. LONSTEIN: Object to the form.
22   **QUESTIONS BY MR. OVERHAUSER:**
23 Q. And this -- so does this -- does this invoice,
24    Exhibit 2, reflect work that you did at the
25    Martinsville Texas Corral restaurant?

Page 31

1        MR. LONSTEIN: Objection to form.
2  A. **Yes.**
3  Q. Now did you ever give Bill Spina or Victor Spina,
4     or anyone else, any reason to believe that the
5     receipt or display of DIRECTV programming by the
6     receivers that DIRECTV activated at 610 Birk
7     Road, Martinsville, Indiana, was not authorized?
8  A. **No, I didn't --**
9        MR. LONSTEIN: Objection to form.
10 A. **-- because I'm not the one that actually did the**
11    **installation, and the -- my company did, but**
12    **through a subcontractor, so, no, me, personally,**
13    **I didn't. But, yeah, somebody gave them a**
14    **receipt.**
15       MR. LONSTEIN: Objection; hearsay.
16   **QUESTIONS BY MR. OVERHAUSER:**
17 Q. Did you or anyone acting on behalf of SAS tell
18    the Spinas it was okay for them to watch --
19 A. **Apparently so.**
20 Q. -- the DIRECTV programming -- wait until I finish
21    my questions.
22 A. **I'm sorry. I'm sorry.**
23 Q. I'll start over. Did you or someone else acting
24    on behalf of SAS tell the Spinas that it was okay
25    to display the DIRECTV programming at their

Page 32

1     restaurants?
2        MR. LONSTEIN: Objection.
3  A. **One of my -- one of my sub -- one of my**
4     **subcontractors, Mark Lavance is the guy that did**
5     **all of this stuff, and, apparently, he told them**
6     **that it was okay and there was no problem.**
7        MR. LONSTEIN: Objection;
8     nonresponsive.
9    **QUESTIONS BY MR. OVERHAUSER:**
10 Q. Were you ever asked to install any other
11    receivers or equipment for the Spinas in a
12    different location?
13 A. **I believe we -- the same guy actually did an**
14    **installation for them in Shelbyville as well.**
15 Q. Okay. And was that address 2103 Intelliplex
16    Drive?
17 A. **I believe it is, yes.**
18 Q. And was that installation done before the
19    restaurant opened?
20 A. **Yes, I believe it was.**
21 Q. But at the time of the installation, were you
22    aware it was going to become a Texas Corral
23    restaurant?
24 A. **No, I had no idea.**
25 Q. Did SAS provide the equipment for that DIRECTV

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 10 of 20 PageID #: 1266

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 33

1 installation?
2 A. Yes, we did.
3 Q. So you provided the antenna and the receivers?
4 A. Yes. Those items go out to the subcontractors
5   for installation, yes, sir.
6 Q. Okay. And did SAS's subcontractor complete that
7   installation and then provide subscription
8   information to DIRECTV for all of the DIRECTV
9   receivers that had been installed?
10 A. Yes.
11      MR. LONSTEIN: Objection; form.
12   QUESTIONS BY MR. OVERHAUSER:
13 Q. And did DIRECTV authorize those receivers in the
14   Shelbyville restaurant to receive DIRECTV
15   programming?
16 A. Yes, we did.
17      MR. LONSTEIN: Objection to what
18   DIRECTV did.
19   QUESTIONS BY MR. OVERHAUSER:
20 Q. Was that done before the restaurant actually
21   opened for business?
22 A. Yes, I believe so.
23      MR. LONSTEIN: Same objection.
24   QUESTIONS BY MR. OVERHAUSER:
25 Q. And let me hand you what's been marked as Exhibit

Page 34

1   3. Is this an SAS invoice for work done at the
2   Shelbyville location?
3 A. Yes, it is.
4 Q. And is it in your handwriting?
5 A. I believe it is.
6 Q. And did SAS charge $598.13 for this work?
7 A. We did.
8 Q. And let me show you what's been marked as Exhibit
9   4. Exhibit 4 appears to be a canceled check
10   payable to Craig Spencer for $598.13, dated
11   November of 2011. Would you agree that that's
12   accurate?
13 A. Yes.
14 Q. Does Exhibit 4 have your signature in the
15   endorsement area on the back of the check?
16 A. It does.
17 Q. Was this the payment for the invoice shown in
18   Exhibit 3?
19 A. It is.
20 Q. Following the installation at the Shelbyville
21   restaurant, was the receipt of TV programming
22   through the receivers installed there authorized
23   by DIRECTV?
24      MR. LONSTEIN: Objection to form.
25 A. Can you read the question again, please.

Page 35

1 Q. Yeah. After, the Shelbyville installation, did
2   DIRECTV authorize the receipt of its programming
3   through the receivers that SAS installed there?
4 A. Yes.
5      MR. LONSTEIN: Same objection.
6   QUESTIONS BY MR. OVERHAUSER:
7 Q. And once DIRECTV authorizes those receivers, can
8   anyone view the DIRECTV programming?
9 A. Yes.
10      MR. LONSTEIN: Same objections.
11   QUESTIONS BY MR. OVERHAUSER:
12 Q. Are you aware of you or anyone else ever giving
13   Bill or Victor Spina any reason to believe that
14   they were not authorized to display DIRECTV?
15 A. No.
16      MR. LONSTEIN: Objection to form.
17   QUESTIONS BY MR. OVERHAUSER:
18 Q. Now the complaint or the complaints that DIRECTV
19   filed in these suits say that Victor Spina had
20   DIRECTV receivers in his residence but then moved
21   them to the restaurants.
22      MR. LONSTEIN: Objection to form.
23   QUESTIONS BY MR. OVERHAUSER:
24 Q. Is that what happened?
25      MR. LONSTEIN: Objection.

Page 36

1 A. I don't believe so.
2      MR. LONSTEIN: Form.
3   QUESTIONS BY MR. OVERHAUSER:
4 Q. Is that because SAS supplied the DIRECTV
5   receivers?
6 A. Yes.
7      MR. LONSTEIN: Objection to form.
8   QUESTIONS BY MR. OVERHAUSER:
9 Q. Okay. When was the first time you were contacted
10   by DIRECTV relating to this lawsuit involving
11   Texas Corral or the Spinas?
12 A. I believe we talked about it earlier. It was in
13   April of 2015.
14 Q. And how were you contacted?
15 A. I received an e-mail from Jose Cruz, and he asked
16   me to call him, and I called him.
17 Q. And what did he say?
18      MR. LONSTEIN: Objection; hearsay.
19 A. He said that basically he needed me to talk with
20   some other people about a lawsuit that had been
21   filed against DIRECTV and myself; that the Spinas
22   were suing us.
23 Q. So Jose Cruz told you that you were being sued?
24      MR. LONSTEIN: Objection.
25 A. Yeah, I think he did say that there was a problem

Case 1:15-cv-00104-JMS-TAB   Document 105-6   Filed 07/01/16   Page 11 of 20 PageID #: 1267

DIRECTV, LLC v. Spina, et al.
Craig A. Spencer
June 20, 2016

Page 37

1   with some -- with an account that I had signed up
2   and that he needed me to talk with some people,
3   and we got on a conference call and...
4 Q. So you --
5 A. So on and so on.
6 Q. So you had a conference call then; right?
7 A. That is correct.
8 Q. And who was everybody on the conference call as
9   best as you can remember?
10       MR. LONSTEIN: Objection.
11 A. Jose was there. I believe Julie Lonstein was on
12   the -- in the meeting. And there was a lady that
13   I talked to back in October or November of 2015
14   after my residuals were stopped. I can't
15   remember her name, but she works out of
16   Mr. Green's office, DIRECTV. I'm not really sure
17   what her name was. But there was three or four
18   people involved in it. And Chris Hufnagel was
19   also part of that meeting, phone conversation.
20 Q. Well, what was said during that call?
21 A. Basically that Bill and Vic were suing me and
22   DIRECTV.
23       MR. LONSTEIN: Objection to form.
24 QUESTIONS BY MR. OVERHAUSER:
25 Q. What was your reaction to hearing that?

Page 38

1 A. Well, I was kind of shocked that the Spinas were
2   suing me since I've known them for 40 years, 30,
3   40 years, and they're friends of mine. So I
4   basically listened to what I was -- you know,
5   questions I was asked, and after that, I called
6   the Spinas and asked them if that was true after
7   the fact of the meeting, and they said no. They
8   were being sued by DIRECTV.
9 Q. Okay. Let's go back to the conference call.
10 A. Yeah.
11 Q. Did they ask you about how the installations at
12   the two Texas Corral restaurants took place?
13 A. Yeah.
14       MR. LONSTEIN: Objection; form.
15 QUESTIONS BY MR. OVERHAUSER:
16 Q. And did you explain how those systems were
17   installed and authorized by DIRECTV as you just
18   testified to?
19       MR. LONSTEIN: Objection; leading.
20 A. Yes.
21 Q. What was DIRECTV's response when you told them
22   that?
23       MR. LONSTEIN: Objection.
24 A. Well, everybody kind of just sat there for a
25   minute. Didn't really say a whole lot. And then

Page 39

1   I was asked some other questions. And I said,
2   Well, I think what happened here is there was a
3   contractor by the name of Mark Lavance that
4   proceeded to do a lot of this -- the stuff that
5   we're sitting here about.
6       MR. LONSTEIN: Objection;
7   nonresponsive.
8 QUESTIONS BY MR. OVERHAUSER:
9 Q. Did Julie Lonstein tell you that she wanted you
10   to say that the receivers were installed at Vic
11   Spina's house and then moved to the restaurants?
12       MR. LONSTEIN: Objection.
13 A. I -- I'm trying to remember. She asked me --
14   what was it? Did we install a system at the
15   Spinas', or they took the receiver. I'm really
16   not sure. I'm going to have to -- I'm going to
17   have to not answer that one because I really
18   don't remember going back that far, but I think I
19   told her I wouldn't believe that that occurred
20   because I've known the Spinas, and I don't think
21   they would do anything, you know, to jeopardize
22   anything, you know, that they thought -- that if
23   they thought something was wrong, they wouldn't
24   do it.
25       MR. LONSTEIN: Objection;

Page 40

1   nonresponsive.
2 QUESTIONS BY MR. OVERHAUSER:
3 Q. Did you tell Ms. Lonstein that DIRECTV itself had
4   authorized the receivers that were in the
5   restaurants?
6       MR. LONSTEIN: Objection; leading.
7 A. Well, of course they -- they would be authorized
8   by DIRECTV. I mean, yes.
9 Q. I mean, is DIRECTV the only one that is able to
10   authorize a receiver?
11 A. That is correct.
12       MR. LONSTEIN: Objection.
13 QUESTIONS BY MR. OVERHAUSER:
14 Q. So during the call I think you said you mentioned
15   something about subcontractors or contractors?
16 A. Mm-hmm.
17       MR. LONSTEIN: Objection; leading.
18 QUESTIONS BY MR. OVERHAUSER:
19 Q. So what did you -- what did you say about
20   contractors or subcontractors?
21 A. Well, they're not employees. They're contractors
22   who are given equipment, work orders to go out
23   and perform installations, and basically they
24   bring me the paperwork back at the end of the day
25   and turn it in, and that's -- that's it.

Page 53

1  A.  Yeah, I believe.  That's normally the way --
2      stuff is installed usually before a restaurant is
3      opened, yeah.
4  Q.  So it had not yet become a commercial
5      establishment, had it?
6  A.  No.
7          MR. LONSTEIN:  Objection.
8  QUESTIONS BY MR. OVERHAUSER:
9  Q.  But you knew it would become a commercial
10     establishment as soon as they opened; right?
11         MR. LONSTEIN:  Objection.
12 A.  Well, yeah.
13 Q.  Let me read paragraph 10 out loud.  "At no time
14     in 2011, or ever, did I visit or inspect the
15     commercial location of 2103 Intelliplex Drive,
16     Shelbyville, Indiana, 46176, to establish a quote
17     for DIRECTV satellite services to be used at said
18     location."
19         So this kind of implies that for you to give
20     a quote, you have to personally visit there or
21     inspect?
22         MR. LONSTEIN:  Objection.
23 A.  No, I did not.
24 Q.  So you didn't -- you didn't have to visit or
25     inspect --

Page 54

1  A.  No.
2  Q.  -- to provide a quote, did you?
3  A.  No.
4          MR. LONSTEIN:  Objection.
5  QUESTIONS BY MR. OVERHAUSER:
6  Q.  And you can -- you did send contractors out there
7      to do the actual work; right?
8          MR. LONSTEIN:  Objection.
9  A.  Yes.
10 Q.  And, again, paragraph 10 uses the word
11     "commercial location," but at the time of the
12     installation, it wasn't a commercial location
13     because it hadn't opened for business; right?
14         MR. LONSTEIN:  Objection.
15 A.  Right.
16 Q.  Let me read paragraph 11 out loud.  "At no time
17     in 2011, or ever, did I personally install nor
18     did I authorize any employee of SAS Digital to
19     install DIRECTV receivers or satellite dish at
20     the commercial location known as Shelbyville
21     Texas Corral located at 2103 Intelliplex Drive
22     Shelbyville, Indiana."
23         Now do you believe that paragraph is also
24     misleading because you used contractors instead
25     of employees?

Page 55

1          MR. LONSTEIN:  Objection.
2  A.  Yeah, the personally imply or "personally
3      install" part of it, yes.
4  Q.  Yeah, okay.
5          But just to be clear, DIRECTV itself did
6      authorize the receivers that were installed at
7      the Shelbyville location; right?
8  A.  Yes, or they wouldn't be on.
9          MR. LONSTEIN:  Objection.
10         THE COURT REPORTER:  I'm sorry, sir.
11 A.  Yes, or they would not be on -- activated.
12         MR. LONSTEIN:  Objection.
13 QUESTIONS BY MR. OVERHAUSER:
14 Q.  Let me read paragraph 13.  This one says, "The
15     first time I heard about the claims of DIRECTV
16     LLC, against the commercial establishments known
17     as Martinsville Texas Corral and Shelbyville
18     Texas Corral, was in September 2014 when I was
19     contacted by William Spina via telephone."
20 A.  Yeah.
21 Q.  And then it goes on to say, "I have known the
22     Spina family since high school, and, therefore,
23     was not surprised to receive a call from William
24     until I heard what William was alleging.  During
25     that phone call William Spina stated to me that

Page 56

1      he was aware that a technician had installed
2      satellite dishes and receivers at the two
3      business locations and that he paid the installer
4      to do that work.  This phone call was the first
5      time I had any knowledge of any receivers being
6      installed at either of the business locations or
7      being utilized" --
8  A.  Yeah.
9  Q.  -- "at either of the business locations owned by
10     the Spinas."
11         Now let me ask you a couple of questions
12     about that.  The first thing it says is that you
13     were contacted in September of 2014.  Is that
14     date correct?
15 A.  I believe it is.
16 Q.  Well, can you confirm the date that you discussed
17     this by --
18 A.  Actually I don't think that is correct.  It was
19     sometime -- I think it was in April.
20         MR. LONSTEIN:  Objection to form.
21 QUESTIONS BY MR. OVERHAUSER:
22 Q.  April of 2015?
23 A.  Yeah.
24 Q.  So the first time you spoke with William Spina
25     about this was --

Page 57

1   A.  Was when I got a call from Jose Cruz.
2   Q.  So that would have been April of 2015?
3   A.  I believe so, yeah.
4   Q.  Okay. So this reference to September of 2014 is
5       incorrect?
6   A.  Yeah.
7   Q.  Okay.
8   A.  I hadn't heard, no -- yes, that is incorrect.
9   Q.  Okay. Let me show you Exhibit 7. Does Exhibit 7
10      show the text messages that were exchanged
11      between you and Bill Spina?
12  A.  Right, right. Because I remember I got a call
13      from DIRECTV, and I did text him and said, "Hey,
14      this is Spencer, call me." Said, "DIRECTV is
15      telling me that you create -- yeah, that I was
16      being sued." And I said, "Can you tell me what's
17      going on?"
18  Q.  Okay. So does Exhibit 7 accurately show the text
19      messages, including the dates that you sent
20      them --
21  A.  Yes.
22  Q.  -- to Bill Spina?
23  A.  Yes, it does.
24  Q.  And you sent these right after DIRECTV had
25      contacted you about this lawsuit?

Page 58

1   A.  Yes.
2           MR. LONSTEIN: Objection to form.
3       QUESTIONS BY MR. OVERHAUSER:
4   Q.  Just so I'm clear, DIRECTV never contacted you
5       about this lawsuit until April of 2015; right?
6   A.  That is correct.
7           MR. LONSTEIN: Objection to form.
8       QUESTIONS BY MR. OVERHAUSER:
9   Q.  Now, just so I'm clear, after DIRECTV told you
10      that you had been sued by the Spinas --
11          MR. LONSTEIN: Objection to form --
12          MR. OVERHAUSER: Well, you should
13      probably wait until I finish my questions,
14      Mr. Lonstein.
15          MR. LONSTEIN: Objection. Objection to
16      form.
17          THE WITNESS: What was the question?
18      I'm sorry.
19      QUESTIONS BY MR. OVERHAUSER:
20  Q.  So DIRECTV told you the Spinas had sued you;
21      right?
22          MR. LONSTEIN: Objection to form.
23  A.  Yes.
24  Q.  But, in fact, had Bill Spina sued you?
25          MR. LONSTEIN: Objection to form.

Page 59

1   A.  No.
2   Q.  Or had Victor Spina sued you?
3           MR. LONSTEIN: Objection to form.
4   A.  No.
5   Q.  Had anyone sued you?
6           MR. LONSTEIN: Objection to form.
7   A.  No.
8   Q.  How did you find out that you had not been sued
9       by Bill or Victor Spina?
10  A.  I called them.
11  Q.  And that would have been sometime in the April/
12      May 2015 time frame?
13  A.  That is correct, yes.
14          MR. LONSTEIN: Objection to form.
15      QUESTIONS BY MR. OVERHAUSER:
16  Q.  So in paragraph -- just so I'm clear, in
17      paragraph 10, when it says the date was September
18      2014, that was an incorrect statement?
19  A.  Yeah, that has to be incorrect.
20          MR. LONSTEIN: Objection to form.
21      QUESTIONS BY MR. OVERHAUSER:
22  Q.  And that now it's your testimony it was actually
23      April of 2015 or later?
24  A.  Yes.
25          MR. LONSTEIN: Objection to form.

Page 60

1       QUESTIONS BY MR. OVERHAUSER:
2   Q.  Did you know that was wrong when you signed
3       Exhibit 6?
4   A.  I must have overlooked that.
5           MR. LONSTEIN: Objection to form.
6       QUESTIONS BY MR. OVERHAUSER:
7   Q.  Let's get back to paragraph 13. This has a
8       sentence that says, "This phone call was the
9       first time I had any knowledge of any receivers
10      being installed at either of the business
11      locations or being utilized at either of the
12      business locations owned by the Spinas."
13          Now was that technically correct?
14          MR. LONSTEIN: Objection to form.
15  A.  Yeah, but it's kind of misleading.
16  Q.  And is that because, as you testified before, at
17      the time of the installations, they had not yet
18      opened for business?
19          MR. LONSTEIN: Objection to form.
20  A.  Part of that, yes.
21  Q.  Is there some other way that makes -- some other
22      way that's misleading?
23          MR. LONSTEIN: Objection to form.
24  A.  I'm just reading this. Hold on. No, I mean
25      basically -- let's see. I --

Page 61

1 Q. Is the only respect in which it's misleading the
2     fact that it references business locations just
3     because they hadn't yet opened for business?
4         MR. LONSTEIN: Objection to form.
5 A. Yes.
6 Q. And who drafted this affidavit?
7         MR. LONSTEIN: Objection.
8 A. I'm not sure. I think it was Chris Hufnagel --
9         MR. LONSTEIN: Objection.
10 A. -- or whoever he works for. I'm not sure.
11 Q. Okay. Now you testified earlier that when you
12     first got the declaration shown in Exhibit 6,
13     that you refused to sign it because it was
14     misleading?
15         MR. LONSTEIN: Objection.
16 A. Yeah, I basically didn't understand what they
17     were trying to get me to sign, and that's why I
18     sat on it for over a month until I got a phone
19     call from, I believe, Chris and the guy by the --
20     from marketing or sales or whatever by the name
21     of Mr. Green saying that he was a vice president
22     of operations, saying I needed to get that signed
23     and back to Chris because it was in my best
24     interest.
25         MR. LONSTEIN: Objection;

Page 62

1     nonresponsive.
2     QUESTIONS BY MR. OVERHAUSER:
3 Q. What did Chris Hufnagel explain to you during the
4     call?
5         MR. LONSTEIN: Objection.
6 A. Basically I just needed to get it signed and get
7     it to him and it would all be good to go.
8 Q. Did he tell you that the affidavit was
9     technically correct?
10        MR. LONSTEIN: Objection.
11 A. Yes.
12 Q. Was there anything else he said about signing the
13     declaration?
14 A. Basically I had a lawsuit filed against me and I
15     needed to get it signed.
16        MR. LONSTEIN: Objection.
17     QUESTIONS BY MR. OVERHAUSER:
18 Q. Let me read paragraph 14 of Exhibit 6 out loud.
19     It says, "I did not perform any installations at
20     610 Birk Road, Martinsville, Indiana, or at 2103
21     Intelliplex Drive, Shelbyville, Indiana. Nor did
22     I authorize or direct my employees to install
23     receivers for DIRECTV satellite programming at
24     the commercial establishments known as
25     Martinsville Texas Corral and/or Shelbyville

Page 63

1     Texas Corral."
2 A. Right.
3 Q. Now you previously testified that other
4     paragraphs with similar language was misleading
5     because this just references employees.
6 A. Right.
7        MR. LONSTEIN: Objection to form.
8     QUESTIONS BY MR. OVERHAUSER:
9 Q. Okay. So is it misleading because you used
10     contractors as opposed to employees?
11 A. That is correct.
12        MR. LONSTEIN: Objection to form.
13     QUESTIONS BY MR. OVERHAUSER:
14 Q. And is it also misleading because it references
15     commercial establishments when, in fact, they
16     just had not yet opened for business?
17        MR. LONSTEIN: Objection.
18 A. Yes.
19 Q. Did you ever discuss with DIRECTV or its
20     attorneys how this declaration was misleading?
21        MR. LONSTEIN: Objection.
22 A. Yeah. I talked to Chris about it, who explained
23     to me that it was okay to sign it because
24     technically it was truthful and even if it was
25     misleading, you know.

Page 64

1 Q. Do you remember him saying anything else?
2        MR. LONSTEIN: Objection.
3 A. Basically I had asked -- I told him about the
4     subcontractor issue, you know, that one of my
5     subcontractors was the one that basically is why
6     we're all sitting here, you know, and basically
7     is not an employee.
8 Q. What -- I'm sorry. What did Chris Hufnagel say
9     about the difference between a subcontractor and
10     an employee?
11       MR. LONSTEIN: Objection.
12 A. Just that a subcontractor -- you know, I talked
13     to him, and he basically said just basically to
14     sign it and not worry about it because a
15     subcontractor is not an employee.
16 Q. Okay. And is that the same thing that you
17     discussed when you had the previous conference
18     call with DIRECTV?
19 A. Yes, I did.
20       MR. LONSTEIN: Objection.
21     QUESTIONS BY MR. OVERHAUSER:
22 Q. Have you since learned that DIRECTV de-authorized
23     the receivers at the Texas Corral restaurants and
24     sued the Spinas for over $100,000?
25       MR. LONSTEIN: Objection to form.

Page 65

1  A.  Yes, I have.
2  Q.  Do you think DIRECTV had the right to de-
3      authorize those receivers?
4          MR. LONSTEIN: Objection.
5  A.  Well, DIRECTV can pretty much do whatever they
6      want when it comes to their pro -- to their
7      equipment and their programming. So, no, I
8      mean...
9  Q.  They can cut off any customer if they want?
10 A.  At any time.
11         MR. LONSTEIN: Objection.
12 A.  Just like they can't pay me whenever they want
13     to.
14         MR. LONSTEIN: Objection;
15     nonresponsive.
16     QUESTIONS BY MR. OVERHAUSER:
17 Q.  So, again, for how long have you known the
18     Spinas?
19 A.  Since high school or before.
20 Q.  Have you known them to be honest and honorable
21     people?
22 A.  Yeah, sure have. I still do business with them
23     as far as video surveillance.
24         MR. LONSTEIN: Objection;
25     nonresponsive: Move to strike.

Page 66

1      QUESTIONS BY MR. OVERHAUSER:
2  Q.  When you had this conference call with DIRECTV
3      and Julie Lonstein and Chris Hufnagel, did you
4      tell them that the Spinas had never moved the
5      DIRECTV equipment from a residence to a business?
6          MR. LONSTEIN: Objection.
7  A.  Yes, I did. I said I found that hard to believe.
8  Q.  Yeah. And, in fact, does -- because you're a
9      DIRECTV authorized retailer, does DIRECTV keep
10     track of every receiver that it ships to you by
11     serial number?
12 A.  Yes, they do.
13 Q.  So is it able to track any particular receiver
14     and figure out which reseller it sent it to?
15         MR. LONSTEIN: Objection.
16 A.  Oh, yeah, sure. Yes.
17 Q.  And just to be clear, when you had your
18     subcontractor install the systems at the two
19     Texas Corral restaurants, you were still an
20     authorized DIRECTV retailer at the time; right?
21 A.  Still am, yes.
22         MR. LONSTEIN: Objection.
23     QUESTIONS BY MR. OVERHAUSER:
24 Q.  And when DIRECTV authorized the DIRECTV receivers
25     at the two Texas Corral restaurants, you were

Page 67

1      still an authorized DIRECTV dealer at the time;
2      right?
3  A.  Still am, yes.
4          MR. LONSTEIN: Objection.
5      QUESTIONS BY MR. OVERHAUSER:
6  Q.  I just have a few questions about how the DIRECTV
7      system works. Is a DIRECTV antenna required to
8      receive DIRECTV programming?
9  A.  Yes.
10         MR. LONSTEIN: Form; objection.
11     QUESTIONS BY MR. OVERHAUSER:
12 Q.  When a DIRECTV subscriber signs up for service,
13     they get a DIRECTV receiver; correct?
14 A.  Yes.
15         MR. LONSTEIN: Objection.
16     QUESTIONS BY MR. OVERHAUSER:
17 Q.  Who actually owns the receiver after it's
18     delivered? DIRECTV or the subscriber?
19         MR. LONSTEIN: Objection.
20 A.  DIRECTV owns all their equipment.
21 Q.  So when a DIRECTV subscription ends, what happens
22     to the DIRECTV receiver?
23         MR. LONSTEIN: Objection.
24 A.  Sometimes -- sometimes they're asked to send it
25     back. If it's older equipment, they tell the

Page 68

1      customer to do with it whatever they want.
2  Q.  Are DIRECTV signals encrypted before they are
3      transmitted from a ground-based satellite?
4  A.  Yes.
5          MR. LONSTEIN: Objection.
6      QUESTIONS BY MR. OVERHAUSER:
7  Q.  And do those signals stay encrypted until they
8      are decrypted by a DIRECTV-owned receiver that
9      DIRECTV has authorized?
10         MR. LONSTEIN: Objection.
11 A.  That is correct.
12 Q.  Are persons that view decrypted DIRECTV
13     programming from a receiver that has been
14     authorized by DIRECTV, authorized by DIRECTV to
15     view that programming?
16         MR. LONSTEIN: Objection.
17 A.  Yes, or they wouldn't be watching TV.
18 Q.  Does DIRECTV continuously maintain control over
19     DIRECTV receivers?
20         MR. LONSTEIN: Objection.
21 A.  Yes.
22 Q.  And each DIRECTV receiver has a unique address;
23     correct?
24         MR. LONSTEIN: Objection.
25 A.  Yes.

Page 69

1  Q.  And DIRECTV can remotely authorize or de-
2      authorize any DIRECTV receiver whenever it wants;
3      correct?
4  A.  They sure can.
5          MR. LONSTEIN: Objection.
6   QUESTIONS BY MR. OVERHAUSER:
7  Q.  Is the TV signal that is output from an
8      activated -- let me say that again.
9          Is the TV signal that is output from an
10     authorized DIRECTV receiver encrypted or
11     decrypted?
12         MR. LONSTEIN: Objection.
13 A.  I'm sorry. Say that again.
14 Q.  The TV signal that is sent out from an authorized
15     DIRECTV receiver, is that signal encrypted or
16     decrypted?
17 A.  It would be decrypted.
18         MR. LONSTEIN: Objection.
19  QUESTIONS BY MR. OVERHAUSER:
20 Q.  And because it's decrypted, can it be input into
21     any conventional television and viewed?
22 A.  Yes.
23 Q.  And so just to make sure I understand, I think
24     you said DIRECTV has -- DIRECTV owns the
25     satellite dish it used to send a signal up to its

Page 70

1      satellites, and it owns the satellite, and then
2      it owns the satellite dish that receives the
3      signal; right?
4          MR. LONSTEIN: Objection.
5  A.  Yeah. Basically the receiver -- the actual dish
6      itself, they don't really -- aren't concerned
7      with that part of it. It's the hardware that
8      decrypts and encrypts the equipment and delivers
9      programming to the TV. That's really -- they
10     pretty much give the -- once they attach it to a
11     customer's house or whatever, that dish becomes
12     that customer's. But the receivers themselves,
13     the parts that's inside that does all the
14     decrypting and encrypting, yes, they own all of
15     that equipment.
16 Q.  Well, is the consumer charged for the satellite
17     dish?
18         MR. LONSTEIN: Objection.
19 A.  Sometimes. It just depends on the fact of the
20     installation, yes.
21 Q.  But in all instances DIRECTV owns the receiver;
22     correct?
23         MR. LONSTEIN: Objection.
24 A.  Yes, that is correct.
25 Q.  Has DIRECTV confirmed to you that anyone watching

Page 71

1      DIRECTV programming through a DIRECTV receiver
2      that has been authorized by DIRECTV is authorized
3      by DIRECTV to watch?
4  A.  Well, sure.
5          MR. LONSTEIN: Objection.
6  A.  Yes.
7  Q.  Has DIRECTV confirmed to you that anyone watching
8      DIRECTV programming through a DIRECTV receiver
9      that has been authorized by DIRECTV is authorized
10     by DIRECTV to watch even if the programming is
11     shown to the public?
12         MR. LONSTEIN: Objection.
13 A.  Yeah, if a receiver is activated, it's activated.
14     Who's watching it, yes, I mean, you know, it's
15     going to be available to anybody. Yes.
16 Q.  Did DIRECTV authorize the display or exhibition
17     to the public of DIRECTV programming at the Texas
18     Corral restaurants in Martinsville and
19     Shelbyville?
20         MR. LONSTEIN: Objection.
21 A.  Well, if the receivers were activated, and they
22     were at DIRECT -- or they were, you know, they
23     were at the Texas Corral, then, yeah, it's going
24     to be seen.
25         MR. LONSTEIN: Objection.

Page 72

1  A.  Yes.
2  Q.  When did it do that?
3          MR. LONSTEIN: Objection.
4  A.  After the system was installed, I believe.
5  Q.  And for how long did DIRECTV's authorization
6      last?
7          MR. LONSTEIN: Objection.
8  A.  Well, from the time we installed it till the time
9      they shut it off. I don't know what the actual
10     time frame is on that. Is that what you're
11     asking? At the Texas Corral?
12 Q.  Yeah, at the Texas Corral?
13 A.  Whatever their opening date was till they shut
14     them off in, what, 2014?
15         MR. LONSTEIN: Objection.
16         MR. OVERHAUSER: I have no further
17     questions.
18         MR. LONSTEIN: Thank you.
19  CROSS-EXAMINATION
20  QUESTIONS BY MR. LONSTEIN:
21 Q.  Mr. Spencer, my name is Wayne Lonstein. I
22     represent DIRECTV in this matter. I'll be asking
23     you a series of questions. If you don't
24     understand a question, please let me know that
25     you don't understand. Otherwise, I'm going to

Page 73

1  assume that you understand the question and are
2  responding to it. Do you understand that?
3  A. Yes.
4  Q. All right. And please answer verbally,
5  especially since I cannot see you, so that way
6  I'll know that -- and the court reporter will
7  know -- that, in fact, you're answering the
8  question. Okay?
9  A. Yes.
10 Q. And Mr. Spencer, again, I want to make sure that
11 you're abundantly clear that you have a right to
12 be represented by an attorney throughout this
13 deposition independent of myself and Mr.
14 Overhauser to protect what rights you may have
15 both civilly or otherwise with respect to any
16 testimony you give. Do you understand that right
17 you have?
18 A. Yes.
19         MR. OVERHAUSER: Are you threatening
20 the witness, Mr. Lonstein?
21         MR. LONSTEIN: No, not at all. I'm
22 just making sure he understands that he's
23 testifying under oath, Mr. Overhauser.
24   QUESTIONS BY MR. LONSTEIN:
25 Q. Mr. Spencer, have you been given any legal advice

Page 74

1  with respect to this deposition by Mr. Overhauser
2  or anybody in his office?
3  A. No.
4  Q. Okay. Now, I'd ask you to look at Exhibit No. 7.
5  A. Yeah.
6  Q. Let me know when you have it?
7  A. I got it.
8  Q. All right. And can you tell me, not the
9  substance of what's in the message, but what does
10 this purport to be?
11 A. What is it -- I'm sorry. What was the question?
12 Q. Sure. Is this a photo of something?
13 A. It's a photo of a text message that I sent Bill
14 and -- yeah, it's a photo of a text message I
15 sent Bill Spina.
16 Q. Okay. Now I notice that it's a text message that
17 appears to say Tuesday, April 7th, 6:04 p.m. Is
18 that correct?
19 A. That is correct.
20 Q. And that's the first part, correct, the first
21 text message?
22 A. That is correct.
23 Q. What type of phone was this text message sent on?
24 A. A Galaxy 5.
25 Q. Do you still own the phone?

Page 75

1  A. I do.
2  Q. All right. And what's the phone number?
3  A. 765-315-8129.
4  Q. And who is the carrier?
5  A. Sprint.
6  Q. Okay. Is there an account associated with this
7  particular cell phone?
8  A. Is there an account?
9  Q. Sure. Is the account -- well, I'm trying --
10 A. Apparently I've got an account with them or I
11 wouldn't have service, would I?
12 Q. I don't know. The question I'm asking, is there
13 an account in your name for this cell phone?
14 A. Actually it's an account that -- it's actually --
15 the name on the account is Patricia Spencer,
16 which is my mother.
17 Q. Okay.
18 A. We share phone service.
19 Q. What is Patricia Spencer's address, sir?
20 A. 2100 Deer Lake Drive.
21 Q. Where? What city?
22 A. Martinsville, Indiana.
23 Q. Okay. And with respect to that account, you're
24 not listed anywhere as being either the owner of
25 the phone or the account; is that correct?

Page 76

1  A. Yeah, I guess it would be.
2  Q. Okay. And have you ever used any services from
3  your provider, your phone provider to back up the
4  data on the phone?
5  A. I don't think so, no.
6  Q. Okay. Do you ever download any photographs or
7  any other information from the phone from time to
8  time?
9  A. Yeah, I believe I do.
10 Q. Okay. Can you explain to me the process by which
11 you do that.
12 A. Well, if somebody sends me something, they can
13 download it to my phone, to my Gmail account or
14 whatever. I mean --
15 Q. Well, tell me how you -- this is -- what I'm
16 seeing is a photocopy of a text message from
17 Tuesday, April 7th. Is that what's before you?
18 A. Yeah, this didn't come from my phone. This came
19 from Bill's phone and it was given to Paul by
20 Bill.
21 Q. So -- okay.
22 A. This is a text message that I sent Bill Spina and
23 Bill Spina copied this and gave it to Paul.
24 Q. Okay. Do you know how this was made?
25 A. Do I know how it was made? The piece of paper?

Page 137

1   at one time we might have had something set up
2   where you could go and check out about what we
3   did as a business.
4 Q. Yeah, a website or a domain?
5 A. Yeah.
6 Q. Is that still in operation, do you know?
7 A. Not to my knowledge. Never used it when I had it
8   and what happened to it after that, I couldn't
9   tell you.
10 Q. Do you recall what the address was, what the
11   domain name was?
12 A. No, I sure don't. I really don't.
13 Q. And what about with respect to the business
14   today, does that have its own website?
15 A. No.
16 Q. So Superior Antenna Systems or SAS has no
17   independent website or e-mail domain?
18 A. No.
19 Q. Okay. Fair enough.
20    MR. LONSTEIN: Thank you, Mr. Spencer.
21   Subject to recross at this point, I have no
22   further questions. Thank you for your patience.
23    MR. OVERHAUSER: A few more questions,
24   Mr. Spencer.
25    THE WITNESS: Yes.

Page 138

1  REDIRECT EXAMINATION
2    QUESTIONS BY MR. OVERHAUSER:
3 Q. You were asked several times about the affidavit,
4   Exhibit 6, and whether particular paragraphs of
5   it were correct; right?
6 A. Right.
7 Q. And you testified that some of these paragraphs
8   are correct; right?
9 A. Some of them are. Some of them -- the reason why
10   I feel they're kind of misleading is because
11   they're talking about employees and myself, when
12   actually a subcontractor is the one that created
13   this mess.
14 Q. Right. So when Mr. Lonstein was asking you
15   whether certain allegations were correct, do you
16   stand by your earlier testimony that overall the
17   affidavit is misleading?
18    MR. LONSTEIN: Objection.
19 A. I do feel like it's misleading because we don't
20   have anything about subcontractors in here, and
21   that's who did the installations at both these
22   places.
23 Q. Yeah. And is it also misleading because when the
24   installations were done, the restaurants had not
25   yet opened for business?

Page 139

1 A. Well, they hadn't opened for business.
2 Q. So they weren't commercial locations?
3 A. That's a fact.
4    MR. LONSTEIN: Note my objection.
5    THE COURT REPORTER: I'm sorry. Did
6   you say "note my objection"?
7    MR. LONSTEIN: Yes, to both. There
8   were two questions in there. If you could just
9   note my objection. Thank you.
10  QUESTIONS BY MR. OVERHAUSER:
11 Q. Now Mr. Lonstein asked you about a text message
12   from Bill Spina.
13 A. Right.
14 Q. And you said you got one in the last week or two
15   saying he needed a new camera at a car wash.
16 A. Right.
17 Q. All right. Do you -- are you able to install a
18   new camera at a car wash?
19 A. Yes.
20 Q. Do you have to have DIRECTV authorization for you
21   to install a camera at a car wash?
22 A. I don't have to have anybody except the guy
23   that's paying the bill.
24 Q. Well, do you need DIRECTV's authorization --
25 A. No.

Page 140

1 Q. -- to install --
2 A. No.
3 Q. -- a receiver at a restaurant?
4   Can't anybody install a receiver --
5 A. Sure.
6 Q. -- anyplace they want to?
7 A. If they've got the equipment and they're an
8   authorized --
9    MR. LONSTEIN: Note my objection to the
10   questions, both of them.
11 A. Yes.
12 Q. So anybody can install a DIRECTV receiver
13   anywhere they want?
14    MR. LONSTEIN: Objection.
15 A. If they have one, yes, they can.
16 Q. And isn't the real issue whether or not DIRECTV
17   authorizes that receiver to display DIRECTV
18   programming; right?
19    MR. LONSTEIN: Objection.
20 A. Correct.
21 Q. Because only DIRECTV authorizes receivers;
22   correct?
23 A. That is correct.
24    MR. LONSTEIN: Objection.
25 Q. And whenever anyone asks DIRECTV to authorize a

Page 141

1  receiver, it's up to DIRECTV to decide whether
2  they want to do it or not; right?
3        MR. LONSTEIN: Objection.
4  A. Yeah, of course.
5  Q. So when Mr. Lonstein was asking you whether you
6     had authorization from DIRECTV to install at
7     commercial locations, isn't it true that you
8     don't need any authorization from DIRECTV to
9     install a DIRECTV receiver anywhere you want?
10 A. Well, there are guidelines at the business,
11    Superior Antenna Systems, SAS Digital, Maxwell
12    Spencer Enterprises, anybody is supposed to
13    follow. But once they hand that equipment to an
14    individual subcontractor, employee, anything can
15    happen.
16 Q. Okay. So just so I'm -- just so I'm clear.
17    Suppose I came to you and I said I have this
18    DIRECTV receiver here. I want to install it in
19    my business. Could you hook it up?
20       MR. LONSTEIN: Objection.
21 A. If you came to me and personally asked me if I
22    could help you hook up a receiver?
23 Q. Yeah.
24 A. And wanted to pay me to do it, could I do it?
25    Yes.

Page 142

1  Q. You don't have to get DIRECTV's authorization to
2     do everything you do, do you?
3        MR. LONSTEIN: Objection.
4  A. Everything I do -- no.
5  Q. So you're allowed to do things even if DIRECTV
6     doesn't authorize you to do them; right?
7  A. You mean other forms of business --
8  Q. Yeah.
9  A. -- or is this through -- are we talking --
10       MR. LONSTEIN: Objection to form.
11 A. Big scope or? I mean, do I solely work for
12    DIRECTV? No, I don't.
13 Q. Okay.
14 A. That's why we're called independent agents.
15 Q. And DIRECTV has no right to tell you whether or
16    not you can install a camera at a car wash, does
17    it?
18 A. No.
19 Q. And they have no right to tell you where you can
20    or cannot hook up a DIRECTV receiver, do they?
21 A. No.
22       MR. OVERHAUSER: No further questions.
23       MR. LONSTEIN: Just a couple more, Mr.
24    Spencer.
25       THE WITNESS: Yeah.

Page 143

1  RECROSS-EXAMINATION
2     QUESTIONS BY MR. LONSTEIN:
3  Q. When Mr. Overhauser phrased the question to you
4     before about installing a DIRECTV receiver at a
5     business, you said you could do that; correct?
6  A. If somebody has a receiver -- he asked me if I
7     have a receiver, him, personally, is the way I
8     understood the question.
9  Q. Yep. No. Absolutely. I understand the way you
10    did.
11 A. And if he wants me to go in there and hook it up
12    and he wants to pay me to do that, sure, I can do
13    that.
14 Q. Right. Just like you could install the camera at
15    the car wash; correct?
16 A. There you go. There you go.
17 Q. Right. Can you request that the receivers be
18    activated in the business you just answered the
19    question, the hypothetical business that Mr.
20    Overhauser asked you?
21 A. Well, at that point I could have them as a
22    customer call DIRECTV and they could get it
23    activated, sure.
24 Q. Right. But you can't request the activation, can
25    you, individually?

Page 144

1  A. No. I mean, you can actually do it through their
2     automated system where it doesn't require to talk
3     to anybody. It's just that's what this Lavance
4     guy did. He went on the automated system and lit
5     up these receivers without my knowledge, you
6     know. And that's how it got done. So, you know,
7     did Bill and Vic know that they were doing
8     something wrong? I don't think they did. Did
9     Mark Lavance mislead them in telling them, you
10    know, it was okay to do that? Yes, I believe he
11    did, but --
12 Q. Do you know -- I'm sorry. I don't want to
13    interrupt.
14 A. Go ahead. Go ahead.
15 Q. Do you as a DIRECTV residential dealer today have
16    the authority to request either by the automated
17    system or by phone call, or in any fashion, do
18    you have the authority or ability to activate
19    receivers at a business or commercial location?
20       MR. OVERHAUSER: Authority or ability?
21    Was that the question?
22       MR. LONSTEIN: Yes.
23 A. The authority, no. The ability, yes.
24 Q. Okay. And by authority you mean the --
25 A. Are we supposed to do it?

Page 149

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIRECTV, LLC, a California )
Limited Liability Company, )
                           )
              Plaintiff,   )
                           ) CIVIL ACTION NO.:
vs.                        ) 1:15-cv-00104-JMS-TAB
                           )
VICTOR A. SPINA, JR., WILLIAM )
A. SPINA, and MARTINSVILLE )
CORRAL, INC.,              )
                           )
              Defendants.  )

The deposition of CRAIG A. SPENCER, taken in the above-captioned case, on June 20, 2016, and at the time and place hereof.

It was requested that said deposition be transcribed and reduced to typewritten form.

It was requested by the deponent, that the signature of the deponent to the deposition be waived; said deposition to be read with the same force and effect as if signed by said deponent.

(The reading, examination and signature by the witness is hereby waived by the witness.)

FURTHER THE DEPONENT SAITH NOT

(Signature Waived)
_____
CRAIG A. SPENCER

SMITH REPORTING
400 NORTH HIGH STREET
SUITE 200
MUNCIE, INDIANA  47305
smithreporting.net

Page 150

STATE OF INDIANA )
                 } SS.
COUNTY OF DELAWARE)

CERTIFICATE OF COURT REPORTER

I, Mary Beth Schafer, the undersigned Court Reporter and Notary Public, residing and maintaining offices in the City of Muncie, County of Delaware, State of Indiana, do hereby certify:

That at the time and place described in this transcript, the deponent, CRAIG A. SPENCER, presented himself before me for administration of an oath of truthfulness, which oath I then administered;

That I then reported to the best of my ability in machine shorthand all of the words spoken by all parties in attendance during the course of the ensuing proceedings, including objections, if any, made by all counsel present;

That I later reduced my stenographic notes into the foregoing typewritten transcript form, which typewritten transcript is a true record of the testimony given by this witness as stated above;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney or employee of any of the parties, that I am not a relative of an employee of such attorney or counsel, and that I am not financially interested in this action.

IN WITNESS HERETO, I have affixed my Notarial Seal and subscribed my signature below this 21st day of June, 2016.

_____
Mary Beth Schafer, RPR, Notary Public

County of Residence:  Delaware
My Commission Expires:  April 11, 2023