IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DIRECTV, LLC, a California limited | ) | Case No.: 1:15-cv-00104-JMS-TAB |
| liability company | ) | |
|         Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR A. SPINA, JR., MARTINSVILLE | ) | |
| CORRAL, INC., and WILLIAM SPINA | ) | |
|         Defendants. | ) | |

**CROSS-MOTION, BRIEF IN SUPPORT AND RESPONSE IN OPPOSITION BY DEFENDANTS**

Paul B. Overhauser
**OVERHAUSER LAW OFFICES LLC**
740 W. Green Meadows Dr., Suite 300
Greenfield, IN 46140-4019
Phone: 317-467-9100
poverhauser@overhauser.com
Attorneys for Defendants

# Table of Contents

I.   CROSS-MOTION. ........................................................................................................ 4

II.  SUMMARY OF RESPONSE AND CROSS-MOTION. ..................................................... 4

III. OBJECTIONS TO DIRECTV'S SUMMARY JUDGMENT EVIDENCE. ........................... 6

    A.   Affidavit of Kent Mader [ECF 79-9]. ...................................................................6

    B.   Affidavit of Julie Lonstein [ECF 79-10]...............................................................6

IV.  FACTS. ....................................................................................................................... 7

V.   DIRECTV'S MOTION: STATEMENT OF MATERIAL FACTS IN DISPUTE (ON DIRECTV'S COUNT I).   10

    A.   Element: Unauthorized Channel of Reception. ...................................................10

    B.   Element - DirecTV is not "Aggrieved." ...............................................................13

VI.  CROSS-MOTION: STATEMENT OF MATERIAL FACTS NOT IN DISPUTE (ON DIRECTV'S COUNTS I AND II). ....................................................................................................... 14

    A.   Element – No Defendant "Intentionally" Intercepted...........................................14

    B.   Element – DirecTV's Programming is "Readily Accessible to the General Public."..................................................................................................................14

VII. ARGUMENT................................................................................................................. 15

    A.   The Allegedly "Intercepted" Communications Occurred on Afternoons of June 3 and 4, 2014, But Were Not Viewed By Anyone Except DirecTV's Authorized "Auditor."..............................................................................................................15

    B.   Because 47 U.S.C. § 605 and 18 U.S.C. § 2511 are Criminal Statutes, they Must Be Strictly Construed, and Any Ambiguity Must Be Resolved in Favor of Lenity.16

    C.   MCI Did Not Violate 47 U.S.C. § 605(a). ...........................................................16

        1.   DirecTV's Evidence Does Not Establish That MCI used an "Unauthorized" Channel of Reception to Receive DirecTV Communications. ..................16

        2.   DirecTV is not "Any Person Aggrieved."....................................................18

    D.   MCI is Entitled to Summary Judgment on DirecTV's Count II - Violation of 18 U.S.C. §2511..................................................................................................20

        1.   There was no "Interception."........................................................................20

        2.   No Defendant Acted "Intentionally."...........................................................20

        3.   Because DirecTV's Programming is "Readily Accessible to the General Public," 18 U.S.C. §2511(2)(g) Bars Liability for Interception..................20

E.      MCI is Entitled to Summary Judgment on DirecTV's Claims to the Extent They Seek to Recover for Damages to Injury to its Reputation, Goodwill, Proprietary Rights or Privacy Rights. .....................................................................................21

F.      Victor Spina and William Spina are Not "Vicariously Liable." ...........................22

     1.    DirecTV's Failure to Identify a "Vicarious Liability" Claim in its Statement of Claims Bars its Attempt to Assert it Now............................................... 22

     2.    47 U.S.C. § 605(e)(3) Does Not Allow "Vicarious Liability." .................. 22

**VIII.**   C<small>ONCLUSION</small> ..................................................................................................................... **24**

# I.   CROSS-MOTION.

Defendants Martinsville Corral, Inc., Victor Spina and William Spina (collectively, "MCI") hereby cross-move for summary judgment on Plaintiff DirecTV's two remaining[1] claims: Count I - Violation of Communications Policy Act [47 U.S.C. § 605(e)(3)(C)] and Count II - Violation of 18 U.S.C. §2511.

# II.   SUMMARY OF RESPONSE AND CROSS-MOTION.

DirecTV only seeks summary judgment only as to its Count I - Violation of Communications Policy Act [47 U.S.C. § 605(e)(3)(A)], but not Count II - Violation of 18 U.S.C. §2511.   MCI seeks cross-summary judgment on both Counts, and on DirecTV's implicit claims for damages to goodwill, reputation and proprietary rights, including its contractual privacy rights.

It is undisputed that DirecTV's authorized retailer Craig Spencer / SAS supplied and installed DirecTV's receivers at MCI's two restaurants, and that DirecTV authorized each of those receivers to receive and display DirecTV programming.   It did this by transmitting authorization codes those DirecTV receivers.   This act made those receivers "authorized channels of reception" for DirecTV signals.   Because MCI used *authorized* receivers to receive DirecTV's signals, there has been no violation of 47 U.S.C. § 605(a), which is violated only when an *unauthorized* "channel of reception" is used.

A second reason why summary judgment in MCI's favor is proper under 47 U.S.C. § 605 is that, in addition to receiving a communication through an *un*authorized channel of reception, §605(a) requires that the communication be *further* "divulged or published" by the recipient There is no evidence that the allegedly "intercepted" DirecTV programming sent on the

_____

[1] The Court dismissed DirecTV's Count III for Conversion at ECF 43.

4

afternoons of June 3 and 4, 2014 was ever so "divulged or published" to anyone. The only person who saw the accused "communications" was DirecTV's "auditor" Kevin Karlak, who was authorized to receive them. There is no evidence that anyone else was in the restaurants at these times, let alone saw the accused "publications."

A third reason why summary judgment in MCI's favor is proper is that only "a person aggrieved" has a private cause of action under 47 U.S.C. § 605(e)(3)(A), but DirecTV is not "aggrieved." MCI paid all of its subscription invoices to DirecTV. Although DirecTV's Complaints allege that DirecTV suffered harm to its reputation, goodwill and proprietary rights, there is no summary judgment evidence of such harm, so DirecTV is not "aggrieved," and not entitled to relief under 47 U.S.C. § 605(e)(3)(A).

MCI is entitled to cross-motion for summary judgment on DirecTV's Count II - Violation of 18 U.S.C. §2511 for essentially the same reasons as Count I. Count II requires an "interception" of an "electronic communication," but no "interception" occurred because MCI had an active DirecTV subscription on June 3 and 4, 2014. In addition, 18 U.S.C. §2511(1) only imposes liability to only persons that "intentionally" intercept. Here, even if there was an "interception," (and there was not) it was not an *intentional* interception because MCI believed is DirecTV subscription allowed it to receive DirecTV communications. A third reason why there is no liability under Count II is that 18 U.S.C. §2511(2)(g) states that there is no liability for any communication "made through an electronic communication system that is configured that such electronic communication is *readily accessible to the general public*." Here, DirecTV has made its programming "readily accessible to the general public" by, for example, entering into agreements that allow its programming to be "accessible to the general public," such as by anyone at the Denver International Airport. In fact, by making its programming publicly

available through such agreements, DirecTV is precluded from asserting a private cause of action under 18 U.S.C. 2520 against *anyone*, not just MCI.

## III.    OBJECTIONS TO DIRECTV'S SUMMARY JUDGMENT EVIDENCE.

### A.    Affidavit of Kent Mader [ECF 79-9].

MCI objects to DirecTV's reliance on the affidavit of Kent Mader [ECF 79-9] on the grounds that it purports to proffer testimony on topics for which DirecTV failed to produce a prepared Rule 30(b)(6) corporate representative.  MCI has filed a separate Motion for Sanctions [ECF 103] seeking dismissal of DirecTV's Complaint, or in the alternative, a lesser sanction.  A lesser sanction could be having certain facts be deemed established, such as the facts that receivers in MCI's restaurants were "authorized channels of reception" and that MCI did not "intercept" DirecTV's signals.  A lesser sanction could also include barring DirecTV from relying on evidence from Mr. Mader, who this Court found was an inadequately-prepared corporate representative of DirecTV.  [ECF 85].  To be clear, the sanction sought by MCI does not seek to bar *itself* from relying on Mr. Mader's deposition testimony; it only seeks to preclude *DirecTV* from relying on Mr. Mader's deposition or affidavit testimony.

### B.    Affidavit of Julie Lonstein [ECF 79-10]

MCI objects to the Affidavit of Julie Lonstein [ECF 79-10].  It does not qualify as a sworn declaration pursuant to 28 U.S.C. § 1746  because it does not recite that its contents are "true and correct" nor state the date on which it was executed. [2]  It is not admissible as an

---

[2] Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public)**, such matter may**, with like force and effect, **be supported**, evidenced, established, or proved **by the unsworn declaration**, certificate, verification, or statement, in writing of such person which is subscribed by him, **as true** under penalty of perjury, and dated, **in substantially the following form**:

affidavit because it is fatally flawed -- it does not have a handwritten notary signature. Local Rule 5-7 states:

> A signature on a document other than a document filed as provided under subdivision (a) [relating to "A pleading, motion, brief, or notice filed electronically under an attorney's ECF log-in"] *must be an original handwritten signature and must be scanned into .pdf format for electronic filing.*"

However, the purported signature of the alleged Notary Public on Ms. Lonstein's affidavit is "/s/ April Draganchuk," so it is not "*an original handwritten signature*" that was "*scanned into .pdf format for electronic filing.*" This "signature" also does not comply with New York law regarding the notarization of documents, which requires a "signature in black ink."[3] New York Executive Law § 137 at p. 8.

Regarding a similar "affidavit" of Ms. Lonstein, at least one other court has ruled that due to its defects, "that Lonstein's affidavit and its attached exhibits are incompetent summary judgment evidence, and the Court will not consider them." *Zuffa, LLC v Trappey*, Case 11-0006 (W.D. La., March 22, 2012) at p. 5. As in *Zuffa*, this court also should not consider Ms. Lonstein's Declaration or referenced exhibits.

## IV.  FACTS.

DirecTV claims that Defendants did not have a valid "account" for DirecTV programming on June 3-4, 2013, so certain DirecTV communications transmitted to MCI's

---

(1) If executed without the United States: "**I declare (or certify, verify, or state)** under penalty of perjury under the laws of the United States of America that **the foregoing is true and correct**. **Executed on (date).**
(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "**I declare** (or certify, verify, or state) under penalty of perjury **that the foregoing is true and correct. Executed on (date)**.
(Signature)".

[3]According to ECF 56-1, p. 10. Draganchucks' siguature is: *April Draganchuk* . This is obviously different than *April Draganchuk* /s/ April Draganchuk ___ which appears on Lonstein's Declaration at ECF 79-10, p. 13.

restaurants must have been "intercepted." However, it is undisputed that MCI had paid its DirecTV subscription invoice for "06/01/2014 – 06/30/2014." (ECF 105-1, Ex. 1 Wm. Spina Decl. at p. 3, ¶¶ 11 – 12). Moreover, having an "account" is not even relevant to whether "interception occurred."

William Spina and Victor Spina, Jr. are brothers and co-owners of Martinsville Corral, Inc. In 2009, MCI opened a Texas Corral restaurant in Martinsville. (ECF 105-1, Ex. 1 W. Spina Decl., ¶¶ 2, 19). Before the restaurant opened, William Spina contacted DirecTV's local representative Craig Spencer d/b/a/ SAS, and asked him to provide equipment that would allow DirecTV signals to be received at the restaurants. DirecTV supplied Mr. Spencer with seven DirecTV receivers, and Spencer or his contractors installed them at the restaurants. (ECF 105-1, Ex. 1 W. Spina Decl., at ¶¶ 3-6, 9). After the installation, DirecTV "authorized" the installed DirecTV receivers by transmitting a code to them, which enabled them to receive DirecTV communications. (ECF105-6, Ex. 6, Spencer Dep. at p. 21:10 – 24:17, 26:21-24; 68:18-69:4). Upon being authorized, the DirecTV receivers became the "channel of communication" by which MCI was able to receive DirecTV communications. (ECF 105-6, p. 7, Ex. 6, Spencer Dep. at p. 22:23:25). When DirecTV receivers are authorized, human beings are authorized by DirecTV to view programming through those receivers. (ECF 105-3, p. 18, Ex. 3, Mader Depo. at 18, ¶ 74:10-18). DirecTV also started billing MCI monthly for a DirecTV subscription. Later, the restaurant opened for business.

In 2011, MCI opened a second Texas Corral restaurant in Shelbyville, and the same process for installing and authorizing three DirecTV receivers was repeated. (ECF 105-1, p. 2, Ex. 1 W. Spina Decl., at ¶¶ 7-9). The three additional DirecTV receivers and charges for them were added to MCI's subscription invoices, appearing as "Additional TV." Thus, DirecTV

charged MCI monthly for ten authorized DirecTV receivers. MCI has always timely paid its DirecTV invoices, including its $158.88 invoice for service for the month of June 2014. (ECF 105-1, at p. 2, Ex. 1 W. Spina Decl., at ¶¶ 9-12).

Although William and Victor Spina own MCI, neither works at the restaurants; they have jobs working as housebuilders for Vic Spina Custom Homes, Inc. MCI is an investment for them, and each store has its own general manager. (ECF 105-1,at p. 5, W. Spina Decl., at ¶¶ 18-19).

DirecTV sent MCI a subscription invoice for "service period 06/01/2014 – 6/30/2014" with an amount due of $158.22. MCI timely paid this invoice with check no. 9031 in the amount of $158.22. (ECF 105-1, p. 3, Ex. 1 W. Spina Decl. at p. 3, ¶¶ 11 – 12).

Kevin Karlak is an "auditor" for DirecTV, and is authorized to view DirecTV programming. (ECF 106-3, p. 26, Ex. 3,Mader Depo. at p. 106:6-107:16). On June 3, 2014 from 3:42 pm – 3:52 pm he was present at the Martinsville Texas Corral and observed DirecTV programming. (ECF 79-2 at p. 2-3 (Karlak Affid. for Martinsville). On June 4, 2014 from 2:31 pm – 2:40 pm he was present at the Shelbyville Texas Corral and observed DirecTV programming. (ECF 79-5 at p. 2-3 (Karlak Affid. for Shelbyville)). There is no evidence that anyone other than Mr. Karlak saw the DirecTV programming that Mr. Karlak viewed at either restaurant. (ECF 105-3, p. 26, Mader Depo. at p. 107:17-109:18).

On June 27, 2014, DirecTV de-authorized the DirecTV receivers at MCI's restaurants by transmitting signals to them, and stopped sending MCI invoice subscriptions. As of that date, DirecTV monthly subscription invoices had totaled about $9,000, and all those invoices had been timely paid by MCI. . (ECF 105-1, p. 4, Ex. 1, W. Spina Decl., at ¶ 14-15); (ECF 105-3, p. 18, Ex. 3, Mader Depo. at p. 74:19-23).

On January 25, 2015, DirecTV filed two Complaints against MCI and the Spina's individually. Each Complaint seeks "damages in the amount of $10,000 for each violation of 47 U.S.C. § 605, plus an additional $100,000 for each violation pursuant to 47 U.S.C. § 605(e)(3)(C)(ii)." e.g, [ECF 001 in 1:15-00104-cv-JMS-TAB at p. 11].

The Complaint filed under Case No. 1:15-00104-cv-JMS-TAB is predicated on Mr. Karlak's viewing of DirecTV programming on June 4 at the Shelbyville restaurant, and the Complaint filed under Case No. 1:15-00105-cv-TWP-TAB is predicated on his viewing on June 3 at the Martinsville restaurant. Neither William Spina nor Victor Spina Jr. were present at the restaurants during those times. (ECF 105-1 at p. 5, Ex. 1, W. Spina Dec., ¶ 17; ECF 105-2, Ex. 2, V. Spina Dec., ¶ 5). Both Complaints have been consolidated under this case no. 1:15-00104-cv-JMS-TAB. [ECF 33, Order].

## V. DIRECTV'S MOTION: STATEMENT OF MATERIAL FACTS IN DISPUTE (ON DIRECTV'S COUNT I).

### A. Element: Unauthorized Channel of Reception.

For DirecTV's Motion for Summary Judgment on Count I - Violation of Communications Policy Act [47 U.S.C. § 605(e)(3)(C)], MCI submits that the motion is fatally defective because it does not proffer *any* summary judgment evidence that MCI used an "unauthorized channel of reception" to receive for DirecTV signals. However, should the court construe DirecTV's evidence as somehow alleging that MCI used an "unauthorized channel of reception," MCI submits the following evidence showing that existence of this element is disputed:

1. A DirecTV receiver is the channel used to receive DirecTV signals (ECF 105-6 at p. 7, Ex. 6, Spencer Dep. at p. 22:23:25).

2.   Each DirecTV receiver has a unique address, and DirecTV is the only one able to authorize (or de-authorize) a DirecTV receiver to receiver DirecTV signals.  It does this by transmitting the receiver a code to turn it on or off.   (ECF 105-6 , Ex. 6, Spencer Dep. At p. 21:10 – 24:17, 26:21-24; 68:18-69:4).

3.   DirecTV is the only one that is able to authorize a receiver.  (ECF 105-6, p. 11, Ex. 6, Spencer Dep. At p. 40:9-11).

4.   DirecTV has confirmed that anyone, including the public, watching DirecTV programming through a DirecTV receiver that has been authorized by DirecTV is authorized by DirecTV to watch.  (ECF 105-6, at p. at 16, Ex. 6, Spencer Dep. At p.70:25-71:15;  (ECF 101-3, p. 18, Ex. 3, Mader Depo. at p. 74:10-18).

5.   Craig Spencer / his business SAS was an authorized DirecTV retailer when he installed DirecTV receivers at MCI's restaurants.  (ECF 101-6, p. , Ex. 6, Spencer Dep. at p. 66:17-21).

7.   DirecTV authorized the DirecTV receivers at MCI's restaurants when they were installed. (ECF 101-6, p. 8, Ex. 6, Spencer Dep. at  p. 27:24-30:2 (Martinsville Restaurant), p. 32:10-35-15; p. 55:4:11 (Shelbyville Restaurant);  (ECF 105-3, p. 18, Ex. 3,  Mader Depo. at p. 73:6-74:9).

8.   DirecTV paid Craig Spencer for setting up MCI's DirecTV account, and then paid him monthly residuals for as long as MCI's account was active – until DirecTV cancelled MCI's account in June 2014. (ECF 105-6, Ex. 6, Spencer Dep. at  p. 11:8-12:9; p. 71:16-72:14).

9.   DirecTV's receivers at MCI's restaurants remained authorized until DirecTV de-authorized the receivers and cancelled the subscription associated with those receivers in late

June of 2014.  ([ECF 105-6, p. 16, Ex. 6, Spencer Dep. at  p. 71:16-72:14)](#);  [ECF 101-1, p. 4, Ex. 1, Wm. Spina Decl. ¶ 14](#)).  ([ECF 101-3, p. 18, Ex. 3,  Mader Depo. p. 73:6-74:9](#)).

10.     The address to which DirecTV sent its subscription invoices for the receivers at the Texas Corral restaurants was: PO Box 1925, Martinsville, IN 46151.  This is the address for MCI's Texas Corral restaurants, to which all of MCI's other suppliers send their invoices.   The invoices included one for "service period 06/01/2014 – 6/30/2014" with an amount due of $158.22.   The invoice listed that service was provided for one "Primary TV" and nine "Additional TV."  MCI did not have more than ten DirecTV receivers or TV's at its Texas Corral restaurants.  In payment for this invoice, DirecTV cashed MCI's check no. 9031 in the amount of $158.22.  ([ECF 105-1, p. 3, Ex. 1, W. Spina Decl., ¶¶ 11 – 12](#)).

11.     From 2009 – 2014, MCI paid DirecTV about $100 - $150 per month for it to supply MCI with authorized DirecTV receivers that could receive DirecTV programming.   ([ECF 105-1, p. 3, Ex. 1, W. Spina Decl., ¶¶ 11 – 12](#)).

12.     The only DirecTV  receivers MCI had at its restaurants were those installed by Craig Spencer d/b/a SAS, all of which DirecTV authorized at the time of installation, and which were listed on DirecTV's subscription invoices sent to MCI.  ([ECF105-1, at 2  (Ex. 1, Wm Spina Decl, ¶ 9](#)).

13.     Neither William Spina or Victor Spina Jr. manage either of MCI's Texas Corral restaurants; both restaurants are managed by full time general manager. ([ECF 105-1, p. 5, Ex. 1. W. Spina Decl., ¶ 18](#)).

15.     The only DirecTV signals at issue in this case are those that occurred when DirecTV's investigator, Kevin Karlak, was at the restaurants.  ([ECF 105-7, p. 2, Ex. 7 DirecTV Answer to Interrogatory No. 3](#) – referring to DirecTV's "auditor affidavits" of Kevin Karlak).

These times were on June 3, 2014 from 3:42 pm – 3:52 pm at the Martinsville Texas Corral, and June 4, 2014 from 2:31 pm – 2:40 pm at the Shelbyville Texas Corral. (ECF 79-2 at p. 2-3 (Karlak Affid. for Martinsville); ECF 79-5 at p. 2-3 (Karlak Affid. for Shelbyville)). Neither William Spina nor Victor Spina Jr. were at the restaurants during those times (ECF 105-1, p. 5, Ex. 1, W. Spina Dec., ¶ 17; ECF 105-2, Ex. 2,V. Spina Dec., ¶ 5).

16. MCI is an investment of William Spina and Victor Spina Jr. Both work as housebuilders for Vic Spina Custom Homes, Inc.; Victor Spina Jr. on a full-time basis, and William Spina on a mostly full-time basis. (ECF 105-1, p. 5, Ex. 1W. Spina Decl. ¶ 19; ECF 105-2, V. Spina Decl., ¶ 7).

**B.     Element - DirecTV is not "Aggrieved."**

MCI further submits that DirecTV's motion is fatally defective because it does not proffer summary judgment evidence that it has been "aggrieved" by any purported violation 47 U.S.C. § 605(a). However, should the court construe DirecTV's evidence as alleging that it has been aggrieved, MCI submits the following that evidence that this element is disputed:

1. From June 2009 through the end of June 2014, all subscription invoices sent to MCI for the DirecTV receivers located at MCI's two Texas Corral restaurants were paid. In particular, DirecTV was paid for all DirecTV receivers at both Texas Corral restaurants on June 3 and 4, 2014. (ECF 105-5, p. 3, Ex. 1 W. Spina Decl. at ¶ 11).

2. Neither Martinsville Corral, Inc., William Spina or Victor Spina Jr. has made any statement or communication or issued any material, that defames, libels, slanders or disparages DirecTV or its goods, products or services, or that has injured its reputation, goodwill or proprietary rights, including privacy rights. (ECF 105-1, p. 5, Ex. 1, Wm. Spina Decl. ¶ 16; ECF 105-2,  Ex. 2, V. Spina Decl., ¶ 4).

**VI.** **CROSS-MOTION: STATEMENT OF MATERIAL FACTS NOT IN DISPUTE (ON DIRECTV'S COUNTS I AND II).**

For MCI's cross-motion for summary judgment on DirecTV's Counts I and II, MCI incorporates by reference the above facts in Section III. In addition, with respect to DirecTV's Count II, MCI further proffers the following evidence.

**A.** **Element – No Defendant "Intentionally" Intercepted.**

1. Neither Martinsville Corral, Inc., William Spina or Victor Spina, Jr. intentionally intercepted, endeavored to intercept or procured any other person to intercept or endeavor to intercept any DirecTV communication. From June 2009 to the end of June 2014 , Martinsville Corral, Inc., William Spina and Victor Spina believed that the receipt, display and publication of DirecTV programming through the DirecTV receivers at the Texas Corral restaurants was authorized by DirecTV. (ECF 105-1, p. 4, Ex. 1, Wm. Spina Decl. ¶ 14; ECF 105-2, Ex. 2 V. Spina Decl., ¶ 3).

2. When the DirecTV systems were installed at MCI's two restaurants, it was told by the DirecTV representatives that performed the installation that the receipt and display of DirecTV communications on the televisions connected to DirecTV receivers at the restaurants was authorized. (ECF105-1, Ex. 1 Wm. Spina Decl. at ¶¶ 6, 8, 14).

**B.** **Element – DirecTV's Programming is "Readily Accessible to the General Public."**

DirecTV has made its programming "readily accessible to the general public" by, for example, entering into agreements that allow is programming to be "accessible to the general public," such as by anyone at the Denver International Airport. [ECF105-9, Ex. 9, DirecTV Press Release re: Denver International Airport]. The Denver airport is "public," and any of the

travelers passing through the airport "would have been able to see DirecTV programming at the airport" because they would be "legitimate viewers." (ECF 101-3, p. 37, Ex. 3, Mader Depo. at p. 152:7 -153:16 ).


**VII.**     **ARGUMENT.**

       **A.**      **The Allegedly "Intercepted" Communications Occurred on Afternoons of June 3 and 4, 2014, But Were Not Viewed By Anyone Except DirecTV's Authorized "Auditor."**

       To be clear, although MCI had a DirecTV subscription for its restaurants from June 2009 – June 2014, DirecTV, the only DirecTV signals at issue in this case are those that occurred when DirecTV's investigator, Kevin Karlak, was at the restaurants. . (ECF 105-7, p. 2, Ex. 7 DirecTV Answer to Interrogatory No. 3 – referring to DirecTV's "auditor affidavits" of Kevin Karlak). These times were on June 3, 2014 from 3:42 pm – 3:52 pm at the Martinsville Texas Corral, and June 4, 2014 from 2:31 pm – 2:40 pm at the Shelbyville Texas Corral. (ECF 79-2 at p. 2-3 (Karlak Affid. for Martinsville); ECF 79-5 at p. 2-3 (Karlak Affid. for Shelbyville)). Neither William Spina nor Victor Spina Jr. were present at the restaurants during those times (ECF 105-1, p. 5, Ex. 1 W. Spina Dec., ¶ 17; ECF 105-2, Ex. 3, V. Spina Dec., ¶ 5). In fact, Mr. Karlak's affidavits do not allege that *anyone* was present in the restaurants during these times, or that anyone other than himself saw the allegedly "intercepted" DirecTV programming. Moreover, DirecTV concedes that Mr. Karlak was "authorized" to the DirecTV programming he claims to have seen. (ECF 105-3, p. 26, Mader Depo. at p. 106:6-107:16).

**B.** **Because 47 U.S.C. § 605 and 18 U.S.C. § 2511 are Criminal Statutes, they Must Be Strictly Construed, and Any Ambiguity Must Be Resolved in Favor of Lenity.**

47 U.S.C. § 605 and 18 U.S.C. §2511 are criminal statutes[4] that also provides a private causes of action.[5] As "a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity." *United States v. Enmons*, 410 U.S. 396, 411 (1973).

**C.** **MCI Did Not Violate 47 U.S.C. § 605(a).**

1.  DirecTV's Evidence Does Not Establish That MCI used an "Unauthorized" Channel of Reception to Receive DirecTV Communications.

DirecTV's 317 pages of summary judgment evidence have a gaping hole: evidence of "interception" by any defendant, or to quote 47 U.S.C. § 605, evidence that MCI did *not* use an "*authorized* channel of reception" to receive DirecTV's signals on the afternoons of June 3 and 3, 2014. DirecTV does not, and cannot, allege that MCI did not use an "authorized channel of reception." Instead, it tries to confuse the court by substituting an allegation that after searching its records, it could not find that MCI had a "commercial account." The following is the key factual allegation on which DirecTV bases its claims against MCI:

> DIRECTV conducted a search of its records and determined that there were *no DIRECTV commercial accounts* for either the Martinsville Texas Corral, located and doing business at 610 Birk Road, Martinsville, IN 46151, or the Shelbyville Texas Corral, located and doing business at 2103 Intelliplex Dr. Shelbyville, IN 46176, authorized to receive DIRECTV's commercial programming.

[DirecTV's *Brief*, Alleged Undisputed Material Fact No. 34, ECF 80 at p. 8, citing ECF 79-9, at p. 6, Affid. Of K. Mader, ¶ 12.]

---

[4] The criminal penalties are set forth at 47 U.S.C. § 605(e)(1) and (2) and 18 U.S.C. §2511(1).
[5] 47 U.S.C. § 605(e)(3); 18 U.S.C. § 2511(a).

However not having a "commercial account" (whatever that is) is not an element of a violation of 47 U.S.C. § 605(a). What this section proscribes is for a "person" to "divulge or publish" a communication "*except through authorized channels of transmission or reception.*" This nothing to do with "accounts," be they commercial, residential, industrial, findable or unfindable. [6] Whether or not "an account" exists is irrelevant to liability under 47 U.S.C. § 605(a), especially as it must be "strictly construed." All that is relevant is whether the "*channels of transmission or reception*" were authorized.

Here, MCI's "channels of reception" were DirecTV receivers – receivers that DirecTV owned, installed and most importantly, *authorized* when MCI opened its restaurants. (ECF 105-6, Ex. 6, Spencer Dep. At p. 21:10 – 24:17, 26:21-24; 68:18-69:4); (ECF 101-3, p.15, Ex 3, Mader Depo., p:61:6-17). In fact, DirecTV is the *only one* able to authorize or de-authorize receivers; it is the *only* one with the technical ability to transmit a code via its satellite to a particular receiver having a specified serial number. (ECF 105-6, Ex. 6, Spencer Dep. At p. 21:10 – 24:17, 26:21-24; 68:18-69:4). This is not a case where DirecTV alleges that someone "hacked" into an unauthorized DirecTV receiver purchased at a yard sale and configured it to decrypt DirecTV programming. From 2009 – 2014, MCI paid DirecTV about $9,000 for it to supply it with authorized DirecTV receivers. (ECF 105-1, p. 5, Ex. 1, W. Spina Decl., ¶ 14-15).

---

[6] At the risk of digressing from the real issue of whether MCI's DirecTV receivers were authorized channels of reception, Mr. Mader's allegation that the supposed search by some unidentified person did not find a "commercial *account*" cannot be construed to allege that DirecTV did not have *an agreement* with any defendant by which it authorized the receipt and display of its programming. Mr. Mader was DirecTV's 30(b)(6) representative, and Topic 8 was "The agreements you claim to have with the defendants." (ECF 105-10, p. 3, Ex. 10 DirecTV Notice of Depo., at p. 3) When asked about agreements, he testified that he never "attempt[ed] to educate [himself] as to whether or not there were any agreements between any defendant and DirecTV," and that he did not know if any agreements existed. (ECF 101-3, Ex.4,, Mader Depo at p. 109:19-22, p. 139:3-140:1). Moreover, Mr. Mader even testified that DirecTV's systems used to track information about its subscribers "has mistaken information in it." (ECF 101-3, Ex. 4, Mader Depo at p. 56:9-57:3).

Not only has DirecTV failed to prove that MCI used an "*un*authorized channels or reception, the evidence compels but one conclusion – that MCI used only *authorized* DirecTV receivers, that is, "authorized channels of reception," to receive DirecTV communications.   There were DirecTV receivers that *DirecTV exclusively* has the ability to authorize or un-authorize by (ECF 105-6, p. 7, Ex. 6, Spencer Dep. At p.23:18 – 24:17).

Because DirecTV's evidence does not show that MCI ever used an "*un*authorized channel of reception" to receive DirecTV communications on the afternoons of June 3 and 4, 2014, DirecTV's motion for summary judgment should be denied.  And because MCI's summary judgment evidence shows that it used only "authorized channels of reception," its cross-motion for summary judgment on Count I should be granted.

### 2.   DirecTV is not "Any Person Aggrieved."

#### a)   **Only a Person "Aggrieved" Has a Private Right of Action under 47 U.S.C. § 605(e)(3)(C)**

For DirecTV's  Count I - Violation of Communications Policy Act [47 U.S.C. § 605(e)(3)(C)], DirecTV's summary judgment motion should be denied, and MCI's cross-motion should be granted, because it is undisputed that DirecTV is "any person aggrieved."

A private cause of action under 47 U.S.C. § 605 is only available to "any person aggrieved by any violation of subsection (a)."[7] 47 U.S.C. § 605(d)(6) does not *completely* define "any person aggrieved," but lists two categories of "persons" that are included by default; persons with "proprietary rights" and certain equipment manufacturers :

the term "any person aggrieved" shall include *any person with proprietary rights in the intercepted communication* by wire or radio, including wholesale or retail distributors of

_____

[7] 47 U.S.C. § 605(e)(3)(A) ("*Any person aggrieved* by any violation of subsection (a) . . . may bring a civil action.")

satellite cable programming, and, *in the case of a violation of paragraph (4) of subsection (e) of this section, shall also include any person engaged in the lawful manufacture, distribution, or sale of equipment necessary to authorize or receive satellite cable programming.*

### b) DirecTV Does Not Even Allege that it has been "Aggrieved."

DirecTV's summary judgment motion does not argue that it falls within either "default" definition, *i.e.*, that it has "proprietary rights in the intercepted communication" or that MCI violated "paragraph (4)," which relates to distribution of devices for "the unauthorized decryption of satellite cable." In fact, DirecTV's Memorandum does not include the words "aggrieved" or "proprietary" *at all*.

Because DirecTV's summary judgment evidence does not establish that it is "a person aggrieved," DirecTV's motion for summary judgment must be denied.

### c) Because There is No Evidence that DirecTV is "Aggrieved" MCI is Entitled to Summary Judgment on its Cross-Motion Under Count I.

Moreover, MCI's cross-motion for summary on Count I should be granted because DirecTV cannot proffer evidence that it is "aggrieved." (*Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)* (To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial); *See also*, *Omega US Ins., Inc. v. D&S Indy, Inc*. 1:11-cv-00355-JMS-TAB (S.D. Ind., Aug. 21, 2012).

Even though DirecTV bears the burden of proof, MCI's evidence shows that DirecTV is not "aggrieved." DirecTV received about $9,000 in exchange for giving MCI access to its authorized DirecTV receivers from June 2009 – June 2014. (ECF 105-1, p. 5, Ex. 1 W. Spina Decl., ¶ 15). It even paid Crag Spencer a commission for establishing the account, and the monthly "residual" payments for each month MCI's account was active. (ECF 105-6, Ex. 6, Spencer Dep. at p. 11:8-12:9; p. 71:16-72:14). If DirecTV was not making money off of MCI, it

would not have paid Spencer a commission and residuals.  Because DirecTV got everything it

asked for, it has not been "aggrieved."  Thus, DirecTV is not entitled to assert a private cause of

action under   47 U.S.C. § 605(e)(3)(A),   so MCI is entitled to cross-summary judgment on

DirecTV's Count I.

### D.     MCI is Entitled to Summary Judgment on DirecTV's Count II - Violation of 18 U.S.C. §2511.

#### 1.    There was no "Interception."

MCI is entitled to cross-motion for summary judgment on DirecTV's Count II - Violation

of 18 U.S.C. §2511 for essentially the same reasons as Count I.  Count II requires an

"interception" of an "electronic communication," but no "interception" occurred because MCI

had an active DirecTV subscription on June 3 and 4, 2014.

#### 2.    No Defendant Acted "Intentionally."

In addition, 18 U.S.C. §2511(1) [8] only imposes liability to only persons that

"intentionally" intercept.  Here, even if there was an "interception," (and there was not) it was

not an *intentional* interception because each Defendant believed the DirecTV subscription

allowed it to receive DirecTV communications. (ECF105-1, p. 4, Ex. 1 W. Spina Decl. ¶ 14;

ECF 105-2, Ex. 2, V. Spina Decl., ¶ 3).

#### 3.    Because DirecTV's Programming is "Readily Accessible to the General Public," 18 U.S.C. §2511(2)(g) Bars Liability for Interception.

18 U.S.C. §2511(2)(g) [9] states that there is no interception liability for any

communication "made through an electronic communication system that is configured that such

---

[8] "(1) Except as otherwise specifically provided in this chapter any person who—
(a) intentionally intercepts, endeavors to intercept . . ."
[9] "(g) It shall not be unlawful under this chapter or chapter 121 of this title for any person—

electronic communication is *readily accessible to the general public*."  Here, DirecTV has made

its programming "readily accessible to the general public" by, for example, entering into

agreements that allow is programming to be "accessible to the general public," such as by

anyone at the Denver International Airport. [ECF105-9, Ex. 9, DirecTV Press Release re: Denver

International Airport]. The Denver airport is "public," and any of the travelers passing through

the airport "would have been able to see DirecTV programming at the airport" because they

would be "legitimate viewers."  (ECF 101-3, p. 37, Ex. 3, Mader Depo. at p. 152:7 -153:16 ).

As a result, 18 U.S.C. §2511(2)(g) provides any interception that may have occurred

would "not be unlawful."  This deprive DirecTV of a private cause of action under 18 U.S.C.

2520(a), because it only allows such actions for interceptions "in violation of this chapter."[10]

### E.    MCI is Entitled to Summary Judgment on DirecTV's Claims to the Extent They Seek to Recover for Damages to Injury to its Reputation, Goodwill, Proprietary Rights or Privacy Rights.

DirecTV's Complaint and Amended Complaint allege injury to its reputation, goodwill,

proprietary rights.  Its answers to interrogatories further state that that the damages it seeks to

recover include those arising out of injury to its reputation and goodwill and contractual privacy

rights it has from a "private viewing" clause it has with its other subscribers.  (ECF 105-5, Ex. 5

–DirecTV Answers to Interrogatory Nos. 19-21).

To the extent DirecTV asserts some sort of claim to recover such damages, MCI is

entitled to summary judgment thereon.  DirecTV did not identify a legal theory that would entitle

---

(i) *to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public;*"

[10] "(a)In General.—

Except as provided in section 2511(2)(ii), **any person whose** wire, oral, or electronic **communication is intercepted**, disclosed, or intentionally used **in violation of this chapter** may in a civil action recover . . ."

it to recover such damages in its <u>Statement of Claims</u>  [ECF 76], which in any event, was not

timely filed.

**F.      Victor Spina and William Spina are Not "Vicariously Liable."**

Victor Spina, Jr. and William Spina should not be found to be "vicariously liable"

because there is no underlying liability of MCI as explained above.  However, there are

additional reasons why they are not "vicariously liable."

1.      <u>DirecTV's Failure to Identify a "Vicarious Liability" Claim in its Statement of Claims Bars its Attempt to Assert it Now.</u>

Section II.D of the Case Management Plan states:

> **Within 14 days after the non-expert discovery deadline**, and consistent with the certification provisions of Fed. R. Civ. Proc. 11(b) the party with the burden of proof **shall file a statement of the claims** or **defenses it intends to prove at trial, stating specifically the legal theories upon which the claims** or defenses **are based**.  [ECF 30, p. 2]

The discovery deadline was December 15, 2015, making the Statement of Claims due

December 29, 2015.  DirecTV missed this deadline by one day.  [ECF 76].  Regardless, its

<u>Statement of Claims</u> did not identify any "vicarious liability" "legal theory," so it may not assert

it now.  The CMP stated "Failure to comply with an Order of the Court may result in sanctions

for contempt, or as provided under Rule 16(f), to and including dismissal or default."  [ECF 30,

at p. 13].  Accordingly, if the Court does not dismiss DirecTV's claims in their entirety for

failing to timely file a Statement of Claims, it should at least find that DirecTV waived any

theory predicated on "vicarious liability" by failing to include this theory in its Statement.

2.      <u>47 U.S.C. § 605(e)(3) Does Not Allow "Vicarious Liability."</u>

Even if the Court overlooks DirecTV's failure to include a "vicarious liability" theory in

its late-filed Statement of Claims, 47 U.S.C. § 605(e)(3) does not provide for "vicarious

liability." Because it is "a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity." *United States v. Enmons*, 410 U.S. 396, 411 (1973).

DirecTV argues that *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.* 443 F.2d 1159 (2d Cir. 1971) permits a finding of "vicarious liability." However, *Gershwin Publishing Corp.* is a *copyright* infringement case, not one arising under 47 U.S.C. § 605, which this court is required to "strictly construe." Vicarious infringement is a form of secondary liability for direct infringement based on the common law principle of *respondeat superior*. While it has been held to be applicable to copyright or trademark infringement claims,[11] it has never been found to be applicable to claims under 47 U.S.C. § 605(e)(3) by any precedential court.

DirecTV also cites *J & J Sports Productions, Inc. v. Ribeiro*, 562 F.Supp.2d 498 (S.D.N.Y., 2008) for the proposition that vicarious liability may be imposed "for violations of §§ 553 and 605." However, case is not precedential, nor does DirecTV assert in this case a claim under § 553, which relates to interception of *cable* service. *J & J Sports* was an entry on a motion for default judgment, in which the plaintiff's counsel was Lonstein Law Offices, DirecTV's counsel here. Except for rulings on default judgments filed by Lonstein Law Offices, MCI has been unable to find *any* case imposing vicarious liability for a violation of 47 U.S.C. § 605(e)(3). To the contrary, contested cases hold that vicarious liability is *not* available for claims under this section. *Joe Hand Promotions, Inc. v. Sharp*, 885 F.Supp.2d 953, 959 (D. Minn., 2012) (Rejecting application of "vicarious liability" to 47 U.S.C. § 605, although permitting "piercing the corporate veil" liability; "The Court agrees with Defendant Sharp that

---

[11] See, e.g., *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143 (C.A.7 1992).

Plaintiff must pierce the corporate veil in order to hold him liable for the corporation's alleged violation of 47 U.S.C. § 605 or 47 U.S.C. § 553.).

Accordingly, Victor Spina, Jr. and William Spina are entitled to summary judgment to the extent DirecTV seeks to hold them "vicariously liable."

## VIII.   CONCLUSION

For the reasons stated above, DirecTV's summary judgment Motion should be denied, and MCI's cross-motion should be granted.

Respectfully Submitted,

By:     s/Paul B. Overhauser
        Paul B. Overhauser
**OVERHAUSER LAW OFFICES LLC**
740 W. Green Meadows Dr., Suite 300
Greenfield, IN  46140-4019
Phone: 317-467-9100
poverhauser@overhauser.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing is being filed electronically via the Court's ECF system and that all parties hereto will be served through such system.

By:     s/Paul B. Overhauser
        Paul B. Overhauser

**Mader Deposition Excerpt**

This last Page of the Mader Deposition was inadvertently omitted from filing ECF 105-3, but is replicated here:



DIRECTV, LLC v. Spina, et al.

Kent Mader
December 15, 2015

**Page 153**

1     programming?
2        MR. LONSTEIN: Objection to form. If
3     you know.
4 A.   I don't know.
5 Q.   You don't know. So it's possible that all of
6     those travelers could be intercepting DIRECTV
7     signals when they see the programming at the
8     airport?
9        MR. LONSTEIN: Objection to form.
10 A.   No. I just -- as I indicated before, I get
11     confused about the word "authorized." I would
12     say that they're legitimate viewers, based on
13     what this document says, is we have some sort of
14     agreement between DIRECTV and the Denver
15     International Airport and their audience that
16     passes through that airport.
17 Q.   And their audience is the public, right?
18 A.   It's the public that has travel documents that
19     allow them to pass through the Denver
20     International Airport.
21 Q.   And other members of the public, right?
22        MR. LONSTEIN: Objection to form.
23        MR. OVERHAUSER: I have no further
24     questions at this time.
25        MR. LONSTEIN: Counsel, I defer to your

**Page 154**

1     local wisdom, knowledge.
2        MR. SMITH: Well, given the fact that
3     the attorney who represents DIRECTV in my lawsuit
4     is not present, I'm a little uncomfortable asking
5     questions of this witness. So I would suggest
6     that if we need to ask questions of this witness
7     that we will contact you and hopefully you remake
8     him available in our lawsuit, or the lawyer who
9     is representing DIRECTV in our lawsuit will agree
10    to make him available.
11        MR. LONSTEIN: I certainly think that
12    that's a sound position because it's beyond my
13    issues in the federal court case anyway, and
14    unfortunately, the circumstances were a little
15    bit short notice so we can't do that.
16      From the perspective of Plaintiff, we don't
17    have any redirect questions of Mr. Mader. So
18    thank you very much --
19        MS. DeVORE: Owners --
20        MR. LONSTEIN: -- at this time.
21        MS. DeVORE: I'm sorry. Owners would
22    just join in with the same circumstances as the
23    state lawsuit --
24        MR. LONSTEIN: And --
25        MS. DeVORE: -- as stated.

**Page 155**

1        MR. LONSTEIN: -- I just want to put on
2    the record that to the extent that any
3    information was mentioned in this deposition or
4    any documents shared, that we not disseminate it
5    to any third parties until such time as the
6    appropriate protective orders are in place for
7    all parties to the litigation.
8        MR. SMITH: That is agreeable with us.
9        MR. OVERHAUSER: For the record --
10        MS. DeVORE: And with us.
11        MR. OVERHAUSER: -- do you claim that
12    any documents that have been made an exhibit are
13    confidential?
14        MR. LONSTEIN: I don't know. And I
15    don't know whether testimony -- there are legal
16    considerations I can't answer to at this point,
17    so I don't want to waive any possible rights or
18    privileges that my client may have with respect
19    to any testimony or documents. I think the sound
20    thing is to make sure that's in place and that
21    we're all comfortable, including your clients.
22        MR. OVERHAUSER: Thank you.
23        MR. LONSTEIN: Thank you very much.
24        (Proceedings conclude at 1:07 p.m.)
25

**Page 156**

1   AND FURTHER THE WITNESS SAITH NOT.
2
3

     _____
4
5          KENT MADER
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Min-U-Script®

SMITH REPORTING
www.smithreporting.net

(39) Pages 153 - 156