Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| G&G Closed-Circuit Events, LLC, | ) | |
|     Plaintiff, | ) | Case No. 14-CV-02073 |
|         v. | ) | Judge Joan Gottschall |
| Jaime F. Castillo, Maria A. Castillo and El Bajio Enterprises, Inc. | ) ) | Magistrate Jeffrey Cole |
|     Defendants. _____ | | |
| Jaime F. Castillo, Maria Castillo and El Bajio Enterprises, Inc., on behalf of themselves and others similarly situated, | ) ) ) | |
|     Counter-Plaintiffs, | ) | |
|         v. | ) | |
| G&G Closed-Circuit Events, LLC, | ) | |
|     Counter-Defendant. _____ | ) | |
| Jaime F. Castillo, Maria Castillo and El Bajio Enterprises, Inc., on behalf of themselves and others similarly situated, | ) ) ) | |
|     Third-Party Plaintiffs, | ) | |
|         v. | ) | |
| DirecTV International, Inc. a Delaware Corporation; DIRECTV, LLC, a California LLC; and the DirecTV Group, Inc., a Delaware Corporation, | ) ) ) | |
|     Third-Party Defendants. _____ | | |
| Jaime F. Castillo, Maria Castillo and El Bajio Enterprises, Inc., on behalf of themselves and others similarly situated, | ) ) ) | |
|     Third-Party Plaintiffs, | ) | |
|         v. | ) | |
| Law Offices of Thomas P. Riley, a California Professional Corporation, | ) ) | |
|     Third-Party Defendant. | ) | |

**FIRST AMENDED CLASS ACTION THIRD-PARTY COMPLAINT AGAINST DIRECTV**
_____

NOW COME Third-Party Plaintiffs Jaime Castillo, Maria Castillo and El Bajio Enterprises, on behalf of themselves and a class of Illinois consumers subject to this Third-Party Defendant's practices, by and through counsel, and hereby asserts the following claims as to Third-Party Defendant DirecTV:

**JURISDICTION**

1. Jurisdiction is conferred by 28 U.S.C. § 1367.

2. This Court has personal jurisdiction over the parties in that most if not all of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

**VENUE**

3. Venue is proper under 28 U.S.C. § 1367 and 28 U.S.C. § 1391(b) in that most if not all of the events or omissions giving rise to the claim occurred in the Northern District of Illinois and these Defendants, in whole or in part, may be found and/or transact business in this District.

**PARTIES**

4. Jaime Castillo is an individual Illinois consumer residing and doing business in Chicago, Illinois. Jaime and his wife, Maria own and operate El Bajio Enterprises, Inc., d/b/a La Pena.

5. Maria Castillo is an individual Illinois consumer residing and doing business in Chicago, Illinois. Maria and her husband, Jaime, own and operate El Bajio Enterprises, Inc., d/b/a La Pena.

6. El Bajio Enterprises, Inc. is an Illinois Corporation d/b/a La Pena Restaurante in Chicago, Illinois.

7. DirecTV International is a Delaware corporation that maintains its principal places of business in Long Beach, California and New York, New York.

8. DirecTV, LLC is a California LLC with offices in El Segundo California and an Illinois service agent in Chicago, Illinois.

9. The DirecTV Group, Inc. is a Delaware Corporation that maintains its principle place of business in El Segundo California and an Illinois service agent in Chicago, Illinois.

**STATEMENT OF FACTS**

10. Sometime prior to November 2011, a male Latino, speaking Spanish, solicited Jaime Castillo about setting up DirecTV in his commercial establishment, La Pena.

11. Jaime agreed to the installation, and set up a time for the DirecTV representative to come to the restaurant to complete the project.

12 The DirecTV representative Jaime had spoken to did not do the actual installation; rather, one of his agents came sometime after the initial meeting, but sometime before the end of November, 2011, to complete the transaction. The agent did not say anything about a difference between a "residential" or "commercial" account.

13. The DirecTV representative's agent was only provided access to the commercial establishment for the installation, hooked up the necessary equipment, and set up the account.

14. There is no possible way the DirecTV representative's agent could confuse the restaurant for a residential dwelling.

15. The DirecTV representative's agent told Jaime that the FEIN # he had provided was "not working," and asked for Jaime's personal information to open the account.

16. Jaime thought nothing of the request, and allowed the DirecTV representative to set up the account using his social security number and the contact information listed on his driver's license.

17. Jaime did not know, and had no reason or suspect, that the DirecTV representative had created a residential and not a commercial account.[1]

18. Upon information and belief, all third-party installers are required to sign a provider agreement that requires them to report any commercial establishment that requests a residential account.

19. Upon information and belief, no report of such a request was made in this case.

20. Jaime was never provided a contract or other agreement that informed him of the residential nature of the account.

21. Because the DirecTV representative had requested Jaime's personal, and not business information, the account was set to draw from Jaime's personal checking account.

22. Jaime had no reason to suspect, and indeed did not learn that he had a residential account until obtaining non-party discovery from DirecTV over a year after he was sued by boxing promotion company G&G.

23. Jaime never requested or wished to pay for any special programming other than sports channels, but was sometimes offered promotion packages for agreeing to longer contract terms or offered bundled packages that would include promotions for channels like Starz, Showtime and HBO.

---

[1] Many other consumers had no reason to suspect they had been provided with a residential account until they, too, were sued. (See affidavits attached hereto as Group Exhibit 1.)

4

24. The catch was that if Jaime did not cancel the programming before the promotion ended, he was billed for those "promo" channels.

25. When Jaime did order special programming, it often came with channels he did not want or need, and since he rarely checked the bills, he often would not realize that he had been paying for programming he did not order for several months.

26. Upon information and belief, on or about March 30, 2013 Jaime ordered an upgraded receiver, and that receiver came with significant extra "bundled" promotional programming that Jaime did not need, want or order, which included Starz, Showtime, HBO and Encore.

27. At some point prior to April 20, 2013, G&G Closed-Circuit Events, LLC ("G&G") alleges to have contracted with Showtime for the commercial television distribution rights to the *Austin Trout v. Saul Alverez* fight (hereinafter "the Fight").

28. Upon information and belief, G&G required all commercial programmers to pay a licensing fee for the Fight, but Showtime broadcast the Fight without additional charge to all residential consumers who had Showtime as part of their cable and/or satellite package.

29. Prior to an event for which G&G claims to have commercial distribution rights, G&G's attorney, Third-Party Defendant Law Offices of Thomas P. Riley ("Riley"), enlists hundreds of auditors/investigators across the country to go in search of purported violators of G&G's alleged licensing rights on the night a fight is shown.

30. These auditors/investigators are only paid for "hits," i.e. evidence against an alleged pirate, providing a tempting reason to lie and exaggerate in their affidavits and/or mislead unsuspecting consumers. Said another way, the investigator/auditor is only paid if s/he

provides Riley with purported evidence that can be used to threaten the consumer/alleged pirate.

31. This fee arrangement encourages these auditors/investigators to exaggerate and/or lie in the form affidavits they complete for the sake of getting paid, and to utilize methods like asking business owners/consumers who may not realize they have a residential account to turn to the Fight, knowing or unknowingly entrapping the consumer.

32. Sometime prior to April 2013, Riley contracted with Larry Biela and Associates, a licensed private detective agency in Chicago, Illinois.

33. Biela subcontracted auditor/investigator work to Aaron Lockner ("Lockner"), one of his employees.

34. On April 20, 2013 Third-Party Plaintiffs/Illinois consumers Jaime and Maria Castillo were working at La Pena.

35. Like most Saturday nights, La Pena had live music provided by Umbral from around 7 p.m. until 10:00 or 10:30 p.m., and then a DJ that played music for dancing.

36. The crowd at La Pena is largely Latino, and comes for the authentic Ecuadorian food and Latino music.

37. Jaime was bartending when an unfamiliar patron now believed to be Lockner, asked Jaime if he could put "the fight"[2] on.

38. Jaime had no idea what Lockner was talking about, as he had never shown a boxing match at the establishment, and asked Lockner which channel he wanted.

---

[2] *Saul Alvarez v. Austin Trout* shown April 20, 2013 is referred to herein as "the Fight."

39. Lockner gave Jaime the channel as a number value, and Showtime, the channel showing the Fight, appeared without any type of pay screen or special notice. Jaime left the fight on because Lockner had requested it, but did not turn the volume on because there was music playing.

40. La Pena had never shown a boxing match prior to the night of April 20, 2013 when Jaime did so only at Lockner's request. La Pena has not shown a boxing match since the night of April 20, 2013.

41. Upon information and belief, Showtime broadcast the Fight without additional charge to all residential consumers who had Showtime as part of their cable and/or satellite package.

42. Riley's agent Lockner was only able to trick Jaime into turning on the Fight, and the Fight was only visible in La Pena because DirecTV had intentionally set up an improper residential account in a commercial establishment.

43. Lockner did not disclose in his affidavit that he was the patron who requested that the Fight be turned on; he lied about the number of televisions showing the Fight; and he exaggerated both the occupancy of the establishment and the number of patrons in the establishment at the time of his visit.

44. In May of 2013, prior to learning of the instant claims by G&G, Jaime contacted DirecTV to discuss "canceling premiums" because he was interested in more and better sports programming.

7

45. Because Jaime was still under contract, and DirecTV was requesting a large contract cancellation fee to cancel the existing account, Jaime kept the old account and signed on for a second account to get the programming he wanted.

46. DirecTV did not provide Jaime with a contract or other agreement that informed him of the residential or commercial nature of the new account.

47. Jaime continued to pay under both accounts until October of 2015.

48. In July of 2013, Jaime learned that G&G was demanding $20,000 in alleged damages resulting from his having agreed to Lockner's request to turn on the Fight. G&G subsequently sued Defendants for $300,000. (See Dockets Nos. 1, 2.)

49. After learning in the summer of 2015 that a possible explanation for his legal difficulties with G&G was that he had been provided a residential account instead of a commercial account, Jaime tried to obtain contract documents from DirecTV.

50. DirecTV refused to provide anything other than recent billing statements.

51. Instead, Jaime's counsel had to subpoena DirecTV, and then file a motion to compel to obtain documents to verify the residential and commercial nature of these accounts.

52. If these Counter-Plaintiffs had not been busted by this boxing promotion Plaintiff, there is a good chance they would have been shaken down by DirecTV using a similar scam as described below.

53. In 2010, DirecTV signed a consent decree with 48 Attorneys General, and paid $13.5 million in damages. As part of that decree, DirecTV was permanently enjoined from a number of practices, including but not limited to the following:

> *DIRECTV shall Clearly and Conspicuously disclose any and all material terms or conditions of an offer to sell or lease any DIRECTV Goods and/or DIRECTV Services.*

*DirecTV shall require its Third-Party Retailers to comply with the provisions of this Judgment, including all Advertising and sales disclosures required by this Judgment. If DIRECTV learns that any of its Third-Party Retailers are conducting any activities, directly or through another person, that violate the terms of this Judgment, DIRECTV shall take appropriate action against such Third-Party Retailers.*

*DIRECTV shall reasonably monitor sales activities of Third-Party Retailers in relation to DIRECTV Goods and/or DIRECTV Services, and shall reasonably investigate written customer complaints related to such activities that it receives directly from the Better Business Bureau, any regulatory agencies, or law enforcement entities.[3]*

54. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers have been, and continue to be, provided with residential accounts in commercial establishments.

55. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers are not provided the contract documents that set forth the material terms and conditions of their agreements.

56. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers have been and continue to be provided "promotions" without adequate information about those promotions or notice of the promotions' end.

57. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers are provided improper installation practices from third-party installers whose work is not properly overseen by DirecTV.

---

[3] See Illinois Consent Decree, Exhibit 2.

58. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers have difficulty obtaining even the most basic information about their accounts from DirecTV.

59. Despite the existence of these Consent Decree provisions, Jaime Castillo and hundreds if not thousands of Illinois consumers incur damages at the hands of DirecTV and/or a boxing promotion company due to threats of litigation and damages, prior to any monitoring or investigation of the third-party installation practices at issue in the Consent Decree.

60. Rather, DirecTV knows and has known that its installers often provide small businesses, particularly minority-owned businesses, with improper accounts. Instead of working to address that issue, DirecTV has made a cottage industry of entrapping and extorting money from consumers in Illinois and all over the country by sending "auditors/investigators" out to "catch" these unsuspecting consumers, just like the boxing promotion companies are doing.[4]

---

[4] These Third-Party Plaintiffs lack standing to allege claims on behalf of the class of individuals who have been damaged by DirecTV's operation of a scam similar to that operated by DirecTV and its attorneys, the same attorney who used to represent the boxing promotion companies. (See Docket No. 82.) Julie Lonstein, as legal agent for DirecTV, hires Signal Auditing to send auditors/investigators to find consumers she believes may have been given residential and not commercial programming. These auditors/investigators then fill out a form affidavit. Attorney Lonstein, prior to conducting any form of the investigation outlined and seemingly required under the Consent Decree, then sends threatening form letters to these Illinois consumers, sometimes including the form affidavit, but usually only including grainy and blurry photos from the establishment, requesting significant sums of money for alleged violation of "the Communications Act," or 47 U.S.C. § 5553 and/or § 605. Attorney Lonstein never informs these consumers of the existence of or their rights under the Consent Decree, their right to file a consumer complaint, or any of their possible defenses under the statutes. (See Rivera Declaration, part of Group Exhibit 1.)

61. DirecTV sets up an unknown number of minority-owned businesses with residential programming in commercial establishments each year, implicating the concern of thousands of Illinois consumers subjected to the unfair and deceptive business practices described in detail herein.

62. DirecTV and its agent/installers' actions implicate consumer protection concerns because hundreds, if not thousands, of Illinois consumers are being subjected to the unfair and misleading business practices described herein, causing damage to these consumers.

**COUNT I**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 505/1 et seq.**
**Unfair Practice under Section 2**
**(pled on behalf of these Counter-Plaintiffs**
**and a class of similarly situated Illinois consumers)**

63. Third-Party Plaintiffs incorporate all prior paragraphs 1 – 62 of their Class Third-Party Complaint as though fully set forth herein.

64. Counter-Plaintiffs Jaime Castillo, Maria Castillo and El Bajio enterprises are "consumers" under the Act.

65. Counter-Defendant DirecTV's actions, through its agents/installers, implicate consumer protection concerns because hundreds, if not thousands, of Illinois consumers are being subjected to the unfair and misleading business practices described herein.

66. Third-Party Defendants have engaged in and continue to engage in unfair practices akin to entrapment.

67. Third-Party Defendants have engaged in and continue to engage in an unfair practice by disregarding the terms of the Consent Decree signed by DirecTV and 48 Attorneys General, including Illinois as follows:

      (a) Third-Party Defendants have engaged in and continue to engage in an unfair practice by providing residential accounts to commercial establishments;

      (b) Third-Party Defendants have engaged in and continue to engage in an unfair practice by failing to provide contracts and documents that set forth the material terms and conditions of their agreements;

      (c) Third-Party Defendants have engaged in and continue to engage in an unfair practice by providing "promotions" without adequate information about those promotions or notice of the promotions' end;

      (d)    Third-Party Defendants have engaged in and continue to engage in an unfair practice by failing to monitor the work of their third-party installers.

      (e)    Third-Party Defendants have engaged in and continue to engage in an unfair practice by failing to provide their customers even basic information about their own accounts.

68.    Third-Party Defendants undertake these practices with the specific and unlawful intent that these Third-Party Plaintiffs, and scores of Illinois consumers like them, not question, but instead submit to the unfair and deceptive business practices described above.

69.    Third-Party Defendants' unfair practices occurred within the course of trade or commerce, and implicate the protection concerns for these Third-Party Plaintiffs and other Illinois consumers who are being subjected to these unfair practices.

70.    The practices of Third-Party Defendants alleged hereto offend the public policy of the State of Illinois.

71. The practices of Third-Party Defendants alleged hereto are immoral, unethical, oppressive, and/or unscrupulous.

72. The practices of Third-Party Defendants alleged hereto have caused, and continue to cause, substantial injury to a significant number of Illinois consumers.

73. Third-Party Plaintiffs, and scores of Illinois consumers like them, have suffered actual damages including, but not limited to, out-of-pocket expenses and attorneys' fees, and in many cases, have incurred actual damages by paying monies directly to Plaintiff/Counter-Defendant.

74. Third-Party Plaintiffs' damages, and damages suffered by other Illinois consumers, are all proximately caused by these Third-Party Defendants' unfair practices.

75. The practices of Counter-Defendant DirecTV, through its agents/installers, constitute outrageous conduct under the Act, both because Counter-Defendant DirecTV's motive is extortion (evil) and also because Counter-Defendant DirecTV's acts and the acts of its agents show a reckless disregard of the rights of hundreds, if not thousands, of Illinois consumers.

WHEREFORE, Third-Party Plaintiffs respectfully request that this Court award damages resulting from these violations as follows:

(a) compensatory damages for themselves and a class of equally damaged Illinois consumers in an amount to be determined at trial;

(b) punitive damages for themselves and a class of equally damaged Illinois consumers in an amount to be determined at trial;

    (c)        all costs and attorney's fees; for themselves and a class of equally damaged Illinois consumers;

    (d)        any additional amounts the Court deems just and reasonable.

### JURY DEMANDED FOR THIRD-PARTY COMPLAINT

Respectfully submitted:

| | |
|---|---|
| /s/ Lisa L. Clay | /s/ Patrick W. Walsh |
| Lisa L. Clay | Patrick W. Walsh |
| Attorney at Law | Attorney at Law |
| 345 N. Canal Street, Suite C202 | 625 Plainfield Road, Suite 330 |
| Chicago, IL 60606 | Willowbrook, IL 60527 |
| 312.753.5302 | 630-794-0300 |
| lclayaal@gmail.com | Patrick@pwalsh.com |

### CERTIFICATE OF SERVICE

Patrick W. Walsh and Lisa L. Clay, both attorneys, certify on May 11, 2016 they served a copy of the foregoing *First Amended Class Action Third-Party Complaint Against DirecTV*, by filing same via the ECF filing system, to the following:

| | |
|---|---|
| Andre Ordeanu | Daniel Rubinstein |
| andre@zanesmith.com | drubenstein@winston.com |
| | |
| Zane Smith | William O'Neil |
| zane@zanesmith.com | woneil@winston.com |
| | |
| Archia A. Parasharami | Matthew David Provance |
| aparasharami@mayerbrown.com | mprovance@mayerbrown.com |

We also certify that we arranged for a courtesy copy of same to be delivered to chambers of District Judge Joan B. Gottschall pursuant to applicable local rule.

    /s/ Patrick W. Walsh                                  /s/ Lisa L.Clay